Reed R. Kathrein (139304)
Danielle Smith (291237)
Lucas E. Gilmore (250893)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 202
Berkeley, CA  94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
reed@hbsslaw.com
danielles@hbsslaw.com
lucasg@hbsslaw.com

*Attorneys for Lead Plaintiff Lawrence Gallagher*
*[Additional counsel listed on signature page]*

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK DALPOGGETTO, Individually and On Behalf Of All Other Similarly Situated<br><br>                              Plaintiff,<br><br>     v.<br><br>WIRECARD AG, MARKUS BRAUN, BURKHARD LEY, ALEXANDER VON KNOOP, JAN MARSALEK, and SUSANNE STEIDL,<br>                              Defendants. | Case No.  2:19-cv-00986-FMO-SK<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

FIRST AMENDED CLASS ACTION COMPLAINT

1

**TABLE OF CONTENTS**

2

3

I.    NATURE OF THE ACTION ................................................................ 1

II.   JURISDICTION AND VENUE .......................................................... 3

III.  PARTIES ............................................................................................. 5

      A.   Plaintiff ..................................................................................... 5

      B.   Defendant Wirecard and Its Business ...................................... 7

      C.   Individual Defendants ............................................................ 10

      D.   Relevant Non-Parties ............................................................. 12

IV.   WIRECARD SECURITIES AT ISSUE ........................................... 12

      A.   Securities Granting Ownership Interests in Common Stock Issued and Authorized for Sale by Wirecard ......................... 12

      B.   Establishment of and Trading in Wirecard ADSs ................. 15

           1.   Nature of an ADS ......................................................... 15

           2.   Establishment of the WCAGY ADS Program ............ 17

           3.   Wirecard's Consent to Sale of WCAGY .................... 21

      C.   The OTC Market .................................................................... 25

V.    FACTUAL ALLEGATIONS ............................................................ 30

      A.   Background Regarding International Financial Reporting Standards ("IFRS") ............................................................... 30

      B.   Background Regarding Wirecard's Growth and History ...... 32

      C.   Whistleblowers Spark Further Probes into Wirecard's Fraudulent Accounting by *The Financial Times*; Criminal Probe Launched .......... 34

           1.   Rajah & Tann ("R&T") Inquiry .................................. 34

           2.   Wirecard Denounces Without Basis ............................. 35

VI.   SUBSTANTIVE ALLEGATIONS ................................................... 37

      A.   *The Financial Times* Uncovers Massive Wirecard's Fraudulent Accounting Scheme ............................................ 37

-i-

1                1.     Significant Outstanding Debts from Phantom Companies.......... 38

2                2.     Improper Recognition of Receivables ........................................ 41

3                3.     A Senior Executive and an M&A Manager at Wirecard Discuss Evading Auditors ........................................................................ 42

VII.   MATERIALLY FALSE AND MISLEADING STATEMENTS .................... 44

VIII.  APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE ............................................................................... 57

IX.    LOSS CAUSATION & DAMAGES ................................................... 60

       A.    WCAGY and WRCDF Trade at the Same Price as WDI in Germany.. 62

       B.    Investors Were Harmed When the Risks and Information Concealed by Defendants' Fraud Were Revealed ........................ 63

X.     PLAINTIFF'S CLASS ACTION ALLEGATIONS ....................................... 65

XI.    CLAIMS FOR RELIEF ................................................................ 68

XII.   PRAYER FOR RELIEF ............................................................... 72

XIII.  DEMAND FOR TRIAL BY JURY ................................................. 73

FIRST AMENDED CLASS ACTION COMPLAINT

# GLOSSARY OF DEFINED TERMS

The following short forms and citations are used herein:

| TERM | DEFINITION |
|---|---|
| "ADS" | American Depositary Share |
| "ADR" | American Depositary Receipt[1] |
| "BNY" | The Bank of New York Mellon ("BNY") |
| "Citibank" | Citibank, N.A. |
| "Class Period" | April 7, 2016 through October 15, 2019, both dates inclusive |
| "Company" | Wirecard AG |
| "Depositary Banks" | Collectively, Citibank, BNY, and JPMorgan |
| "Ex. __" | Exhibits to the First Amended Class Action Complaint for Violation of the Federal Securities Laws, filed concurrently herewith |
| "Exchange Act" | Securities Exchange Act of 1934 |
| "FT" | *The Financial Times* |
| "IFRS" | International Financial Reporting Standards |
| "JPMorgan" | JPMorgan Chase Bank, N.A. ("JPMorgan ") |
| "GAAP" | Generally accepted accounting principles |
| "OTC" | Over-the-Counter |
| "OTC Markets Group" | OTC Markets Group Inc. |
| "SEC" | United States Securities and Exchange Commission |
| "WDI" | Common stock issued by Wirecard |
| "Wirecard" | Wirecard AG |

---

[1] "ADRs" is used collectively to refer to both ADRs and ADSs.

FIRST AMENDED CLASS ACTION COMPLAINT

1

**EXHIBIT LIST**

2

| Exhibit | Description |
|---------|-------------|
| 1 | Form F-6 filed by Citibank, N.A., dated September 18, 2013 |
| 2 | Form F-6 filed by JPMorgan Chase Bank, N.A., dated February 1, 2016 |
| 3 | Form F-6 filed by The Bank of New York Mellon Corporation, dated October 2, 2019 |
| 4 | Form F-6 filed by JPMorgan Chase Bank, N.A., dated November 22, 2019 |
| 5 | SEC Office of Investor Education and Advocacy, Investor Bulletin: American Depositary Receipts (Aug. 2012) |
| 6 | December 8, 2016 Email from Alan White to Edo Kurniawan |
| 7 | Attachment to December 8, 2016 Email from Alan White to Edo Kurniawan, entitled, "WUKI Payplugger 2016 September.xlsx" |
| 8 | Attachment to December 8, 2016 Email from Alan White to Edo Kurniawan, entitled, "Report WCUK-Ireland 07-09.2016.xlsx" |
| 9 | July 24, 2017 Email from Kai Oliver Zitzmann to Edo Kurniawan |
| 10 | Excerpted Attachment to July 24, 2017 Email from Kai Oliver Zitzmann to Edo Kurniawan, entitled, "Übersicht Dritt-Acquirer 2017-06-30 Stand 20-07-2017 V1.xlsx". For reference, *The Financial Times* has identified terms in the spreadsheet as follows: Brottovolumen = gross volume; Netto Volumen = net volume; Umsatzerlöse = revenues; Materialaufwand = cost of materials; Ebitda-Effekt = Ebitda effect. |
| 11 | July 24, 2017 Email from Edo Kurniawan to Stephan von Erffa |
| 12 | Attachment to July 24, 2017 Email from Edo Kurniawan to Stephan von Erffa entitled, "Receivables Q2 2017.xlsx" |
| 13 | April 6, 2018 Email from Lars Rastede to Edo Kurniawan |
| 14 | Excerpted Attachment to April 6, 2018 Email from Lars Rastede to Edo Kurniawan entitled, "Monitoring Customer Relationships 31 12 2016.xlsx" |
| 15 | Excerpted Attachment to April 6, 2018 Email from Lars Rastede to Edo Kurniawan entitled, "Q4 2017 Monitoring CR intern"; |

-iv-

FIRST AMENDED CLASS ACTION COMPLAINT

| | | |
|---|---|---|
| | | Spreadsheet, Tab 3 ("2017 Al Alam"), displaying a year's worth of financial data for Al Alam's relationship with CardSystems. |
| | 16 | April 9, 2018 Email from Lars Rastede to Edo Kurniawan, copying Ron Franke and Steffen Elsner |
| | 17 | April 9, 2018 Email from Edo Kurniawan to Lars Rastede, reflecting Skype conversation between Edo Kurniawan and Lars Rastede |

FIRST AMENDED CLASS ACTION COMPLAINT

Lead Plaintiff Lawrence Gallagher ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Wirecard AG ("Wirecard" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      NATURE OF THE ACTION

1.      This is a federal securities class action seeking damages from Defendants Wirecard, Markus Braun, Burkhard Ley, Alexander von Knoop, Jan Marsalek, and Susanne Steidl for violations of the U.S. Securities Exchange Act of 1934 ("Exchange Act") in connection with transactions in: (i) Wirecard American Depositary Receipts ("ADRs") sold under the ticker symbol WCAGY on the Over-the-Counter ("OTC") Market in the United States; (ii) Wirecard common stock sold as foreign issue shares under the ticker symbol WRCDF on the OTC Market in the United States; and (iii)

-1-

Wirecard common stock sold under the ticker symbol WDI on the Frankfurter Wertpapierbörse ("FWB" OR "Frankfurt Stock Exchange"), Börse Stuttgart, and Tradegate Exchange stock exchanges in Germany.

2.      The claims alleged herein are brought on behalf of a class (the "Class"), consisting of (i) all persons and entities other than Defendants who purchased shares of WCAGY and WRCDF on the OTC Market between April 7, 2016 through October 15, 2019, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

3.      This case arises from Wirecard's deliberate use of improper accounting to conceal a concerted effort to fraudulently inflate sales and profits at Wirecard businesses in Dubai, Ireland, and elsewhere, as well as to mislead Ernst & Young ("EY"), Wirecard's auditor. Wirecard exploded in value over the past decade, growing to a market capitalisation greater than Deutsche Bank, by presenting itself as a fast-growing fintech champion with an ever-increasing global network.

4.      The Company's accounting fraud was orchestrated at the highest levels of the Company by its senior executives and was uncovered by a series of investigations by *The Financial Times* ("*The Financial Times*" or "FT") that took place beginning in 2015, culminating in October 2019 with a series of whistleblower-provided internal

FIRST AMENDED CLASS ACTION COMPLAINT

Company spreadsheets and correspondence published that revealed numerous instances of deliberate violations of International Financial Reporting Standards ("IFRS") and generally accepted accounting principles ("GAAP") carried out at the direction or with the knowledge and approval of Wirecard's most senior executives.[2]

5.     Currently, the Company is facing an ongoing criminal inquiry in Singapore into its accounting at several subsidiaries in Asia and the Pacific, as well as a special audit by KPMG announced in November 2019. The KPMG audit is scheduled to be completed and made public at some point in March 2020, after the date of this complaint.[3] The Company's Chairman, who resisted calls for an independent audit, resigned suddenly in January 2020.[4]

## II.     JURISDICTION AND VENUE

The Exchange Act claims asserted herein are asserted on behalf of purchasers of WCAGY and WRCDF shares in the United States and arise under §§ 10(b) and 20(a)

---

[2] Dan McCrum, *Wirecard's suspect accounting practices revealed*, The Financial Times (Oct. 14, 2019), https://www.ft.com/content/19c6be2a-ee67-11e9-bfa4-b25f11f42901 (last visited Feb. 12, 2020).

[3] Olaf Storbeck and Dan McCrum, *KPMG widens review of Wirecard accounting*, The Financial Times (Nov. 6, 2019), https://www.ft.com/content/e132cb98-0073-11ea-b7bc-f3fa4e77dd47 (last visited Feb. 12, 2020).

[4] Paul J. Davies, *Wirecard Chairman Steps Down From Embattled Payments Giant*, The Wall Street Journal (Jan. 12, 2020, 1:32 PM), https://www.wsj.com/articles/wirecard-chairman-steps-down-from-embattled-payments-giant-11578768359 (last visited Feb. 12, 2020).

-3-

FIRST AMENDED CLASS ACTION COMPLAINT

of the Exchange Act (15 U.S.C. §§ 78j(b) and § 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

6.      This Court has jurisdiction over the subject matter of the Exchange Act claims under 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

7.      Wirecard is subject to personal jurisdiction in the United States and in this District because, as alleged in further detail below, Wirecard: (i) engaged in the fraudulent scheme and course of conduct described herein, including by engaging in fraud that arose from transactions and occurrences that took place in and caused foreseeable losses in the United States and this District; (ii) permitted and encouraged Wirecard's stock to be traded OTC in the U.S. to grow its American shareholder base; (iii) took further advantage of the benefits and protections of U.S. law by utilizing SEC Rule 12g3-2(b), which exempted Wirecard from registration under Exchange Act Section 12(g) so long as the Company, *inter alia*, electronically published reports made in its home country, including relevant annual reports, shareholder communications and other financial reports; (iv) issued false and/or misleading statements in connection with its Rule 12g3-2(b) exemption; and (v) marketed Wirecard's securities in the U.S. with the benefits and protections of this nation's securities laws. Individual Defendants Braun, Ley, Knoop, Marsalek, and Steidl are subject to personal jurisdiction in this Court because they are or were control persons of Wirecard.

-4-

FIRST AMENDED CLASS ACTION COMPLAINT

8.     Venue is proper in this judicial district pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) and (c)(3) as the Company's business has an effect in this District, and because some of the fraudulent acts alleged misstatements alleged herein occurred or were related to transactions and occurrences that occurred in the United States and caused economic harm in the United States, including in this District.

9.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III.     PARTIES

### A.     Plaintiff

10.     Plaintiff purchased the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure. Plaintiff purchased 877 shares of WCAGY and 144 shares of WRCDF through transactions on the OTC Market in the United States from September 26, 2017 to August 29, 2018, thereby acquiring an ownership interest in 582.5 shares of WDI common stock issued and authorized for sale by Wirecard. His PSLRA certification was previously filed with the Court and is incorporated by reference.

11.     The WCAGY ADRs reflecting Plaintiff's purchases and his beneficial ownership of the underlying WDI shares were issued by one of three Depository

-5-

FIRST AMENDED CLASS ACTION COMPLAINT

Banks, each located in New York City, within the United States. Contemporaneous with Plaintiff's purchase and issuance of the ADR, the 582.5 shares of WDI common stock in which he acquired an ownership interest were deposited with the applicable Depository Bank, which held the shares for the benefit of Plaintiff.

12.     Plaintiff incurred irrevocable liability in the United States to purchase the WCAGY and WRCDF shares he acquired during the Class Period. The placement of the buy order, the payment of the purchase price, transfer of the title to the securities, and other related transactions took place within the territorial jurisdiction of the United States:

a)      Plaintiff initiated the purchase of WCAGY and WRCDF by placing the buy order through Plaintiff's broker, Fidelity, based in Boston, Massachusetts;

b)      Plaintiff purchased WCAGY and WRCDF on the OTC Market using a trading platform based in the United States;

c)      On information and belief based on the facts about the OTC Market alleged herein, the purchase order and trade confirmation were routed through servers located wholly within the United States;

d)      The WCAGY ADRs reflecting Plaintiff's purchase and his ownership interest in the underlying WDI shares was issued by Citibank, JPMorgan, or BNY from their depository bank office in New York;

-6-

FIRST AMENDED CLASS ACTION COMPLAINT

e)     Plaintiff's purchases of WCAGY and WRCDF were settled on September 28, 2017, October 16, 2017, and August 31, 2018 through payments totaling $111,201.74 (including commission) in U.S. dollars disbursed from his personal bank account maintained by Excite Credit Union in San Jose, California; and

f)     As required by the ADR agreements filed with the SEC by Citibank, JPMorgan, and BNY (*see infra* § IV.B.2), a transfer of title establishing Plaintiff's beneficial ownership of WCAGY and WRCDF and the Wirecard shares on deposit on his behalf was recorded on the transfer books of the Depository Bank maintained in New York.

**B.     Defendant Wirecard and Its Business**

13.     Defendant Wirecard, a technology company, purports to provide outsourcing and white label solutions for electronic payment transactions worldwide. The Company is headquartered in Aschheim, Germany. Wirecard securities trade OTC under the ticker symbols "WCAGY" and "WRCDF," and in various Germany-based stock exchanges under the ticker symbol "WDI."

14.     The Company claims it was founded in 1999, but it barely survived the dotcom crash. In 2002, CEO Markus Braun took over and injected the Company with cash. Three years later, in 2005, Wirecard began publicly trading on the stock market through the reverse takeover of a defunct call-center business.

FIRST AMENDED CLASS ACTION COMPLAINT

15.     Wirecard operates its business through a worldwide network of subsidiaries and affiliated companies whose activities and financial data were misleadingly represented by the Company's top executives during the Class Period, as described below. During the Class Period, Wirecard treated its subsidiaries and business units as mere instrumentalities of itself, ordering them to improperly recognize assets in order to meet profit and valuation expectations that Wirecard had established even knowing the targets could not be attained without falsifying financial results. Wirecard used the phrase "Wirecard Group" throughout its public reports and filings to refer to Wirecard and its consolidated subsidiaries.

16.     The Company regularly communicates with investors through the periodic publication of English-language quarterly and annual reports, and in press releases, conference calls, and investor and analyst presentations. During the Class Period, Wirecard maintained an English-language corporate website at http://www.wirecard.com, on which it established an Investor Relations section where its quarterly and annual reports, press releases, conference call transcripts, corporate profiles, descriptions of its business, and other information about the Company is made available to investors. Wirecard's annual and quarterly reports included detailed financial information presenting data in both Euros and U.S. currency.

17.     On an ongoing basis and for each fiscal year, Wirecard published on its Internet website English-language versions of its annual and quarterly reports,

FIRST AMENDED CLASS ACTION COMPLAINT

earnings and other press releases, investor presentations, governance and business policies, and other information reflecting the Company's results of operations or financial condition, changes in business, acquisitions or dispositions of assets, changes in management or control, and other information required to maintain compliance with SEC Rule 12g3-2(b), 17 C.F.R. § 240.12g3-2(b) (*see* ¶¶ 7, 43, 46, 55).

18.    According to the Company's 2018 Annual Report, the Company employs at least 100 employees in its United States-based subsidiary, Wirecard North America, Inc. The Company's 2018 Annual Report also states that in June 2016, Wirecard acquired Citi Prepaid Card Services, a business that "has already issued more than 2,500 card programmes for large international companies, primarily on the North American market."[5]

19.    Wirecard maintained a substantial presence in the United States through its business activities, operations, and corporate representatives in the United States. During the Class Period, Wirecard's Wirecard North America, Inc. was a corporation organized under U.S. law with its headquarters in Pennsylvania. Wirecard North America, Inc. is a subsidiary of Wirecard, with all of its equity effectively held by Wirecard.

_____

[5] *Transition to Tomorrow: Annual Report 2018*, Wirecard, https://ir.wirecard.com/download/companies/wirecard/Annual%20Reports/DE0007472060-JA-2018-EQ-E-01.pdf (last visited Feb. 14, 2020).

-9-

**FIRST AMENDED CLASS ACTION COMPLAINT**

## C.     Individual Defendants

20.     Defendant Markus Braun ("Braun") has served as the Company's Chief Executive Officer ("CEO") since 2002. Braun is a member of the Company's Management Board.

21.     Defendant Burkhard Ley ("Ley") served as the Company's Chief Financial Officer ("CFO") from the beginning of the Class Period until December 31, 2017. Ley served as a member of the Company's Management Board.

22.     Defendant Alexander von Knoop ("Knoop") has served as the Company's CFO since January 1, 2018. Knoop is a member of the Company's Management Board.

23.     Defendant Jan Marsalek ("Marsalek") has served as the Company's Chief Operating Officer ("COO") and a member of the Company's Management Board since February 2010.

24.     Defendant Susanne Steidl ("Steidl") serves on the Company's Management Board and as Chief Product Officer ("CPO"), effective January 1, 2018.

25.     Defendants Braun, Ley, Knoop, Marsalek, and Steidl are herein referred to as "Individual Defendants."

26.     Each of the Individual Defendants:

a)     directly participated in the management of the Company;

b)     was directly involved in the day-to-day operations of the Company at the highest levels;

-10-

**FIRST AMENDED CLASS ACTION COMPLAINT**

c)      was privy to confidential proprietary information concerning the Company and its business and operations;

d)      was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

e)      was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

f)      was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

g)      approved or ratified these statements in violation of the federal securities laws.

27.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

28.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

29.     The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

-11-

**D.     Relevant Non-Parties**

30.     Edo Kurniawan ("Kurniawan") is Wirecard's former head of international finance, reporting to Stephan von Erffa, Deputy CFO. He oversaw the accounts for Wirecard's various businesses in Asia and the Pacific from Singapore. Kurniawan is now a suspect in a probe by Singapore police into potential accounting fraud and money laundering at several Wirecard subsidiaries in the region.

31.     Kai Oliver Zitzmann ("Zitzmann") was Wirecard's head of corporate accounting and international reporting.

32.     Lars Rastede ("Rastede") was a manager of Mergers and Acquisitions within Wirecard's German finance team.

33.     Alan White ("White") was a Finance and Administration Director at Wirecard UK and Ireland Limited.

## IV.     WIRECARD SECURITIES AT ISSUE

34.     Each of the Class members acquired beneficial ownership interests in Wirecard through the purchase of one or more of the following securities: WDI, WRCDF and/or WCAGY (all as further described and defined below).

**A.     Securities Granting Ownership Interests in Common Stock Issued and Authorized for Sale by Wirecard**

35.     Wirecard's common stock is publicly traded on the Frankfurt Stock Exchange, Börse Stuttgart, and Tradegate Exchange stock exchanges in Germany under the ticker symbol "WDI."

-12-

**FIRST AMENDED CLASS ACTION COMPLAINT**

36.     Wirecard common stock is also sold in the United States as "F-shares" under the ticker "WRCDF." An F-share is a foreign security denominated in U.S. currency, and traded on the U.S. OTC Market based in New York. One share of WRCDF represents ownership of one share of Wirecard common stock sold under the ticker symbol WDI in Germany. An F-share is established in the U.S. when a broker-dealer files with the Financial Industry Regulatory Authority ("FINRA") to create a ticker symbol in order to facilitate reporting trades in the U.S. in the company's security. OTC Markets Group, Inc., the operator of the OTC Markets, identifies WRCDF as "Ordinary Shares" on its website.[6]

37.     Wirecard common stock is also packaged and sold on the OTC Markets in the United States under the ticker symbol "WCAGY." WCAGY is an American Depositary Receipt ("ADR") reflecting ownership of shares of WDI common stock that have been deposited with or are otherwise controlled by a depositary institution in the United States and held for the benefit of the WCAGY purchaser. One share of WCAGY conferred on Class Period purchasers a beneficial ownership interest in 0.5 shares of Wirecard WDI common stock that had been authorized for sale by Wirecard. OTC Markets Group identifies WCAGY as an ADR on its website.[7]

---

[6] *See* Wirecard Overview, OTC Markets, https://www.otcmarkets.com/stock/WRCDF/overview (last visited Feb. 13, 2020).

[7] *See* Wirecard Filings and Disclosure, OTC Markets, https://www.otcmarkets.com/stock/WCAGY/disclosure (last visited Feb.13, 2020).

-13-

**FIRST AMENDED CLASS ACTION COMPLAINT**

38.     Purchasers of WCAGY and WRCDF shares on the OTC Markets become irrevocably liable to purchase the shares at the stated price at the time their purchase order is placed.

39.     As of the first day of the Class Period, Wirecard had issued and authorized the sale of more than 100 million shares of common stock.[8]

40.     Only shares of common stock that had been issued and authorized by Wirecard were available to be sold as ADSs or F-shares in the United States under the ticker symbols WRCDF and WCAGY (*see infra* § IV.B.).

41.     Both WRCDF and WCAGY shares are bought and sold at market prices that are set to equal the trading price of WDI on the Frankfurt Stock Exchange, Börse Stuttgart, and Tradegate Exchange stock exchanges at the time of the transaction, converted to U.S. dollars at the then-current foreign currency exchange rate (USD to Euros). Thus, events that impact the trading price of WDI shares on the Frankfurt Stock Exchange, Börse Stuttgart, and Tradegate Exchange stock exchanges have a contemporaneous impact on the trading price of WRCDF and WCAGY shares sold on the OTC Markets in the United States.

---

[8] *See Connected Commerce: Annual Report 2016*, Wirecard, https://ir.wirecard.com/download/companies/wirecard/Annual%20Reports/DE0007472060-JA-2016-EQ-E-03.pdf (last visited Feb. 14, 2020).

-14-

**FIRST AMENDED CLASS ACTION COMPLAINT**

**B.    Establishment of and Trading in Wirecard ADSs**

**1.    Nature of an ADS**

42.    The sale of ADSs was authorized by Congress in 1927, as a way to permit American investors to diversify their portfolios by acquiring shares of foreign companies without the necessity of purchasing those shares on foreign exchanges using foreign currency. The SEC has explained that "ADRs allow U.S. investors to invest in non-U.S. companies and give non-U.S. companies easier access to the U.S. capital markets."[9]

43.    WCAGY and other ADSs are sold in the United States pursuant to regulations adopted by the SEC, including SEC Rule 12g3-2(b), 17 C.F.R. § 240.12g3-2(b).

44.    The purchase of an ADS is equivalent to the purchase of the underlying foreign securities (here, WDI shares issued by Wirecard) which are held by the depositary banks for the benefit of the purchasers of the ADR (here, WCAGY). As explained by the SEC:

> An ADR is a negotiable certificate that evidences an ownership interest in American Depositary Shares ("ADSs") which, in turn, represent an interest in the shares of a non-U.S. company that have been deposited with a U.S. bank. It is similar to a stock certificate representing shares of stock. The terms ADR and ADS are often used interchangeably by market participants. ADRs trade in U.S. dollars and clear

---

[9] Ex. 5, SEC Office of Investor Education and Advocacy, Investor Bulletin: American Depositary Receipts (Aug. 2012) at 1 ("SEC ADR Bulletin").

-15-

**FIRST AMENDED CLASS ACTION COMPLAINT**

through U.S. settlement systems, allowing ADR holders to avoid having to transact in a foreign currency.

SEC ADR Bulletin at 1.

45.     Thus, ADSs, including WCAGY, are securities that represent specific shares of common stock of foreign issuers that have been deposited with a U.S. bank. This method of sale of foreign shares in the United States has historically been referred to in the industry as a "hat check" model, because an ADR is akin to the receipt provided to a customer who left his hat for safekeeping at the door of a nightclub or restaurant. The hat, in turn, is akin to the foreign shares, which is the article that the customer (investor) has purchased and deposited for safekeeping.

46.     SEC regulations, including SEC Rule 12g3-2(b), require depositary institutions to acquire and hold shares of foreign securities in an amount equal to the number of those shares sold as ADSs in the United States, based on the ratio of foreign-to-domestic shares stated in the ADR.[10] The underlying shares of common stock must be deposited with the depositary institution by the time the ADR transaction is cleared, thereby removing them from the market until the ADR is cancelled or sold. Thus, the number of foreign shares that can be sold as ADSs in the United States is limited by the number of shares that have been issued and authorized

---

[10] For example, during the Class Period WCAGY ADRs were issued at a ratio of .5 foreign shares (WDI) for each ADS. Thus, for every 1 million shares of WCAGY sold, the depositary banks were required to hold 500,000 shares of WDI for the benefit of the purchasers.

-16-

**FIRST AMENDED CLASS ACTION COMPLAINT**

for sale by the foreign issuer. An ADS program has no ability to expand ownership interests in the foreign issuer beyond the limits established by that issuer (*see infra* § IV.B.2.).

47.     ADSs may be either "sponsored" or "unsponsored." Sponsored ADSs are established pursuant to a contract signed by the foreign issuer. Unsponsored ADSs are established by one or more depositary banks by filing a Form F-6 with the SEC. Unsponsored ADSs may only be established where, *inter alia*: (i) no sponsored ADS program exists; (ii) the foreign issuer is listed on a regulated foreign exchange; (iii) the foreign issuer provides regular financial reports and other investor information in English, and on a website that is generally available to U.S. investors; and (iv) the holder of the ADS is entitled to receive the corresponding deposited shares issued by the foreign company on demand at any time.

48.     Unsponsored ADSs are not sold without the express or implied consent of the foreign issuer. As described in more detail below, each of the depositary institutions involved in the sale of unsponsored ADSs has a regular practice of contacting foreign issuers before an unsponsored program is established, and will generally not establish or sell unsponsored ADSs where the foreign issuer refuses to consent.

2.      **Establishment of the WCAGY ADS Program**

49.     WCAGY is an unsponsored ADS.

-17-

**FIRST AMENDED CLASS ACTION COMPLAINT**

50.     WCAGY shares are denominated in U.S. dollars, cleared through U.S. settlement systems, and listed alongside U.S. stocks.

51.     Three depositary institutions have filed Forms F-6 with the SEC to register and issue WCAGY ADRs in the United States: Citibank, N.A. ("Citibank") (filed Sept. 18, 2013); The Bank of New York Mellon ("BNY") (filed Oct. 2, 2019); and JPMorgan Chase Bank, N.A. ("JPMorgan ") (filed Nov. 22, 2019).[11] Exs. 1-4.

52.     The number of WCAGY shares that are available for sale in the United States is limited by the number of WDI shares that have been issued and authorized for sale by Wirecard, as explained above. Depositary banks are prohibited from selling WCAGY shares that are not supported by underlying shares of WDI stock deposited and held by the depositary. Thus, as with ADSs generally, the Depositary Banks here have no ability to create or issue additional securities or shares of Wirecard beyond the number of WDI shares that have been specifically issued and authorized for sale by the Company.

53.     The Forms F-6 filed by each of the Depositary Banks identify the location of its depository as a physical address in New York City, New York, within the territory of the United States.

---

[11] Citibank, BNY, and JPMorgan are collectively referred to herein as the "Depositary Banks."

**FIRST AMENDED CLASS ACTION COMPLAINT**

54.     Each Form F-6 includes a form of agreement between the Depositary Bank and the holders of WCAGY shares (a "Form of ADR"). Each such agreement filed by the Depositary Banks states that it is to be interpreted under the laws of New York, within the United States.

55.     Each Form of ADR contains terms:

a)      with the bank for the benefit of the purchaser;

b)      obligating the bank to hold the deposited WDI shares for the benefit of the purchaser;

c)      requiring the bank to deliver the WDI shares to the WCAGY purchaser immediately upon tender of their ADR to the bank;

d)      affirming that Wirecard publishes financial and other information required by SEC Rule 12g3-2(b) in English on a website generally available to the public;

e)      undertaking to maintain transfer books at the bank's New York City office that list the owners of the ADRs to record transfers of title in those books upon the purchase or sale of an ADR, and to make those books available for inspection during regular business hours;

f)      obligating the bank to distribute dividends and other distributions of cash or rights associated with the WDI shares to the WCAGY purchaser on whose behalf those shares are being held; and

-19-

**FIRST AMENDED CLASS ACTION COMPLAINT**

g)      providing for the reimbursement of certain expenses and fees that may be charged by the bank for its custodial and other services provided under the agreement.

56.     Purchasers of WCAGY have the right under the Form of ADR filed by the Depositary Banks to tender their ADSs to the Depositary Bank and receive the underlying WDI shares in return. The Forms of ADR attached to the Forms F-6 filed by each of the Depositary Banks require that, to obtain their underlying WDI shares, purchasers must tender their receipt evidencing the purchase of ADSs (i.e., their ADR), at the Depositary Bank's office in New York.

57.     Each Form of ADR attached to the Forms F-6 filed by the Depositary Banks contains the following clause, or a substantially identical clause:

> Until the surrender of this Receipt in accordance with the terms hereof, the Depositary or its agent will keep a register for the registration and registration of transfers of Receipts and where the Holders of Receipts may, during regular business hours, inspect the transfer books or the list of Holders of Receipts as maintained by the Depositary. The transfer of this Receipt is registrable on the transfer books of the Depositary by the Holder hereof in person or by duly authorized attorney, upon surrender of this Receipt properly endorsed for transfer or accompanied by proper instruments of transfer and payment of funds sufficient to pay the fees and expenses of the Depositary and any applicable taxes and other governmental charges and upon compliance with such regulations, if any, as the Depositary may establish for such purpose.

58.     Consistent with the economic reality of the transaction, the Form of ADR filed with the SEC by each of the Depositary Banks reflects that purchasers are being

-20-

FIRST AMENDED CLASS ACTION COMPLAINT

provided with a receipt reflecting their purchase and ownership of shares of common stock – i.e., WDI – that have been authorized and issued by Wirecard. *See* Ex. 1 (Form F-6, at Exhibit (a)) (Citibank Form of ADR "Evidencing **American Depositary Shares Representing Shares of Common Stock of Wirecard AG**"); Ex. 3 (Form F-6 Exhibit 1) (BNY Form of ADR "Statement of Terms and Conditions with Respect To **American Depositary Shares Representing Common Stock of Wirecard AG**"); Exs. 2 (Form F-6, at Exhibit (a)); Ex. 4 (Form F-6, at Exhibit (a)) (JPMorgan Forms of ADR "Evidencing **American Depositary Shares Representing Ordinary Shares of Wirecard AG**").

### 3. Wirecard's Consent to Sale of WCAGY

59. It is a regular practice and custom in the industry for a depositary institution to notify the foreign issuer of securities of its intent to register those securities for sale as unsponsored ADSs in the United States, and to obtain its affirmative or implied consent to the sale of those securities before an unsponsored ADS is sold. If a foreign issuer refuses to consent or otherwise objects to the establishment of an unsponsored ADS program, a depositary institution ordinarily will not proceed to register or sell those shares as unsponsored ADSs.

60. For example, in a regulatory comment letter sent to the SEC on April 21, 2008 addressing the question of whether proposed regulations should require formal consent from foreign issuers before an unsponsored ADS program is established, Deutsche Bank, one of the primary ADR depository banks in the U.S., asserted that

-21-

such a requirement was unnecessary because: "in practice depositary banks obtain the issuer's consent before establishing an unsponsored ADR program." The bank further explained:

> In our experience, foreign issuers are often willing to allow a depositary bank to establish an unsponsored ADR program but are reluctant to memorialize this in writing. We believe that, given the adequacy of the current environment of self-regulation, the protection provided issuers by the ability to affirmatively object to the establishment of an unsponsored ADR program and the benefit provided to U.S. investors by **unsponsored ADR programs, consent should be implied by a lack of affirmative objection by the issuer**.

61.     Other commentators who regularly advise entities involved in ADR transactions have made similar observations. In an October 2008 article discussing the SEC's adoption of regulations permitting the sale of unsponsored ADSs, the law firm of Paul, Weiss noted, for example, that a "depositary typically requests a letter of non-objection from the issuer before establishing an unsponsored program."[12] Similar observations were made in articles by other law firms regularly involved in advising ADR issuers and investors following the Ninth Circuit's decision in this action.[13]

---

[12] Paul, Weiss, Rifind, Wharton & Garrison LLP, *SEC Amends Form F-6, which has Implications for Foreign Private Issuers that do not have ADR Programs* (October 2008), https://www.paulweiss.com/media/1053659/3nov08-f-6.pdf.

[13] *See* Linklaters, *Ninth Circuit Holds that Rule 10b-5 Could Apply to Unsponsored ADRs Traded Over the Counter* (Aug. 3, 2018) https://www.lexology.com/library/detail.aspx?g=6f9186bf-77e5-4bf0-a772-7ede4a9628dd (last visited February 14, 2020) ("Although an unsponsored facility may be established without the consent of the issuer, the depositary will typically request a letter of non-objection from the issuer before establishing the program in

-22-

62.    Based on the foregoing information and belief, one or more of the Depositary Banks, consistent with their business practices and the custom in the industry, contacted Wirecard before the WCAGY ADS program was established and before any WCAGY shares were registered or sold in the United States. On the same information and belief, during those contacts the Depositary Banks: (i) provided Wirecard with an opportunity to object to and prevent the establishment of such program; (ii) obtained a letter of non-objection or other evidence of consent from Wirecard; and/or (iii) took other actions intended to obtain Wirecard's consent to the sale of unsponsored ADSs in the United States or from which such consent could reasonably be implied.

63.    Wirecard either provided its affirmative consent to the sale of its WDI shares as ADSs in the United States or its consent may be implied under the circumstances.

64.    Wirecard did not make any affirmative objection to, or take any other action reasonably calculated to prevent, the sale of its common stock as unsponsored ADSs in the United States, despite having been provided with an opportunity to do so.

order to maintain a good relationship with the issuer."); Sullivan & Cromwell, *Ninth Circuit Holds that Non-U.S. Issuers Can Be Liable in U.S. for Unsponsored American Depositary Receipt Facility* (July 30, 2018) at 2, https://www.sullcrom.com/files/upload/SC-Publication-Ninth-Circuit-Upholds-Lawsuit-Over-Unsponsored-American-Depositary-Receipts.pdf (last accessed February 14, 2020) ("depositary banks frequently seek letters of non-objection from the non-U.S. issuer before establishing an unsponsored ADR facility").

-23-

**FIRST AMENDED CLASS ACTION COMPLAINT**

65.     WCAGY would not have been offered for sale in the United States absent Wirecard's affirmative or implied consent to the sale of unsponsored ADSs in the United States.

66.     The following facts lend additional support for finding that Wirecard either affirmatively consented to or participated in the sale of its WDI stock or that such consent and participation may reasonably be implied from its actions.

a)     Wirecard published its quarterly and annual results in English, as required to support the sale of unsponsored ADSs in the United States. Had Wirecard not published that information in English, or ceased such publication, the sale of its WDI stock as ADSs would have been prohibited and Wirecard would have been required to register its common stock pursuant to § 12(g) of the Exchange Act, 15 U.S.C. § 78L(g).

b)     It is unlikely that the Depositary Banks or brokers assisting with transactions in WCAGY or WRCDF, individually or collectively, could have obtained a sufficient number of WDI shares to support sales of those securities without the participation, assistance or consent of Wirecard.

c)     The Depositary Banks' substantial holdings in Wirecard common stock also make it unlikely that they would have established an unsponsored ADS program for the sale of WCAGY shares without the consent, or over the objection, of Wirecard.

-24-

FIRST AMENDED CLASS ACTION COMPLAINT

## C.     The OTC Market

67.     WCAGY and WRCDF shares trade on the Pink market, which is part of the OTC Markets. The OTC Markets and the Pink market are both located in the United States, and are operated by OTC Markets Group, which is based in New York City.

68.     The OTC Markets are regulated by FINRA and the SEC.

69.     Trades on the OTC Markets are accomplished through the OTC Link Alternative Trading System ("ATS") registered with the SEC and regulated by both the SEC and FINRA. OTC Link ATS allows broker-dealers to quote any OTC equity security eligible for quoting under SEC Rule 15c2-11, 17 C.F.R. § 240.15c2-11. There are thousands of securities quoted on the OTC Link ATS. OTC Link ATS delivers trade messages electronically, allowing subscribers to execute, negotiate, or decline trade messages.

70.     The SEC maintains a website containing lists of alternative trading systems, which states: "An ATS is a trading system that meets the definition of 'exchange' under federal securities laws but is not required to register as a national securities exchange . . . ."[14] By rule, the SEC has exempted ATSs from the definition

---

[14] Alternative Trading System ("ATS") List, U.S. Securities and Exchange Commission, https://www.sec.gov/foia/docs/atslist.htm (last visited Feb. 13, 2020).

-25-

**FIRST AMENDED CLASS ACTION COMPLAINT**

of "exchange" only for the purpose of relieving ATSs from the requirement to register as a national exchange subject to § 6 of the Exchange Act, 15 U.S.C. § 78f.

71. In its 2018 annual report to investors, OTC Markets Group described OTC Link as follows:

> OTC Link ATS offers our broker-dealer subscribers a fully-attributable, network-based model for quoting and facilitating transactions in OTC equity securities and serves a diverse community of FINRA member broker-dealers that operate as market makers, agency brokers and ATSs, including Electronic Communication Networks ("ECNs"). OTC Link ATS provides a suite of quotation and trade-messaging services offering broker-dealers control of trades and choice of counterparties so they can efficiently provide best execution, attract order flow, and comply with FINRA and SEC regulations. Unlike traditional exchanges and matching engines, OTC Link ATS is not an intermediary. Rather, OTC Link ATS delivers trade messages electronically, allowing subscribers to execute or negotiate trades.

> OTC Link ECN functions as a matching engine and router for certain OTC securities. OTC Link ECN complements OTC Link ATS by providing FINRA registered broker-dealer subscribers with anonymous order matching functionality. OTC Link ECN acts as an agency intermediary in relation to all transactions executed on the ECN's platform. When orders do not match internally on OTC Link ECN's matching engine, they are routed to an interdealer quotation system where they may appear as quotes using the market participant identifier "OTCX".

> [...]

> OTC Markets Group Inc. ("OTC Markets Group" or the "Company") (OTCQX: OTCM) operates the OTCQX® Best Market; the OTCQB® Venture Market; and the Pink® Open Market for 10,000 U.S. and global securities. Through OTC Link® ATS and OTC Link ECN, each a Securities and

-26-

FIRST AMENDED CLASS ACTION COMPLAINT

Exchange Commission ("SEC") registered Alternative Trading System ("ATS") operated by the Company's wholly-owned subsidiary OTC Link LLC, a Financial Industry Regulatory Authority, Inc. ("FINRA") and SEC registered broker-dealer, the Company enables investors to easily trade through the broker of their choice and empowers companies to improve the quality and availability of information for their investors.

The Company has three business lines: OTC Link, Market Data Licensing and Corporate Services.

- OTC Link – OTC Link LLC operates two ATSs. OTC Link ATS and OTC Link ECN, which provide trading services to FINRA member broker-dealer subscribers.

- Market Data Licensing – OTC Markets Group provides real-time data, delayed and historical market data, company financial data, security master data, corporate reference data and compliance data for securities traded on the OTCQX, OTCQB and Pink markets. The Market Data Licensing business line provides investors, traders, institutions and regulators with a suite of enterprise and user market data licenses, offered via direct or extranet connectivity, through third party market data redistributors or Order Management Systems ("OMS").

- Corporate Services – OTC Markets Group operates the OTCQX Best Market and the OTCQB Venture Market and offers companies a suite of services that are designed to create a better informational experience for investors by facilitating public disclosure and communication with investors, promoting greater transparency and allowing companies to demonstrate regulatory compliance and mitigate market risk. These services include the OTC Disclosure & News Service, Real-Time Level 2 Quote Display and Blue Sky Monitoring Service.

-27-

010821-11/1240725 V1

72.     The OTC Link ATS permits subscribing broker-dealers to view and publish quotes and negotiate trades in Pink-listed securities, including WCAGY and WRCDF. OTC Link ATS is described on OTC Markets Group's website as an "electronic messaging system" where "[t]raders have direct access to send, execute, negotiate or decline trade messages with increased efficiency and speed."[15] OTC Link ATS is operated by OTC Link LLC, located in New York City.[16]

73.     Broker-dealers can access OTC Link though OTC Dealer, which OTC Markets Group describes as a "high-performance, real-time, front-end application [that] provides a consolidated quotation, trading and information system to attract and access market liquidity."[17]

74.     As of December 31, 2018, 91 broker-dealers subscribed to our OTC Link ATS.[18]

75.     All of the broker-dealers listed in the OTC Market Group's online directory of broker dealers are located in the United States.[19]

---

[15] OTC Link ATS Overview, OTC Markets, https://www.otcmarkets.com/otc-link/overview (last visited Feb. 13, 2020).

[16] OTC Markets Group Inc. 2018 Annual Report, https://backend.otcmarkets.com/otcapi/company/financial-report/213065/content (last visited Feb. 13, 2020).

[17] OTC Link ATS Overview, *supra* note 14.

[18] *Id.*

[19] Broker-Dealer Directory, OTC Markets, https://www.otcmarkets.com/otc-link/broker-dealer-directory (last visited Feb. 13, 2020).

-28-

FIRST AMENDED CLASS ACTION COMPLAINT

76.     According to the company profile posted by Bloomberg, "OTC Link serves clients in the United States."[20]

77.     Trades on the OTC Markets are arranged through the broker-dealers who have subscribed to OTC Link ATS. The broker-dealers may execute the trade internally or externally through market or limit offers posted on OTC Link ATS. Completed trades are reported, cleared and settled by the broker-dealers involved in the transaction. Trades on the OTC Markets are deemed complete upon the delivery of funds by the buyer and delivery of securities by the seller.

78.     FINRA members are prohibited from publishing quotations in any security unless the member is prepared to purchase or sell at the price quote and under the conditions stated at the time the offer is posted. FINRA, Rule 5220 (eff. Jul. 9, 2012) ("Rule 5220").[21] The OTC Markets Group further describes Rule 5220 on its website as follows: "Plain speak: Broker-dealers must honor their posted quotes."[22]

---

[20] OTC Link LLC Company Profile, Bloomberg, https://www.bloomberg.com/profile/company/0719514D:US (last visited Feb. 13, 2020).

[21] 5220. Offers at Stated Prices Rules & Guidance, Finra, https://www.finra.org/rules-guidance/rulebooks/finra-rules/5220 (last visited Feb. 13, 2020).

[22] Regulation Governing Trading in OTCQX, OTCQB and Pink Markets, OTC Markets, https://www.otcmarkets.com/learn/market-101/regulation (last visited Feb. 13, 2020).

FIRST AMENDED CLASS ACTION COMPLAINT

79.     Transactions in WCAGY and WRCDF were conducted via servers and facilities located wholly within the United States.

80.     According to OTC Markets Group's FY16, FY17 and FY18 annual reports, its operations during the Class Period were conducted from offices located in New York City and Washington D.C. According to OTC Markets Group's website, brokers access OTC Dealer and OTC Fix through one of five extranet providers in the United States: BT Radianz, TNS, Century Link, NYSE Technologies Connectivity Inc. (SFTI), or Options-IT.

81.     ADRs are issued and shares of Wirecard common stock (WDI) required to support the sale of WCAGY shares are maintained by depositaries located in New York, where transfers of interests in those securities are recorded.

82.     As a result of the foregoing, purchasers and sellers of and WRCDF incur irrevocable liability in the United States to complete transactions executed through the OTC Link ATS.

## V.     FACTUAL ALLEGATIONS

**A.     Background Regarding International Financial Reporting Standards ("IFRS")**

83.     At all relevant times, Wirecard was required to prepare and file its financial statements according to International Financial Reporting Standards. IFRS are accounting principles that are substantially similar to U.S. GAAP.

FIRST AMENDED CLASS ACTION COMPLAINT
010821-11/1240725 V1

84. IFRS 15 establishes the principles that an entity applies when reporting information about the nature, amount, timing and uncertainty of revenue and cash flows from a contract with a customer. Applying IFRS 15, an entity recognises revenue to depict the transfer of promised goods or services to the customer in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services.[23]

85. To recognise revenue under IFRS 15, an entity applies the following five steps:

(1) identify the contract(s) with a customer.

(2) identify the performance obligations in the contract. Performance obligations are promises in a contract to transfer to a customer goods or services that are distinct.

(3) determine the transaction price. The transaction price is the amount of consideration to which an entity expects to be entitled in exchange for transferring promised goods or services to a customer. If the consideration promised in a contract includes a variable amount, an entity must estimate the amount of consideration to which it expects to be entitled in exchange for transferring the promised goods or services to a customer.

---

[23] IRFS 15 Revenue from Contracts with Customers, IFRS Foundation, https://www.ifrs.org/issued-standards/list-of-standards/ifrs-15-revenue-from-contracts-with-customers/ (last visited Feb. 13, 2020).

-31-

**FIRST AMENDED CLASS ACTION COMPLAINT**

(4)     allocate the transaction price to each performance obligation on the basis of the relative stand-alone selling prices of each distinct good or service promised in the contract.

(5)     recognise revenue when a performance obligation is satisfied by transferring a promised good or service to a customer (which is when the customer obtains control of that good or service). A performance obligation may be satisfied at a point in time (typically for promises to transfer goods to a customer) or over time (typically for promises to transfer services to a customer). For a performance obligation satisfied over time, an entity would select an appropriate measure of progress to determine how much revenue should be recognised as the performance obligation is satisfied.[24]

**B.      Background Regarding Wirecard's Growth and History**

86.     In April 2015, *The Financial Times* began publishing a series of investigative articles on Wirecard. The first article, entitled "The House of Wirecard," scrutinized the Company's unusual M&A practices, such as its practice of purchasing portfolios of customer relationships, the unusual nature of the deals, and the swift rise in the Company's intangible assets.[25]

---

[24] *Id*.

[25] Dan McCrum, *The House of Wirecard,* Financial Times Alphaville (Apr. 27, 2015), *https*://ftalphaville.ft.com/2015/04/27/2127427/the-house-of-wirecard/.

**FIRST AMENDED CLASS ACTION COMPLAINT**

87.     According to *The Financial Times*, Wirecard has tended not to disclose who sells it these portfolios, and its Asian expansion included such deals wrapped up with purchases of obscure payments groups. The structure of some Wirecard transactions is also unusual, with purchases of portfolios of customer relationships disclosed only in Singapore corporate filings.

88.     For instance, *The Financial Times* reported that a €13m "pre-payment" sum paid out in October 2010 was only recorded in notes to the 2010 annual report, in contrast with the Company's typical practice of announcing such deals. The €13m sum was reported again in a table published two years later reclassifying €13m as "customer relationships". When asked, the Company explained that the prepayment was part of a deal announced 14 months later, in December 2011, to buy Singapore payments group Systems@Work. The pre-payment was not disclosed at the time, despite being a transaction described as comprising €34m in cash, €13m in future "earn-out" payments, and the assumption of €12m of liabilities.

89.     Moreover, when Wirecard buys a company, it must record the investment on its balance sheet. As *The Financial Times* reports, however, most of the value is typically ascribed to "customer relationships" an accounting convention to reflect the value of repeat customer business, an alternative to the intangible catchall "goodwill". Yet Wirecard treats customer relationships as real assets. The Company has a transaction based business model, so it says buying customers is a way to sell more

-33-

**FIRST AMENDED CLASS ACTION COMPLAINT**

payment services. In 2006, the Company paid €18m for a portfolio of customer relationships, then gave another €17m to the unnamed sellers a year later, saying profits were larger than expected. Occasional purchases of a similar size continued. The Company told *The Financial Times* a €15m pre-payment at the time of the Trans Infotech deal was for the purchase of customer relationships from a "sales partner", completed a year later.

**C.**     **Whistleblowers Spark Further Probes into Wirecard's Fraudulent Accounting by *The Financial Times*; Criminal Probe Launched**

90.     In 2018, alerted by whistleblowers, the Company's own compliance team started an investigation into suspicious transactions in Asia. Wirecard's head of international finance, based in Singapore, was accused by whistleblowers of cooking the books to boost the sales and profits for various entities in Asia and the Pacific.

**1.     Rajah & Tann ("R&T") Inquiry**

91.     In April 2018, Wirecard called in Rajah & Tann ("R&T"), a Singapore law firm, to conduct an inquiry.

92.     The lawyers found evidence of forged documents, accounting irregularities and potential money laundering in multiple jurisdictions, according to their preliminary report dated May 2018.

93.     A full investigation followed, but by the start of this year there were still no conclusions and individuals under suspicion remained in their jobs.

-34-

**FIRST AMENDED CLASS ACTION COMPLAINT**

94.     After *The Financial Times* reported the allegations in January, Singapore police raided Wirecard's offices in February, and prosecutors named six Singapore employees as suspects in a probe into alleged fraudulent accounting at six Wirecard subsidiaries, involving 11 external companies identified as "transactional partners".

95.     The FT reported that Wirecard's deputy chief financial officer and its head of Treasury approved four money transfers from Munich to Singapore, which appear designed to artificially inflate profits at a subsidiary in Hong Kong.

96.     On March 29 the FT reported finding that two Philippine payment processors, recorded as significant business partners in Wirecard's internal records, shared the office of a bus company. The contact address of a third was the family home of a retired seaman.

97.     In April, the FT reported the contribution to Wirecard's sales and profits from three companies, including a Dubai payment processor with skeletal operations. Internal documents indicated the three partners contributed half the group's revenues and 95 per cent of profits in 2016, for instance. Neither these figures nor the importance of the three partner companies was disclosed to shareholders.

**2.      Wirecard Denounces Without Basis**

98.     A Wirecard spokesperson denounced the first FT story as "false, inaccurate, misleading and defamatory." A January 31 statement said "no material compliance findings" resulted from the internal inquiry.

-35-

FIRST AMENDED CLASS ACTION COMPLAINT

99.    In February, Wirecard said neither it nor R&T had "made any conclusive findings of criminal misconduct" about the employees involved. Braun characterized the affair as a dispute between employees, and told investors the allegations were "unfounded, full stop".

100.    On March 26, however, Wirecard published its summary of findings made by R&T. The Company admitted some employees in Singapore may face criminal liability, that the law firm could not correlate certain payments with agreements, and there was evidence some contracts were created for audit purposes.

101.    R&T found executives in Germany faced no liability under Singapore law, according to Wirecard, which also said an accounting review by an unnamed "global independent consulting firm" concluded there was no material impact on its financial statements.

102.    Still, annual results were delayed for three weeks until April 25, when Wirecard announced a dozen measures to improve compliance, oversight and internal controls.

103.    While Wirecard also said the contribution to profits from three of its partner companies was "not significant", and was much less than the 95 per cent reported by the FT for 2016, it did not explain why figures cited by the FT, from a document created by Wirecard's head of accounting in Munich, should be disregarded.

-36-

FIRST AMENDED CLASS ACTION COMPLAINT

104.    The Company also disputed whistleblower claims, reported by the FT, that Wirecard's largest subsidiary by sales, based in Dubai, was not audited in 2016 and 2017. The figures were overseen by EY as part of the global audit, the company said. Wirecard also said it had disclosed some information about the subsidiary in German-language filings not prepared under international accounting standards.

105.    Still, today, the Company is under investigation, has not completed a special audit and the Chairman leading the charge to refute *The Financial Times* resigned only last month. The façade created to defend Wirecard is crumbling.

## VI.    SUBSTANTIVE ALLEGATIONS

A.    ***The Financial Times* Uncovers Massive Wirecard's Fraudulent Accounting Scheme**

106.    Through the investigation outlined above, as well as its continuing investigative efforts, *The Financial Times* engaged in conversations with and obtained multiple documents numerous Wirecard whistleblowers in multiple countries.

107.    Among the investigation's findings were the following:

-37-

FIRST AMENDED CLASS ACTION COMPLAINT

**1.    Significant Outstanding Debts from Phantom Companies**

108.    As detailed below, *The Financial Times* documents released in October 2019 revealed that the Company had substantial debts owed to Wirecard businesses by a dozen companies.[26]

| RECEIVABLES | Entity | Debtor | EUR as of 31 Mar 2017 | EUR as of 30 June 2017 | |
|---|---|---|---|---|---|
| | Hermes | Goomo | 3,569,886.96 | 3,569,886.96 | |
| | | Skilworth | 343,521.22 | 343,521.22 | |
| | | Pakfin | 7,000,000.00 | 7,000,000.00 | |
| | WDT GmbH | PayEasy | 123,125,047.88 | Q2 billing not yet done | |
| | | CAL | 3,198,246.20 | Q2 billing not yet done | |
| | | Allied Wallet | 311,952.05 | 413,165.96 | |
| | WD UK & Ireland | AL Alam | 30,100,692.75 | Q2 billing not yet done | |
| | Card Systems FZ LLC | Al Alam | 6,696,445.82 | Q2 billing not yet done | |
| | | Sénjo | 19,855,397.13 | Q2 billing not yet done | |
| | | Tadawul (cadencies) | 2,071,667.86 | 2,071,667.86 | |
| | | Tadawul (processing) | 1,317,697.00 | 1,716,002.00 | we have not issue bill yet |
| | Wirecard Gibraltar | Sénjo | 6,593,803.77 | Q2 billing not yet done | |
| | Wirecard Singapore | Conepay (Maxcone) | 3,368,639.42 | Q2 billing not yet done | |
| | | Centurion | 2,853,141.72 | Q2 billing not yet done | |
| | | | | | |
| TRUSTEE-ACCOUNT | WD UK & Ireland | AL Alam | 247,533,034.52 | Q2 billing not yet done | |
| | Card Systems FZ LLC | Al Alam | 86,382,983.80 | Q2 billing not yet done | |
| | | Sénjo | 104,009,703.83 | Q2 billing not yet done | |
| | Card Systems FZ LLC | Kingdom Card | 5,000,000.00 | 5,000,000.00 | |

109.    On investigation, two of the companies, ConePay (Maxcone) and Centurion Online Payment International, had owed Wirecard Singapore money for years, and are "transactional parties" under investigation by the authorities in Singapore as part of a criminal probe into Kurniawan and five of his Wirecard colleagues.

---

[26] *See* Exs. 6-17.

-38-

**FIRST AMENDED CLASS ACTION COMPLAINT**

110.   When the *The Financial Times*'s Stefania Palma paid a surprise visit to the Philippine address listed on the website of ConePay International, she found a confused fisherman, a Wirecard Bank statement, and no evidence of electronic payment processing:



111.   The registered office of Centurion and PayEasy Solutions is a Manila office that doubles up as the headquarters of Froehlich Tours, a bus and coach rental business owned by Christopher Bauer, a former executive at Wirecard Asia Pacific.

112.   Escalion is one of the companies described in the article as a customer of PayEasy.

-39-

FIRST AMENDED CLASS ACTION COMPLAINT

113.   Escalion is a Luxembourg payments business in the Docler group of companies behind Live Jasmin, a popular webcam site for adults.

114.   After publication, Jasmin's head of marketing got in touch with *The Financial Times* to say it had no dealings with PayEasy whatsoever:

> We are linked directly to Wirecard because they are one of our acquirer banks. There is no other party involved in this and we do not have nor need any other party to process transactions.

115.   Allied Wallet was a US/ UK payment facilitator, which recently settled US charges that it helped perpetrators to defraud more than $110m from consumers in coaching scams, pyramid schemes and unlawful debt collection operations. The company and its officers settled without admitting or denying the allegations, and Wirecard has said it took appropriate measures when suspicious transaction patterns were noticed.

116.   Allied Wallet's UK business was placed into liquidation in August, after the Financial Conduct Authority withdrew its authorisation to provide payment services in June.

117.   CAL is the name of the Israel Credit Card Company, controlled by Israel Discount Bank, which in November 2016 settled criminal charges related to allegedly fraudulent processing of payments for porn and gambling sites between 2006 and 2009. *The Financial Times* had previously written about the case when Dietmar

-40-

**FIRST AMENDED CLASS ACTION COMPLAINT**

Knöchelmann admitted helping ICC-Cal and its then-senior executives commit fraud as part of a plea agreement in Israel.

118. The €6.6m debt owed by Wirecard Gibraltar to Senjo is curious because Zitzmann's overview showed no movement in the figure throughout 2016.[27] Wirecard Gibraltar, meanwhile, was placed into liquidation in 2013 but remains listed as a subsidiary of the group, and appears to have had about €50m of retained earnings sitting on its balance sheet for almost a decade.

## 2. Improper Recognition of Receivables

119. *The Financial Times*'s investigation discovered that a very large proportion of Wirecard sales and profits appear to have been attributed to a relationship with Al Alam, a payment processor with a small office in Dubai and a minimal web presence. When asked by *The Financial Times* in the course of its investigation, Visa and MasterCard both said they did not license Al Alam. The documents obtained by *The Financial Times* indicate these profits from Al Alam were routed through subsidiaries in Dubai and Ireland that do not file public financial statements.[28]

---

[27] *See* Exs. 9-10 Email from Kai Oliver Zitzmann to Kurniawan, and attached file.

[28] *See* Ex. 10. *See also* Dan McCrum, *The Wirecard documents, explained*, The Financial Times (Oct. 14, 2019), https://ftalphaville.ft.com/2019/10/14/1571059326000/The-Wirecard-documents--explained/ (last visited Feb. 12, 2020).

-41-

**FIRST AMENDED CLASS ACTION COMPLAINT**

**3.     A Senior Executive and an M&A Manager at Wirecard Discuss Evading Auditors**

120.    Through its investigation, *The Financial Times* also obtained an email exchange dated April 6, 2018 and subsequent Skype chat conversation transcript between Lars Rastede, a member of Wirecard's German finance team who served as a manager for mergers and acquisitions, and Kurniawan. Rastede sent the email to Kurniawan with two attachments, as follows:[29]

| From: | Rastede, Lars |
|---|---|
| Sent: | 06 April 2018 12:41 |
| To: | Kurniawan, Edo |
| Subject: | Customer Relationships - Monitoring |
| Attachments: | Monitoring Customer Relationships 31 12 2016.xlsx; Q4 2017 Monitoring CR_intern.xlsx |

2 files:
31.12.2016 & 31.12.2017
I am available for questions!
Best,
Lars

121.    Rastede explained the use and purpose of the data in a subsequent Skype chat with Kurniawan. The two started by discussing a couple of the companies mentioned above — Centurion and Maxcone (also known as ConePay).

122.    At last count the value of customer relationships on Wirecard's balance sheet was €438m.[30] Like any such asset, auditors must consider whether the value is fair, or if it should be impaired.

---

[29] *See* Ex. 13.

[30] *Transition to Tomorrow: Half Year Financial Report,* Wirecard (June 30, 2019), https://ir.wirecard.com/download/companies/wirecard/Quarterly Reports/DE0007472060-Q2-2019-EQ-E-01.pdf.

-42-

**FIRST AMENDED CLASS ACTION COMPLAINT**

123.   Rastede and Kurniawan's discussion took place in the final days of EY's audit of the Wirecard accounts for 2017, and during it Rastede explained the approach to the impairment testing of customer relationships in Munich.

124.   It involved a simple test, he said. If gross profits from the asset were larger than an annual cost, known as depreciation, then the test was passed and "EY has to accept it", Rastede said.[31]

Rastede, Lars 4:39 PM:

Okay Edo one last thing:

There is a reason our practice is called "triggering event analysis" If in 2017 Maxcone generates more Gross Profit than annual depreciation, EY has to accept it. No fuc**ing Impairment Test is necessary!

Triggering Event analysis is passed (stop your work EY!) once Gross Margin is higher than annual depreciation!

I am just seeing it, Edo! Maxcone has about €230k annual depreciation and generated €2.500k of Gross Margin?! Triggering Event Testing is passed! No Impairment Test is necessary!

Kurniawan, Edo 4:43 PM:

I am totally agree on this!

apparently they come to me from the other angle

and I start realize that, thats why I plan not to reply immediately and contact you

Rastede, Lars 4:46 PM:

Okay so here in Munich there is Andreas Loetscher and Gregor Fichtelberger who lead the Wirecard Group Audit! They requested from me the complete Customer Relationship Monitoring File (the one I sent to you last week!) This is where we compare annual depreciation with Gross Margin which the respective Customer Relationship is generating. As long as GM > annual depreciation THEY AND WE STOP working! The Test is passed and EY is totally fine with it!

Maybe you tell the local EY guys?

Kurniawan, Edo 4:48 PM:

ok will not do things here for now

Rastede, Lars 4:48 PM:

There is massive effort flowing into that big table! It is done in order to avoid doing sophisticated impairment tests!

Please don't get me wrong: If there is anything I can do to help you, just say so!

---

[31] *See* Ex. 17.

-43-

**FIRST AMENDED CLASS ACTION COMPLAINT**

125.    So long as profits claimed for the customer relationship were large enough, Rastede stated, "no fuc**ing impairment test is necessary!"[32]

126.    Rastede also refers to the "Customer relationship monitoring file" he sent to Kurniawan, the one "with massive effort flowing into it".

127.    The file, called "Q4 2017 Monitoring CR_intern" reveals a year's worth of financial data for Al Alam's relationship with CardSystems.[33] Figures for the first three months of 2017 match those in Zitzmann's overview spreadsheet.[34] Thus the internal financial reports are again consistent, and appear to have been used to justify sales, profits and asset values reported by Wirecard.

## VII.    MATERIALLY FALSE AND MISLEADING STATEMENTS

128.    On April 7, 2016, the Company issued a press release containing a web link to its financial results for the fiscal year ended December 31, 2015 (the "2015 Annual Report"). The 2015 Annual Report was signed by Defendants Braun, Ley and Marsalek. The 2015 Annual Report contained signed statements by Defendants Braun, Ley and Marsalek attesting to the accuracy of financial reporting and a fair review of the development and performance of the business, as well as the attendant opportunities and risks.

---

[32] *Id.*

[33] Ex. 15.

[34] Ex. 10.

FIRST AMENDED CLASS ACTION COMPLAINT

129.   The 2015 Annual Report stated the Company had a thorough process in place to ensure employees would not misuse (i.e., falsify) information. The 2015 Annual Report stated, in relevant part:

> In addition, the Wirecard Group counteracts internal misuse through a closed concept, starting with the selection of employees and a stringent "need-to-know" principle, through to the monitoring of all data access events. In close cooperation with the Wirecard Group's Data Protection Officer, experts ensure that personal data is processed solely in accordance with the rules and regulations of the applicable data protection laws.

130.   Wirecard's 2015 Annual Report stated the Company had systems in place to "guarantee" the correct accounting of business processes and transactions and to "ensure[] compliance" with accounting regulations and statutory standards. The 2015 Annual Report stated, in relevant part:

> 2.4 Internal control and risk management system relating to the Group financial accounting process
>
> The Wirecard Group has an internal control and risk management system relating to the (Group) accounting process, in which suitable structures and processes are defined and then implemented within the organisation. This is designed to guarantee the timely, uniform and correct accounting of all business processes and transactions. It ensures compliance with statutory standards, accounting regulations and the internal Group accounting directive, which is binding for all companies included in the consolidated financial statements.

131.   On April 6, 2017, the Company issued a press release containing a web link to its financial results for the fiscal year ended December 31, 2016 (the "2016

-45-

FIRST AMENDED CLASS ACTION COMPLAINT

Annual Report"). The 2016 Annual Report was signed by Defendants Braun, Ley and Marsalek. The 2016 Annual Report contained signed statements by Defendants Braun, Ley and Marsalek attesting to the accuracy of financial reporting and a fair review of the development and performance of the business, as well as the attendant opportunities and risks.

132.   The 2016 Annual Report stated the Company had a thorough process in place to ensure employees would not misuse (i.e., falsify) information. The 2016 Annual Report stated, in relevant part:

> In addition, the Wirecard Group counteracts internal misuse through a closed concept, starting with the selection of employees and a stringent "need-to-know" principle, through to the monitoring of all data access events. In close cooperation with the Wirecard Group's Data Protection Officer, experts ensure that personal data is processed solely in accordance with the rules and regulations of the applicable data protection laws.

133.   Wirecard's 2016 Annual Report stated the Company had systems in place to "guarantee" the correct accounting of business processes and transactions and to "ensure[] compliance" with accounting regulations and statutory standards. The 2016 Annual Report stated, in relevant part:

> 2.4 Internal control and risk management system relating to the Group financial accounting process
>
> The Wirecard Group has an internal control and risk management system relating to the (Group) accounting process, in which appropriate structures and processes are defined and then implemented within the organisation. This is designed to guarantee the timely, uniform and correct

-46-

FIRST AMENDED CLASS ACTION COMPLAINT

accounting of business processes and transactions. It ensures compliance with statutory standards, accounting regulations and the internal Group accounting directive, which is binding for all companies included in the consolidated financial statements.

134.   On April 12, 2018, the Company issued a press release containing a web link to its financial results for the fiscal year ended December 31, 2017 (the "2017 Annual Report"). The 2017 Annual Report was signed by Defendants Braun, Knoop, Marsalek, and Steidl. The 2017 Annual Report contained signed statements by Defendants Braun, Ley, Marsalek, and Steidl attesting to the accuracy of financial reporting and a fair review of the development and performance of the business, as well as the attendant opportunities and risks.

135.   The 2017 Annual Report stated the Company had a thorough process in place to ensure employees would not misuse (i.e., falsify) information. The 2017 Annual Report stated, in relevant part:

In addition, the Wirecard Group counteracts internal misuse through a closed concept, starting with the selection of employees and a stringent "need-to-know" principle, through to the monitoring of all data access events. In close cooperation with the Wirecard Group's Data Protection Officer, experts ensure that personal data is processed solely in accordance with the rules and regulations of the applicable data protection laws.

136.   Wirecard's 2017 Annual Report stated the Company had systems in place to "guarantee" the correct accounting of business processes and transactions and to

-47-

FIRST AMENDED CLASS ACTION COMPLAINT

"ensure[] compliance" with accounting regulations and statutory standards. The 2017 Annual Report stated, in relevant part:

> 2.4 Internal control and risk management system relating to the Group financial accounting process
>
> The Wirecard Group has an internal control and risk management system also in relation to the (Group) accounting process, in which appropriate structures and processes are defined and then implemented within the organization. This is designed to guarantee the timely, uniform and correct accounting of business processes and transactions. It ensures compliance with statutory standards, accounting regulations and the internal Group accounting directive, which is binding for all companies included in the consolidated financial statements.

137. On April 25, 2019, the Company issued a press release containing a web link to its financial results for the fiscal year ended December 31, 2018 (the "2018 Annual Report"). The 2018 Annual Report was signed by Defendants Braun, Knoop, Marsalek, and Steidl. The 2018 Annual Report contained signed statements by Defendants Braun, Knoop, Marsalek, and Steidl attesting to the accuracy of financial reporting and a fair review of the development and performance of the business, as well as the attendant opportunities and risks.

138. The 2018 Annual Report stated the Company had a thorough process in place to ensure employees would not misuse (i.e., falsify) information. The 2018 Annual Report stated, in relevant part:

> In addition, the Wirecard Group counteracts internal misuse through a closed concept, starting with the selection of employees and a stringent "need-to-know" principle, through

-48-

FIRST AMENDED CLASS ACTION COMPLAINT

to the monitoring of all data access events. In close cooperation with the Wirecard Group's Data Protection Officer, experts ensure that personal data is processed solely in accordance with the rules and regulations of the applicable data protection laws.

139. Wirecard's 2018 Annual Report also stated in relevant part:

2.4 Internal control and risk management system

Wirecard Group has an internal control and risk management system also in relation to the (Group) accounting process, in which appropriate structures and processes are defined and then implemented within the organization. This is designed to guarantee the timely, uniform and correct accounting of business processes and transactions. It ensures compliance with statutory standards, accounting regulations and the internal Group accounting directive, which is binding for all companies included in the consolidated financial statements.

[…]

The consolidated financial statements are prepared on a centralised basis, using data from the subsidiaries included in consolidation. The Accounting and Controlling departments are responsible for consolidation measures, certain reconciliation work and for monitoring time and process-related parameters. Technical system controls are monitored by employees and augmented by manual audits. The principle of dual control is implemented as a minimum requirement. Certain approval processes must be applied throughout the accounting process. In addition, a group of experts that is not involved in the preparation process, including external advisers, is on hand for special functional questions and complex issues.

While reviewing the propriety of the accounting systems of the German and Foreign companies, the following issues are taken into account:

FIRST AMENDED CLASS ACTION COMPLAINT

- Compliance with statutory parameters and directives issued by the Management Board, as well as other guidelines and internal instructions

- Formal and substantive propriety of accounting and related reporting, including the IT systems deployed

- Functionality and effectiveness of internal control systems to avoid financial losses

- Propriety of task fulfilment and compliance with economic and business principles

140.   The statements referenced in ¶¶ 128-139 above were materially false and/or misleading because they misinterpreted and failed to disclose the following adverse facts pertaining to the Company's business and operations which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) for the period spanning from 2015 to 2018, a senior Wirecard executive in Singapore had been accused of forging and backdating contracts, including falsifying accounts and money laundering; (2) an external law firm commissioned to investigate Wirecard's Singapore office had reportedly found evidence of "serious offences of forgery and/or of falsification of accounts"; (3) Wirecard had downplayed weaknesses in its internal controls over financial reporting and failed to disclose the true extent of those weaknesses; and (4) as a result, Defendants'  statements about Wirecard's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

FIRST AMENDED CLASS ACTION COMPLAINT

141.   In addition, each of the revenue, income, asset valuations, and liability figures provided to investors in the 2016, 2017, and 2018 Annual Reports were each materially false and misleading and/or lacked a reasonable basis at all relevant times for the reasons stated above, and for the reasons referenced in ¶¶ 106-127.[35]

**The Truth Begins to Emerge**

142.   On January 30, 2019, *The Financial Times* reported that "[a] senior Wirecard executive was last year suspected of using forged and backdated contracts in a string of suspicious transactions[.]" According to the article, an internal presentation "outlined potential violations of Singapore law, including 'falsification of accounts' and 'money laundering.'" Further, "[t]he whistleblower who briefed the FT on the document was motivated to do so, the person said, out of a concern that no action appeared to have been taken over potentially criminal acts inside a company presenting itself as a blue-chip financial institution."

143.   On this news, shares of WCAGY fell $8.54 per share or nearly 9% to close at $86.66 per share on January 30, 2019. Shares of WRCDF fell $28.10 per share or nearly 15% to close at $161.90 per share on January 30, 2019.

144.   On February 1, 2019, *The Financial Times* reported that "[a]n external law firm commissioned by Wirecard to investigate the payment company's Singapore office found evidence indicating 'serious offences of forgery and/or of falsification of

---

[35] The financial results presented in Wirecard's Annual Reports are pending review by KPMG (*see supra* ¶ 5).

-51-

**FIRST AMENDED CLASS ACTION COMPLAINT**

accounts', according to a preliminary report on the inquiry seen by the Financial

Times." According to the article, the lawyers' report stated the following:

> On the face of the evidence uncovered so far, these acts appear to bear out at the very least serious offences of forgery and/or of falsification of accounts/documents under section 477A of Singapore's Penal Code. As these acts were intentional, there are reasons to suspect that they may have been carried out to conceal other misdeeds, such as cheating, criminal breach of trust, corruption and/or money laundering.

145.   On this news, shares of WCAGY fell $16.60 per share or nearly 20% to

close at $66.64 per share on February 1, 2019. Shares of WRCDF fell $30.17 per share

or over 18% to close at $133.88 per share on February 1, 2019.

146.   On April 24, 2019, *The Financial Times*, a London-based publication,

published an article entitled, "Wirecard relied on Three Opaque Partners for Almost

All its Profit," reporting that "[h]alf of the worldwide revenue and almost all of the

reported profits of Wirecard" have come from only three opaque partner companies in

recent years. According to the article, Al Alam Solutions, a Dubai-based payments

processor with skeletal operations, was the largest of the three "partner" entities, and a

former Al Alam employee said the business had six or seven staff in total and "the

boss" was Oliver Bellenhaus, a Wirecard executive. The other partners were PayEasy

Solutions, a Philippine payments group that shares an office with a Manila bus

company, and Singapore-based Senjo. The three companies allegedly contributed

-52-

FIRST AMENDED CLASS ACTION COMPLAINT

earnings before interest, tax, depreciation and amortisation of €290m on revenues of €541m.[36]

147.   The next day, on April 25, 2019, *The Financial Times* published an article entitled, "Wirecard seeks to put scandal behind it with results," reporting that Wirecard had announced that auditor EY signed off its 2018 accounts and that the supervisory board had agreed measures to improve its processes. According to the article, publication of full-year results had been delayed for three weeks after Wirecard disclosed that some employees may face criminal liability in the group's Singapore unit, where it is embroiled in a police investigation into suspected forgery and fraudulent accounting.[37]

148.   On this news, shares of WCAGY fell $4.72 per share or about 6.2% from a previous-day close of $75.90 to close at $71.18 per share on April 25, 2019. Shares of WRCDF fell $6.00 per share or nearly 9.5% from a previous-day close of $146.25 to close at $140.25 per share on April 25, 2019.

149.   On October 14, 2019, *The Financial Times* published an article entitled, "Wirecard's suspect accounting practices revealed," along which *The Financial Times*

---

[36] Dan McCrum, *Wirecard relied on three opaque partners for almost all its profit*, The Financial Times (Apr. 24, 2019), https://www.ft.com/content/a7b43142-6675-11e9-9adc-98bf1d35a056 (last visited Feb. 12, 2020).

[37] Olaf Storbeck and Dan McCrum, *Wirecard seeks to put scandal behind it with results*, The Financial Times (Apr. 25, 2019), https://www.ft.com/content/9f6b4f70-671f-11e9-9adc-98bf1d35a056 (last visited Feb. 12, 2020).

-53-

**FIRST AMENDED CLASS ACTION COMPLAINT**

published a set of internal documents procured from Wirecard whistleblowers "which cast further doubt on Wirecard's accounting practices." According to the article:

> Internal company spreadsheets, along with related correspondence between senior members of Wirecard's finance team, appear to indicate a concerted effort to fraudulently inflate sales and profits at Wirecard businesses in Dubai and Ireland, as well as to potentially mislead EY, Wirecard's tier-one auditor.
>
> The decision to publish these documents follows repeated charges by Wirecard that the FT is relying on fake material and that its own journalism is corrupt and suspect. The documents, provided by whistleblowers, give the clearest picture to date of Wirecard's questionable accounting practices and business model.[38]

150.    On this news, shares of WCAGY fell $1.09 per share or about 1.4% from a previous-day close of $78.29 to close at $77.20 per share on October 14, 2019. Shares of WRCDF fell $5.92 per share or about 3.75% from a previous-day close of $157.71 to close at $151.79 per share on October 14, 2019.

151.    The next day, shares continued to plummet, as shares of WCAGY fell $9.83 per share or about 12.7% from a previous-day close of $77.20 to close at $67.37 per share on October 15, 2019. Shares of WRCDF fell $17.25 per share or about

---

[38] Dan McCrum, *Wirecard's suspect accounting practices revealed*, The Financial Times (Oct. 14, 2019), https://www.ft.com/content/19c6be2a-ee67-11e9-bfa4-b25f11f42901 (last visited Feb. 12, 2020). *See also* Dan McCrum, *The Wirecard documents, explained*, The Financial Times (Oct. 14, 2019), hhttps://ftalphaville.ft.com/2019/10/14/1571059326000/The-Wirecard-documents--explained/ (last visited Feb. 12, 2020).

-54-

**FIRST AMENDED CLASS ACTION COMPLAINT**

11.36% from a previous-day close of $151.79 to close at $134.54 per share on October 15, 2019.

152.   On November 6, 2019, *The Financial Times* published an article entitled, "KPMG widens review of Wirecard accounting," which reported on Wirecard's announcement that "a special audit by KPMG will be wider-ranging than previously announced, examining accusations from short-sellers about the German payment company's lending activities in Brazil and Turkey."[39]

153.   According to the article, in addition to reported suspicions that hundreds of millions of euros in sales and profits at Wirecard businesses in Dubai and Dublin were fraudulent, KPMG would also look at Wirecard's use of a type of lending known as a "Merchant Cash Advance" — a type of loan designed to bridge the gap between when merchants process credit card payments and when they receive the money. Specifically, KPMG would look into the claims made by short seller MCA Mathematik that, while Wirecard claimed it had put €400m into making short-term loans to its customers, with many of them being located in Turkey and Brazil, filings made by Wirecard's Brazil subsidiary at the Brazil's central bank do not describe significant MCA lending. In Turkey, such advance cash loans to merchants were not legal, so it remains unclear where money for the loans had gone. Wirecard claimed

---

[39] Olaf Storbeck and Dan McCrum. *KPMG widens review of Wirecard accounting*, The Financial Times (Nov. 6, 2019), https://www.ft.com/content/e132cb98-0073-11ea-b7bc-f3fa4e77dd47 (last visited Feb. 12, 2020).

**FIRST AMENDED CLASS ACTION COMPLAINT**

that KPMG had already started work on the special audit, which is expected to be concluded by March 2020.[40]

154.   On January 10, 2020, the Company announced that Wulf Matthias, Chairman of the Supervisory Board of Wirecard AG, "has resigned in today's Board Meeting as Chairman of the Supervisory board for personal reasons."[41] The same day, *Bloomberg* published an article entitled, "Wirecard Chairman Resigns in Midst of Accounting Controversy," reporting that Matthias "resigned after months of controversy over the digital payments company's accounting practices," and had "faced a battle to calm investors rattled by reports of accounting irregularities. According to Neil Campling, an analyst at Mirabaud Securities, "[t]he role of the supervisory board, which Matthias chaired, "is key," especially in Wirecard's case. KPMG, which has been commissioned to perform an independent special audit on the back of the allegations, is accountable only to the supervisory board, he said. Supervisory boards in Germany play an important role as they are formed of shareholders and employee representatives, who oversee the management and approve major business decisions.[42]

---

[40] *Id.*

[41] Press Release, *Change at the top of the Supervisory Board of Wirecard AG: Wulf Matthias resigns from the chair of the committee*, Wirecard (Jan. 10, 2020), https://www.wirecard.com/en-us/company/press-releases/change-at-the-top-of-the-supervisory-board-of-wirecard-ag (last visited Feb. 12, 2020).

[42] Nico Grant *et al.*, *Wirecard Chairman Resigns in Midst of Accounting Controversy*, Bloomberg Technology (Jan. 10, 2020, 2:46 PM),

-56-

155.   *Bloomberg* also noted Wirecard's revenue soared in 2018 after it bought more than 15 companies in a few years, allegations of accounting fraud at Wirecard in Singapore and other Asian countries, the R&T investigation, and *The Financial Times*' report in October 2019 that "payments processed by a Dubai-based partner company in 2016 and 2017 may not have taken place." Neil Campling also stated, "The more we dig on Wirecard, the more disturbing it looks," according to the article.

156.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## VIII.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

157.   Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that at all relevant times, WDI, WCAGY and WRCDF traded in an efficient market. The efficiency of the market for these securities may be established by the following facts, among others:

a)   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b)   the omissions and misrepresentations were material;

c)   the Company's securities are traded in efficient markets;

---

https://www.bloomberg.com/news/articles/2020-01-10/wirecard-chairman-resigns-in-midst-of-accounting-controversy (last visited Feb. 12, 2020).

-57-

**FIRST AMENDED CLASS ACTION COMPLAINT**

d)      the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

e)      WCAGY and WRCDF were actively traded as ADSs on the OTC Markets in the United States at prices that matched the contemporaneous trading price of Wirecard common stock on the FWB and other German markets. The OTC Markets is a highly efficient and automated market;

f)      During the Class Period, Wirecard was followed by multiple analysts;

g)      Wirecard published its quarterly and annual reports, press releases, presentation materials, and other material information of significance to investors on its website, including contemporaneous English-language versions of materials submitted to regulators in Europe;

h)      the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

-58-

FIRST AMENDED CLASS ACTION COMPLAINT

i)      Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

158.   Information that affected the price of Wirecard's common stock affected the price of WCAGY and WRCDF in the same manner and to the same extent. The price of Wirecard's common (F) shares and ADSs traded on the OTC Markets in the United States during the Class Period was based upon and moved in tandem with the price of Wirecard's common stock traded on FWB. The price of WRCDF shares generally tracks the currency-adjusted price of WDI common stock on the FWB exchange. The price of WCAGY shares, which reflect an ownership interest in .5 shares of Wirecard's common stock, is generally one-half the currency-adjusted price of Wirecard's common stock traded on the FWB. As a result, the same facts that support the finding that the market for Wirecard common stock sold on the FWB in Germany was efficient also support a finding that the market for Wirecard's common stock sold on the OTC market in the United States was efficient.[43]

_____

[43] The chart below reflects the movement of Wirecard's common stock sold on the Frankfurt Stock Exchange. The price of both WCAGY and WRCDF sold in the United States is linked to and moves in tandem with the price of Wirecard WDI common stock on the Frankfurt exchange, such that the movements of the latter during the Class Period, as reflected in the chart below, are also illustrative of the movements of the former. The red line represents WDI, the blue line represents WCAGY, and the green line represents WRCDF.

-59-

**FIRST AMENDED CLASS ACTION COMPLAINT**



159.   Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

160.   Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## IX.   LOSS CAUSATION & DAMAGES

161.   Each member of the proposed Class suffered economic losses as a direct and proximate result of the misleading conduct alleged herein. Each Class member suffered similar injury as a result of: (i) their purchase of Wirecard securities at prices that were higher than they would have been had defendant made truthful and complete disclosures of information about the Company as necessary to prevent the statements,

-60-

omissions, and course of business alleged herein from being materially false or misleading to investors; and (ii) their retention of those securities through the date of one or more declines in the market price of those shares that was caused by the revelation of facts, transactions, occurrences, or risks concealed from investors by defendant's scheme to defraud, including the actual or anticipated financial consequences of its concealed actions.

162.   The fraudulent accounting and the other misrepresentations and omissions alleged herein caused Wirecard securities to trade at prices higher than they would have during the Class Period had the Company disclosed accurate and truthful information about the financial condition, results, and operations of its business.

163.   Because the misrepresentations and omissions that occurred before the start of the Class Period remained uncorrected at the outset of the Class Period, they continued to impact the price of Wirecard securities during the Class Period by causing securities to trade at prices that were higher than they would have traded had accurate and complete information been disclosed at the time of those misrepresentations or omissions, or had Wirecard, prior to the start of the Class Period, corrected the misrepresentations and disclosed the omitted facts that rendered them misleading to investors.

164.   Even when Wirecard reported or responded to results or information that caused its stock price to decline, the disclosures and statements were incomplete and

FIRST AMENDED CLASS ACTION COMPLAINT

misleading. The false and concealed information described herein therefore continued to maintain artificial inflation in the price of Wirecard's shares by preventing the share price from suffering even steeper declines than would have occurred had accurate and complete information been disclosed, or had investors learned that Wirecard had long been manipulating its reported results through deliberately false accounting, discovered the specific manner in which Wirecard had done so at the time of each of the false earnings reports described herein, or understood the impact that those manipulations had on current, previously reported, or anticipated financial results.

A.     **WCAGY and WRCDF Trade at the Same Price as WDI in Germany**

165.   The misrepresentations and omissions alleged herein affected the price of WCAGY and WRCDF in the same manner and to the same extent it affected the price of WDI sold in Germany.

166.   WCAGY and WRCDF shares are bought and sold at market prices that are set to equal the trading price of WDI shares on the FWB and other German stock exchanges at the time of the transaction, converted to U.S. dollars at the then-current foreign currency exchange rate (USD to German yen). Foreign currency conversion fees and other expenses do not have a material impact on the price of WCAGY and WRCDF shares as compared with the contemporaneous market price of WDI shares in Germany.

167.   The prevailing prices on the markets for WDI, WCAGY and WRCDF were therefore inflated to a similar extent by the false and misleading information

-62-

alleged herein. The securities reacted similarly to the disclosure of corrective information that revealed the facts, transactions, and occurrences concealed by Wirecard's fraud, or the actual or potential impact of those occurrences on the Company's financial condition, results, or prospects.

**B.    Investors Were Harmed When the Risks and Information Concealed by Defendants' Fraud Were Revealed**

168.   The fraud alleged herein caused shares of WDI, WCAGY and WRCDF to trade at prices that were higher than those securities would have sold for had the true facts concealed from investors been known.

169.   Disclosure of the true facts concealed by Defendants' fraud would have caused WDI, WRCDF and WCAGY stock to trade at prices that were materially lower than the prices prevailing in the markets for those securities during the Class Period.

170.   The fraud alleged herein caused Plaintiff and the members of the Class to pay higher prices for the WDI, WCAGY and WRCDF shares they purchased during the Class Period. Neither Plaintiff, nor the members of the Class, would have purchased those securities at the prices they paid had the true condition of Wirecard's business been known.

171.   The facts, transactions, and occurrences concealed from investors by Defendants' scheme to defraud reached the market through a series of partial disclosures. Though each of the disclosures was incomplete, each revealed some of the business conditions and risks concealed by Defendants' fraud scheme, leading to price

-63-

FIRST AMENDED CLASS ACTION COMPLAINT

declines that partially corrected Wirecard's stock price by reducing the extent to which it had been inflated by Defendants' fraud. These price declines caused economic injury to Plaintiff and other members of the Class who had purchased Wirecard securities during the Class Period at prices that had been artificially inflated by the fraudulent course of business and misleading statements and omissions alleged herein.

172.   As detailed above, when the truth about Defendants' misconduct was revealed, the value of Wirecard securities declined precipitously as the prior artificial inflation no longer propped up the Company's prices. The declines in the prices of Wirecard securities were the direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the price declines negate any inference that the loss suffered by Plaintiff was caused by changed market conditions, macroeconomic or industry factors or facts unrelated to Defendants' fraudulent conduct. The economic loss, i.e., damages, suffered by Plaintiff, was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of Wirecard securities and the subsequent significant decline in the value of the securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

173.   At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by Plaintiff. Those statements were materially false and misleading through

FIRST AMENDED CLASS ACTION COMPLAINT

their failure to disclose a true and accurate picture of the Company's business and operations, as alleged herein. Before and during the time of Plaintiff's purchases of Wirecard securities, Defendants issued materially false and misleading statements and omitted material facts necessary to make the Defendants' statements not false or misleading, causing the prices of Wirecard securities to be artificially inflated. Plaintiff purchased Wirecard securities at those artificially inflated prices, causing him to suffer damages as complained of herein.

## X.   PLAINTIFF'S CLASS ACTION ALLEGATIONS

174.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of (i) all persons and entities other than Defendants who purchased shares of WCAGY and WRCDF on the OTC Market between April 7, 2016 through October 15, 2019, both dates inclusive (the "Class Period"); and (ii) all citizens and residents of the United States other than Defendants who purchased shares of Wirecard common stock during the Class Period. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

175.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded OTC. While the exact number of Class members is unknown to Plaintiff at this

-65-

time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

176.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

177.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

178.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a)   whether Defendants' acts as alleged violated the federal securities laws;

FIRST AMENDED CLASS ACTION COMPLAINT
010821-11/1240725 V1

b) whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

c) whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d) whether the Individual Defendants caused the Company to issue false and misleading quarterly and annual reports and public statements during the Class Period;

e) whether Defendants acted knowingly or recklessly in issuing false and misleading quarterly and annual reports and public statements during the Class Period;

f) whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

g) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

179. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively

-67-

FIRST AMENDED CLASS ACTION COMPLAINT

small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI.   CLAIMS FOR RELIEF

### COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

180.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

181.   This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

182.   During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

183.   The Company and the Individual Defendants violated § 10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in

-68-

010821-11/1240725 V1

order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

184.   The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants, by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

185.   Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by

-69-

them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

186. As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

187. Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

188. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

189. By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial

-70-

damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act
### Against The Individual Defendants

190.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

191.   During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

192.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

193.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public reports and/or filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period,

-71-

the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

194.    Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

195.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

-72-

010821-11/1240725 V1

1

2

3
      B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

4

5
      C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

6

7

8
      D.     Awarding such other and further relief as this Court may deem just and proper.

9

10

## XIII.  DEMAND FOR TRIAL BY JURY

11

12
Plaintiff hereby demands a trial by jury.

13
DATED: February 14, 2020       HAGENS BERMAN SOBOL SHAPIRO LLP

14
          By:   /s/ *Reed R. Kathrein*

15
          Reed R. Kathrein (139304)
          Danielle Smith (291237)

16
          Lucas E. Gilmore (250893)
          715 Hearst Avenue, Suite 202

17
          Berkeley, CA  94710

18
          Telephone: (510) 725-3000
          Facsimile:  (510) 725-3001

19
          reed@hbsslaw.com

20
          danielles@hbsslaw.com
          lucasg@hbsslaw.com

21

22
          Steve W. Berman

23
          HAGENS BERMAN SOBOL SHAPIRO LLP
          1301 Second Avenue, Suite 2000

24
          Seattle, WA  98101

25
          Telephone: (206) 623-7292

26

27

28

-73-

## FIRST AMENDED CLASS ACTION COMPLAINT

1

Facsimile:  (206) 623-0594
steve@hbsslaw.com

2

3

*Attorneys for Lead Plaintiff Lawrence Gallagher*

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-74-

FIRST AMENDED CLASS ACTION COMPLAINT