Reed R. Kathrein (139304)
Danielle Smith (291237)
Lucas E. Gilmore (250893)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 202
Berkeley, CA  94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
reed@hbsslaw.com
danielles@hbsslaw.com
lucasg@hbsslaw.com

*Counsel for Lead Plaintiff Lawrence Gallagher*
*[Additional counsel listed on signature page]*

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK DALPOGGETTO, Individually and on Behalf of all other similarly situated<br><br>Plaintiff,<br><br>v.<br><br>WIRECARD AG, MARKUS BRAUN, BURKHARD LEY, ALEXANDER VON KNOOP, JAN MARSALEK, SUSANNE STEIDL, WULF MATTHIAS, and ERNST & YOUNG GMBH WIRTSCHAFTSPRUEFUNGSGESELLSCHAFT<br><br>Defendants. | Case No.  2:19-cv-00986-FMO-SK<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br><br><br>**JURY TRIAL DEMANDED** |

SECOND AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

I.  NATURE OF THE ACTION .......................................................................... 1

II.  JURISDICTION AND VENUE ..................................................................... 10

III.  PARTIES ...................................................................................................... 13

    A.  Plaintiff ............................................................................................... 13

    B.  Defendant Wirecard ........................................................................... 15

    C.  Individual Defendants ........................................................................ 15

    D.  Auditor Defendant .............................................................................. 17

IV.  WIRECARD SECURITIES AT ISSUE ....................................................... 18

    A.  Securities Granting Ownership Interests in Common Stock Issued and Authorized for Sale by Wirecard ................................................ 18

    B.  Establishment of and Trading in Wirecard ADRs .............................. 20

        1.  Nature of an ADR ..................................................................... 20

        2.  Establishment of the WCAGY ADR Program ......................... 23

        3.  Wirecard's Consent to Sale of WCAGY .................................. 27

    C.  The OTC Market ................................................................................. 30

V.  BACKGROUND INFORMATION .............................................................. 36

    A.  Wirecard's Business ........................................................................... 36

    B.  Wirecard's Growth and History ......................................................... 38

VI.  THE FRAUDULENT SCHEME TO OVERSTATE WIRECARD'S REPORTED FINANCIAL RESULTS DURING THE CLASS PERIOD ...... 39

    A.  Wirecard's Recognition of False Revenues from Phony TPA Transactions With Foreign Wirecard Subsidiaries ............................ 39

    B.  Wirecard's Fraudulent Recognition of "Round-Triping" Sales ............ 42

    C.  Improper Recognition of Cash and Cash Equivalents .......................... 44

VII.  MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD ................................................................................ 45

    A.  Wirecard's False and Misleading Reported 2015 Results .................... 45

    B.  Wirecard's False and Misleading Reported 2016 Results .................... 51

-i-

C.      Wirecard's False and Misleading Reported 2017 Results ...................... 56

D.      Wirecard's False and Misleading Reported 2018 Results ...................... 61

VIII.   THE TRUTH REGARDING WIRECARD'S MASSIVE FRAUD EMERGES THROUGH A SERIES OF PARTIAL DISCLOSURES ................................ 68

IX.     E&Y'S DEFICIENT AUDIT AND ROLE IN THE SCHEME ...................... 84

X.      APPLICABILITY OF PRESUMPTION OF RELIANCE ............................. 89

XI.     LOSS CAUSATION & DAMAGES ................................................ 92

A.      Loss Causation is Demonstrated by the Revelation of Defendants' Fraud Through a Series of Corrective Disclosures ............................................ 93

B.      Alternatively, Loss Causation is Demonstrated by the Materialization of Concealed Risks ............................................................................. 97

XII.    PLAINTIFF'S CLASS ACTION ALLEGATIONS ........................................ 99

XIII.   CLAIMS FOR RELIEF .................................................................... 101

XIV.    PRAYER FOR RELIEF ................................................................. 109

XV.     DEMAND FOR TRIAL BY JURY ................................................... 109

# GLOSSARY OF DEFINED TERMS

The following short forms and citations are used herein:

| TERM | DEFINITION |
|---|---|
| "ADS" | American Depositary Share |
| "ADR" | American Depositary Receipt[1] |
| "BNY" | The Bank of New York Mellon ("BNY") |
| "Citibank" | Citibank, N.A. |
| "Class Period" | August 17, 2015 through June 26, 2020, both dates inclusive |
| "Company" | Wirecard AG |
| "Depositary Banks" | Collectively, Citibank, BNY, and JPMorgan |
| "Ex. _" | Exhibits to the Second Amended Class Action Complaint for Violation of the Federal Securities Laws, filed concurrently herewith |
| "Exchange Act" | Securities Exchange Act of 1934 |
| "E&Y"/"EY" | Ernst & Young GmbH Wirtschaftspruefungsgesellschaft |
| "FT" | The Financial Times |
| "IFRS" | International Financial Reporting Standards |
| "JPMorgan" | JPMorgan Chase Bank, N.A. ("JPMorgan ") |
| "GAAP" | Generally accepted accounting principles |
| "OTC" | Over-the-Counter |
| "OTC Markets Group" | OTC Markets Group Inc. |
| "SEC" | United States Securities and Exchange Commission |
| "WDI" | Common stock issued by Wirecard |
| "Wirecard" | Wirecard AG |

---

[1] "ADRs" is used collectively to refer to both ADRs and ADSs.

SECOND AMENDED CLASS ACTION COMPLAINT

**EXHIBIT LIST**

| EXHIBIT | DESCRIPTION |
|---|---|
| 1 | Form F-6 filed by Citibank, N.A., dated September 18, 2013 |
| 2 | Form F-6 filed by JPMorgan Chase Bank, N.A., dated February 1, 2016 |
| 3 | Form F-6 filed by The Bank of New York Mellon Corporation, dated October 2, 2019 |
| 4 | Form F-6 filed by JPMorgan Chase Bank, N.A., dated November 22, 2019 |
| 5 | SEC Office of Investor Education and Advocacy, Investor Bulletin: American Depositary Receipts (Aug. 2012) |

Lead Plaintiff Lawrence Gallagher ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Wirecard AG ("Wirecard" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     NATURE OF THE ACTION

1.     This is a federal securities class action seeking damages from Defendants Wirecard, Markus Braun, Burkhard Ley, Alexander von Knoop, Jan Marsalek, Susanne Steidl, Wulf Matthias, and Ernst & Young GmbH Wirtschaftspruefungsgesellschaft ("E&Y") for violations of the U.S. Securities Exchange Act of 1934 ("Exchange Act") in connection with transactions in: (i) Wirecard American Depository Receipts ("ADRs") sold under the ticker symbol WCAGY on the Over-the-Counter ("OTC") Market in the United States; and (ii)

-1-

Wirecard common stock sold as foreign issue shares under the ticker symbol WRCDF on the OTC Market in the United States .

2.      The claims alleged herein are brought on behalf of a class (the "Class"), consisting of all persons and entities other than Defendants who purchased shares of WCAGY and WRCDF on the OTC Market between August 17, 2015 and June 26, 2020, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

3.      This case arises from Wirecard's deliberate use of improper accounting to conceal a concerted effort to fraudulently inflate sales and profits at Wirecard businesses in Dubai, Ireland, and elsewhere. Wirecard exploded in value over the past decade, growing to a market capitalization greater than Deutsche Bank, by presenting itself as a fast-growing fintech champion with an ever-increasing global network.

4.      The Company's accounting fraud was orchestrated at the highest levels of the Company. In October 2019, a series of whistleblower-provided internal Company spreadsheets and correspondence were published that revealed numerous instances of deliberate violations of International Financial Reporting Standards ("IFRS") and generally accepted accounting principles ("GAAP") carried out at the direction or with

the knowledge and approval of Wirecard's most senior executives.[2] The reports of the Company's fraudulent accounting practices were initially dismissed by the Company as a baseless "short-seller" scheme to bring down the value of the Company's shares.

5.     The fraud was further confirmed by both a criminal inquiry in Singapore into its accounting at several subsidiaries in Asia and the Pacific, as well as a special audit by KPMG announced in November 2019.[3] The Company's Chairman, who resisted calls for an independent audit, resigned suddenly in January 2020.[4]

6.     On April 28, 2020, and after months of repeated assurances to the investing public that KPMG's audit would produce no significant negative

_____

[2] Dan McCrum, *Wirecard's suspect accounting practices revealed*, The Financial Times (Oct. 14, 2019), https://www.ft.com/content/19c6be2a-ee67-11e9-bfa4-b25f11f42901.

[3] Olaf Storbeck and Dan McCrum, *KPMG widens review of Wirecard accounting*, The Financial Times (Nov. 6, 2019), https://www.ft.com/content/e132cb98-0073-11ea-b7bc-f3fa4e77dd47.

[4] Paul J. Davies, *Wirecard Chairman Steps Down From Embattled Payments Giant*, The Wall Street Journal (Jan. 12, 2020, 1:32 PM Eastern), https://www.wsj.com/articles/wirecard-chairman-steps-down-from-embattled-payments-giant-11578768359.

SECOND AMENDED CLASS ACTION COMPLAINT

findings,[5,6,7,8] Wirecard published the highly-anticipated report of KPMG's special

audit of the Company's accounting practices.[9] KPMG's audit investigated allegations

raised by both *The Financial Times* and the First Amended Complaint[10] concerning

Wirecard's accounting of third party business acquisitions and partnerships, which

historically represented a significant portion of Wirecard's revenues and profits.

---

[5] *See* Press Release, Wirecard, Wirecard: KPMG's special audit has no impact on the annual financial statements of the period under review in the areas of investigation India, Singapore and Merchant Cash Advance (Mar. 12, 2020), https://www.dgap.de/dgap/News/corporate/wirecard-kpmgs-special-audit-has-impact-the-annual-financial-statements-the-period-under-review-the-areas-investigation-india-singapore-and-merchant-cash-advance-the-investigation-thirdparty-partner-business-still-ongoing/?newsID=1293373 (*previously available at* https://ir.wirecard.com/websites/wc/English/3150/financial-news.html?newsID=1923069) [ECF No. 74-4].

[6] Press Release, Wirecard, Wirecard AG: KPMG's special audit (Mar. 12, 2020), https://ir.wirecard.com/websites/wirecard/English/5110/news-detail.html?newsID=1923069&fromID=5000) [ECF No. 74-5].

[7] Press Release, Wirecard, Wirecard AG: KPMG special review lasts until April 27 2020. Analysis so far provides no evidence of balance sheet manipulation (Apr. 22, 2020), https://ir.wirecard.com/websites/wirecard/English/5110/news-detail.html?newsID=1949977&fromID=1000 [ECF No. 74-6].

[8] Aishwarya Nair, *KPMG audit finds no manipulation in Wirecard's financial statements*, Reuters (Mar. 12, 2020), https://www.reuters.com/article/us-wirecard-accounting/kpmg-audit-finds-no-manipulation-in-wirecards-financial-statements-idUSKBN20Z3UI [ECF No. 74-7].

[9] Press Release, Wirecard, Wirecard AG: KPMG delivers report on special investigation (Apr. 28, 2020), https://www.wirecard.com/company/press-releases/wirecard-ag-kpmg-delivers-report-on-special-investigation (last accessed Apr. 30, 2020); KPMG report (Apr. 27, 2020), https://www.wirecard.com/uploads/Bericht_Sonderpruefung_KPMG.pdf [ECF No. 74-8].

[10] *See* First Am. Compl. (incorporated herein by reference), ECF No. 62 ¶¶ 108-127, 146-149, 153, 155.

-4-
SECOND AMENDED CLASS ACTION COMPLAINT

7.     KPMG reported that its investigation into Wirecard's practices had been obstructed by both Wirecard and its third party partners, and it was unable to trace or verify any of the underlying transactions for 2016 to 2018, the period it was investigating. According to KPMG, the Company's third-party partners refused to cooperate, rendering KPMG unable to confirm whether the Company's reported sales revenue existed or was correct.[11] Moreover, KPMG also reported that "Bank statements that prove the receipt of payments of about €1bn at escrow agent 1, were not submitted to us," and that its investigators "have not been able to conclusively assess the reliability of the bank confirmations" sent to Wirecard's longstanding auditor, E&Y. In some cases, KPMG had to rely on screenshots instead of original documents.[12]

8.     In the hours following the release of the KPMG report, analysts and journalists quickly noted the report's alarming adverse findings. Most critically, KPMG was unable to verify over $1 billion in transactions with third parties due to Wirecard's apparent refusal or inability to provide relevant data.[13] As KPMG's

---

[11] Paul J. Davies, *Wirecard Shares Tumble as Questions Remain After Special Audit*, The Wall Street Journal (Apr. 28, 2020), https://www.wsj.com/articles/wirecard-tumbles-as-questions-remain-after-special-audit-11588071316.

[12] Olaf Storbeck and Dan McCrum, *KPMG unable to verify Wirecard's third-party profits*, The Financial Times (Apr. 28, 2020), https://www.ft.com/content/56a2057c-b975-4965-b0cf-641b83ee0f82.

[13] Sarah Syed and Eyk Henning, *Wirecard Says KPMG Could Not Review All Data for Audit*, Bloomberg (Apr. 28, 2020), https://finance.yahoo.com/news/wirecard-says-

-5-

SECOND AMENDED CLASS ACTION COMPLAINT

examination of the third party business was still ongoing, the publication of Wirecard's annual results was postponed once again.[14] KPMG encountered delays and obstacles to the investigation, including "an absence of original documents such as bank records, a 'significant delay' in accessing material and difficulty in securing interviews with key Wirecard employees."[15] One analyst described the report as "anything but a clean bill of health," and added that the years 2016 to 2018 "remain a black hole" that left Wirecard "wide open to further allegations."[16] The same day, on April 28, 2020, a prominent investor published an open letter to Wirecard's supervisory board stating that KPMG's inability to verify Wirecard's financial statements raised additional questions over management's compliance with anti-money laundering and know-your-customer laws, and called for the removal of CEO Markus Braun.[17]

---

kpmg-could-not-061125248.html [ECF No. 74-9].

[14] Olaf Storbeck and Dan McCrum, *KPMG unable to verify Wirecard's third-party profits*, Financial Times (Apr. 28, 2020), https://www.ft.com/content/56a2057c-b975-4965-b0cf-641b83ee0f82 [ECF No. 74-10].

[15] *Id.*

[16] Patricia Uhlig, Hans Seidenstuecker and Aradhana Aravindan, *Wirecard Shares Crash 26% After Critical KPMG Audit*, The New York Times (Apr. 28, 2020), https://www.nytimes.com/reuters/2020/04/28/technology/28reuters-wirecard-auditor-report.html [ECF No. 74-11].

[17] Chris Hohn and Max Schroeder, Letter: *Audit of Wirecard by KPMG*, TCI Fund Management Limited (Apr. 28, 2020), https://www.tcifund.com/files/corporateengageement/wirecard/TCI%20-%20Letter%20to%20Wirecard%2028%20April%202020.pdf [ECF No. 74-12].

SECOND AMENDED CLASS ACTION COMPLAINT

9.     On June 18, 2020, Wirecard announced that its auditor, Ernst & Young GmbH, informed the Company that €1.9 billion ($2.1 billion) (approximately a quarter of the Company's consolidated balance sheet total could not be accounted for, and that as result, the audit of its 2019 annual and consolidated financial statements would be postponed indefinitely.[18]

10.    The next day, on June 19, 2020, the Company issued a brief statement that Braun had resigned as CEO "with immediate effect" and that James Freis would take his place as interim CEO.[19]

11.    On June 22, 2020, Wirecard admitted that the $2 billion of cash on its balance sheet probably does "not exist," that it had previously mischaracterized its biggest source of profits, and that it was now trying to work out "whether, in which manner and to what extent such business has actually been conducted for the benefit of the company." The Company additionally withdrew its most recent financial results and said other years' accounts may be inaccurate.[20] Felix Hufeld, the president of

---

[18] Press Release, Wirecard, Wirecard AG: Date for publication of annual and consolidated financial statements 2019 delayed due to indications of presentation of spurious balance confirmations (June 18, 2020), https://ir.wirecard.com/websites/wirecard/English/5110/news-detail.html?newsID=1984117&fromID=1000.

[19] Charles Riley and Eoin McSweeney, *Wirecard CEO quits after $2 billion goes missing and fraud accusations fly*, CNN Business (June 19, 2020), https://www.cnn.com/2020/06/19/tech/wirecard-fraud-tech-accounting/index.html.

[20] Olaf Storbeck, Dan McCrum, and Stefania Palma, *Wirecard fights for survival as it admits scale of fraud*, Financial Times (June 22, 2020), https://www.ft.com/content/2581fda5-8c89-46b5-9acf-ba8a88d74d88.

010821-11/1334135 V1

BaFin, Germany's financial regulator, described Wirecard's situation as "a complete disaster."[21]

12.     The same evening, then-former CEO Braun was arrested in Munich, following prosecutors' suspicion that Braun was inflating Wirecard's balance sheet and sales volume by faking income from transactions with so-called third-party acquirers, possibly in cooperation with other perpetrators, for the purpose of making the company appear financially strong and more attractive for investors and customers.[22] Wirecard also announced, without explanation, that it had terminated Jan Marsalek, its chief operating officer that it had previously suspended.[23]

13.     On June 24, 2020, multiple news reports announced that Wirecard's former chief operating officer, Defendant Jan Marsalek, was missing and may have travelled to the Philippines. Menardo Guevarra, the Philippine secretary of justice,

---

[21] Paul J. Davies, *Wirecard Says Missing $2 Billion Probably Doesn't Exist*, The Wall Street Journal (June 22, 2020), https://www.wsj.com/articles/wirecards-missing-2-billion-probably-doesnt-exist-board-says-11592802732; *see also* Charles Riley, *Wirecard says missing $2 billion never existed. Its stock is down 85% in 3 days*, CNN Business (June 22, 2020), https://www.cnn.com/2020/06/22/tech/wirecard-missing-money/index.html.

[22] Karin Matussek and Sarah Syed, *Former Wirecard CEO Braun arrested over missing cash scandal*, Accounting Today (June 23, 2020), https://www.accountingtoday.com/articles/former-wirecard-ceo-braun-arrested-over-missing-cash-scandal.

[23] Steve Goldstein, *Wirecard says it's terminated COO Marsalek*, MarketWatch (June 22, 2020), https://www.marketwatch.com/story/wirecard-says-its-terminated-coo-marsalek-2020-06-22.

SECOND AMENDED CLASS ACTION COMPLAINT

reportedly announced an investigation into the Wirecard fraud by the Philippine National Bureau of Investigation.[24]

14.     On June 25, 2020, just days after $2 billion was announced missing by its auditor, Wirecard filed for insolvency,[25] reportedly owing creditors almost $4 billion.[26]

15.     At the same time, E&Y, which audited Wirecard for a decade, was facing increased scrutiny for its failure to conduct routine audit procedures that would have revealed the fraud earlier. Among its scrutinized actions was E&Y's failure for more than three years to request crucial account information from a Singapore bank where Wirecard claimed it had up to €1bn in cash — a routine audit procedure that could have uncovered the vast fraud at Wirecard.[27] The German shareholders' association

---

[24] John Reed, Olaf Storbeck, and Stefania Palma, *Philippine authorities search for Wirecard's number two in fraud probe*, Financial Times (June 24, 2020), https://www.ft.com/content/fa01a04f-8f35-4219-9aff-58f4ba58fd34; *see also* Jörn Poltz and Karen Lema, *Philippines to investigate Wirecard's phantom billions*, Reuters (June 24, 2020), https://www.reuters.com/article/us-wirecard-accounts/former-wirecard-ceo-freed-on-bail-in-missing-billions-case-idUSKBN23V0Y2.

[25] Charles Riley, *Wirecard files for insolvency after ex-CEO arrested in $2 billion scandal*, CNN Business (June 25, 2020), https://www.cnn.com/2020/06/25/tech/wirecard-insolvency/index.html.

[26] Arno Schuetze and John O'Donnell, '*The money's gone': Wirecard collapses owing $4 billion*, Reuters (June 25, 2020), https://news.yahoo.com/wirecard-files-insolvency-083819193.html.

[27] Olaf Storbeck, Tabby Kinder, and Stefania Palma, *EY failed to check Wirecard bank statements for 3 years*, Financial Times (June 26, 2020), https://www.ft.com/content/a9deb987-df70-4a72-bd41-47ed8942e83b.

SECOND AMENDED CLASS ACTION COMPLAINT

SdK announced that it had filed a criminal complaint against auditors at E&Y, targeting two current employees and one former employee of E&Y.[28]

16. The rating agency Moody's slashed its ratings on Wirecard six notches to junk level, and has now withdrawn the ratings altogether due to "insufficient or otherwise inadequate information to support the maintenance of the ratings."[29]

17. Now, with Wirecard's shares and its corresponding ADRs having collapsed, losing more than 90% of their value, Plaintiff and other Class members have suffered significant harm as a result of Defendants' wrongful acts and omissions. Moreover, if E&Y had done its job as an auditor properly, investors would not have relied on its "clean" audit opinions, nor would they have been defrauded of millions of dollars.

## II.    JURISDICTION AND VENUE

The Exchange Act claims asserted herein are asserted on behalf of purchasers of WCAGY and WRCDF shares in the United States and arise under §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and § 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

---

[28] Ryan Browne, *Wirecard auditors face legal action after collapse of scandal-hit payments firm*, CNBC (June 26, 2020), https://www.cnbc.com/2020/06/26/wirecard-investor-group-files-criminal-complaint-against-ey-auditors.html.

[29] *Moody's withdraws Wirecard ratings, says can't verify finances*, Reuters (June 22, 2020), https://www.reuters.com/article/wirecard-accounts-moodys/moodys-withdraws-wirecard-ratings-says-cant-verify-finances-idUSFWN2DX08B.

SECOND AMENDED CLASS ACTION COMPLAINT

18.     This Court has jurisdiction over the subject matter of the Exchange Act claims under 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

19.     Wirecard is subject to personal jurisdiction in the United States and in this District because, as alleged in further detail below, Wirecard: (i) engaged in the fraudulent scheme and course of conduct described herein, including by engaging in fraud that arose from transactions and occurrences that took place in and caused foreseeable losses in the United States and this District; (ii) permitted and encouraged Wirecard's stock to be traded OTC in the U.S. to grow its American shareholder base; (iii) took further advantage of the benefits and protections of U.S. law by utilizing SEC Rule 12g3-2(b), which exempted Wirecard from registration under Exchange Act Section 12(g) so long as the Company, *inter alia*, electronically published reports made in its home country, including relevant annual reports, shareholder communications and other financial reports; (iv) issued false and/or misleading statements in connection with its Rule 12g3-2(b) exemption; and (v) marketed Wirecard's securities in the U.S., including at its "Capital Markets Day" conference in New York City, with the benefits and protections of this nation's securities laws. Individual Defendants Braun, Ley, Knoop, Marsalek, Steidl, and Matthias are subject to personal jurisdiction in this District because they: (i) are or were control persons of Wirecard; and (ii) each purposefully directed their activities as alleged herein toward the United States and this District.

SECOND AMENDED CLASS ACTION COMPLAINT

20.     E&Y is subject to general personal jurisdiction in this District because it engages in continuous and systematic general business contact within the United States by virtue of: (i) its registration with the PCAOB; (ii) signing the audit opinion for at least four U.S. exchange-listed companies (Centogene, BioNTech, Trivago, and Orion); and (iii) substantially participating in the audits of at least 30 U.S. multinational corporations, including McDonald's, Expedia, Texas Instruments, Archer Daniels Midland, and other high-profile U.S. companies.

21.     E&Y is also subject to specific personal jurisdiction in the United States and in this District because, as alleged in further detail below, E&Y purposefully directed its activities at the United States and this District by preparing its audit opinions that it knew would be included in Wirecard's annual reports cited herein, which E&Y knew were translated into English and aimed at potential U.S. investors as required by Wirecard's Rule 12g3-2(b) exemption. E&Y knew, and agreed, that its name, reputation and imprimatur in these annual reports aimed at U.S. investors would be relied upon by these U.S. investors in deciding whether to purchase Wirecard ADRs. Further, the claims at issue in this actions arises out of or relates to E&Y's activities within the United States and the exercise of jurisdiction over the E&Y is reasonable under the circumstances.

22.     Venue is proper in this judicial district pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) and (c)(3) as the Company's business has an effect in this District, and because some of the fraudulent acts alleged

-12-
SECOND AMENDED CLASS ACTION COMPLAINT

010821-11/1334135 V1

misstatements alleged herein occurred or were related to transactions and occurrences that occurred in the United States and caused economic harm in the United States, including in this District.

23.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

### III.   PARTIES

**A.     Plaintiff**

24.     Plaintiff purchased the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure. Plaintiff purchased 877 shares of WCAGY and 144 shares of WRCDF through transactions on the OTC Market in the United States from September 26, 2017 to August 29, 2018, thereby acquiring an ownership interest in 582.5 shares of WDI common stock issued and authorized for sale by Wirecard. His PSLRA certification was previously filed with the Court and is incorporated by reference.

25.     The WCAGY ADRs reflecting Plaintiff's purchases and his beneficial ownership of the underlying WDI shares were issued by one of three Depository Banks, each located in New York City, within the United States. Contemporaneous with Plaintiff's purchase and issuance of the ADR, the 582.5 shares of WDI common

SECOND AMENDED CLASS ACTION COMPLAINT

stock in which he acquired an ownership interest were deposited with the applicable Depository Bank, which held the shares for the benefit of Plaintiff.

26.   Plaintiff incurred irrevocable liability in the United States to purchase the WCAGY and WRCDF shares he acquired during the Class Period. The placement of the buy order, the payment of the purchase price, transfer of the title to the securities, and other related transactions took place within the territorial jurisdiction of the United States:

a)   Plaintiff initiated the purchase of WCAGY and WRCDF by placing the buy order through Plaintiff's broker, Fidelity, based in Boston, Massachusetts;

b)   Plaintiff purchased WCAGY and WRCDF on the OTC Market using a trading platform based in the United States;

c)   On information and belief based on the facts about the OTC Market alleged herein, the purchase order and trade confirmation were routed through servers located wholly within the United States;

d)   The WCAGY ADRs reflecting Plaintiff's purchase and his ownership interest in the underlying WDI shares was issued by Citibank, JPMorgan, or BNY from their depositary bank office in New York;

e)   Plaintiff's purchases of WCAGY and WRCDF were settled on September 28, 2017, October 16, 2017, and August 31, 2018 through payments totaling $111,201.74 (including commission) in U.S. dollars disbursed

-14-

from his personal bank account maintained by Excite Credit Union in San Jose, California; and

f) As required by the ADR agreements filed with the SEC by Citibank, JPMorgan, and BNY (*see infra* § IV.B.2), a transfer of title establishing Plaintiff's beneficial ownership of WCAGY and WRCDF and the Wirecard shares on deposit on his behalf was recorded on the transfer books of the Depository Bank maintained in New York.

## B.     Defendant Wirecard

27.     Defendant Wirecard, a technology company, purports to provide outsourcing and white label solutions for electronic payment transactions worldwide. The Company is headquartered in Aschheim, Germany. Wirecard securities trade OTC under the ticker symbols "WCAGY" and "WRCDF," and in various Germany-based stock exchanges under the ticker symbol "WDI."

## C.     Individual Defendants

28.     Defendant Markus Braun ("Braun") has served as the Company's Chief Executive Officer ("CEO") since 2002. Braun is a member of the Company's Management Board, and the Company's single largest shareholder.

29.     Defendant Burkhard Ley ("Ley") served as the Company's Chief Financial Officer ("CFO") from the beginning of the Class Period until December 31, 2017. Ley served as a member of the Company's Management Board.

SECOND AMENDED CLASS ACTION COMPLAINT

30.     Defendant Alexander von Knoop ("Knoop") has served as the Company's CFO since January 1, 2018. Knoop is a member of the Company's Management Board.

31.     Defendant Jan Marsalek ("Marsalek") has served as the Company's Chief Operating Officer ("COO") and a member of the Company's Management Board since February 2010.

32.     Defendant Susanne Steidl ("Steidl") serves on the Company's Management Board and as Chief Product Officer ("CPO"), effective January 1, 2018.

33.     Defendant Wulf Matthias ("Matthias") served as the Chairman of the Supervisory Board of the Company until January 11, 2020 and as a member of the Supervisory Board at all relevant times.

34.     Defendants Braun, Ley, Knoop, Marsalek, Steidl, and Matthias are herein referred to as the "Individual Defendants."

35.     Each of the Individual Defendants:

a)     directly participated in the management of the Company;

b)     was directly involved in the day-to-day operations of the Company at the highest levels;

c)     was privy to confidential proprietary information concerning the Company and its business and operations;

SECOND AMENDED CLASS ACTION COMPLAINT
010821-11/1334135 V1

d)      was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

e)      was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

f)      was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

g)      approved or ratified these statements in violation of the federal securities laws.

36.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

37.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

38.     The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

**D.     Auditor Defendant**

39.     Defendant Ernst & Young GmbH Wirtschaftspruefungsgesellschaft ("E&Y") served as the Company's independent auditor for approximately 10 years

-17-

010821-11/1334135 V1

and during the Class Period. E&Y's audit opinions were incorporated into the Company's annual and quarterly reports during the Class Period.

40. E&Y is registered with, and has been assigned I.D. Number 1251 by the United States Public Company Accounting Oversight Board ("PCAOB").

## IV.   WIRECARD SECURITIES AT ISSUE

41. Each of the Class members acquired beneficial ownership interests in Wirecard through the purchase of one or more of the following securities: WDI, WRCDF and/or WCAGY (all as further described and defined below).

## A.   Securities Granting Ownership Interests in Common Stock Issued and Authorized for Sale by Wirecard

42. Wirecard's common stock is publicly traded on the Frankfurt Stock Exchange, Börse Stuttgart, and Tradegate Exchange stock exchanges in Germany under the ticker symbol "WDI."

43. Wirecard common stock is also sold in the United States as "F-shares" under the ticker "WRCDF." An F-share is a foreign security denominated in U.S. currency, and traded on the U.S. OTC Market based in New York. One share of WRCDF represents ownership of one share of Wirecard common stock sold under the ticker symbol WDI in Germany. An F-share is established in the U.S. when a broker-dealer files with the Financial Industry Regulatory Authority ("FINRA") to create a ticker symbol in order to facilitate reporting trades in the U.S. in the company's

-18-

SECOND AMENDED CLASS ACTION COMPLAINT

security. OTC Markets Group, Inc., the operator of the OTC Markets, identifies WRCDF as "Ordinary Shares" on its website.[30]

44.     Wirecard common stock is also packaged and sold on the OTC Markets in the United States under the ticker symbol "WCAGY." WCAGY is an American Depository Receipt ("ADR") reflecting ownership of shares of WDI common stock that have been deposited with or are otherwise controlled by a depositary institution in the United States and held for the benefit of the WCAGY purchaser. One share of WCAGY conferred on Class Period purchasers a beneficial ownership interest in 0.5 shares of Wirecard WDI common stock that had been authorized for sale by Wirecard. OTC Markets Group identifies WCAGY as an ADR on its website.[31]

45.     Purchasers of WCAGY and WRCDF shares on the OTC Markets become irrevocably liable to purchase the shares at the stated price at the time their purchase order is placed.

46.     As of the first day of the Class Period, Wirecard had issued and authorized the sale of more than 100 million shares of common stock.[32]

---

[30] *See* Wirecard Overview, OTC Markets, https://www.otcmarkets.com/stock/WRCDF/overview (last visited Feb. 13, 2020).

[31] *See* Wirecard Filings and Disclosure, OTC Markets, https://www.otcmarkets.com/stock/WCAGY/disclosure (last visited Feb.13, 2020).

[32] *See Connected Commerce: Annual Report 2016*, Wirecard, https://ir.wirecard.com/download/companies/wirecard/Annual%20Reports/DE000747 2060-JA-2016-EQ-E-03.pdf (last visited Feb. 14, 2020).

SECOND AMENDED CLASS ACTION COMPLAINT

47.     Only shares of common stock that had been issued and authorized by Wirecard were available to be sold as ADRs or F-shares in the United States under the ticker symbols WRCDF and WCAGY (*see infra* § IV.B.).

48.     Both WRCDF and WCAGY shares are bought and sold at market prices that are set to equal the trading price of WDI on the Frankfurt Stock Exchange, Börse Stuttgart, and Tradegate Exchange stock exchanges at the time of the transaction, converted to U.S. dollars at the then-current foreign currency exchange rate (USD to Euros). Thus, events that impact the trading price of WDI shares on the Frankfurt Stock Exchange, Börse Stuttgart, and Tradegate Exchange stock exchanges have a contemporaneous impact on the trading price of WRCDF and WCAGY shares sold on the OTC Markets in the United States.

**B.     Establishment of and Trading in Wirecard ADRs**

**1.     Nature of an ADR**

49.     The sale of ADRs was authorized by Congress in 1927, as a way to permit American investors to diversify their portfolios by acquiring shares of foreign companies without the necessity of purchasing those shares on foreign exchanges using foreign currency. The SEC has explained that "ADRs allow U.S. investors to invest in non-U.S. companies and give non-U.S. companies easier access to the U.S. capital markets."[33]

---

[33] Ex. 5, SEC Office of Investor Education and Advocacy, Investor Bulletin: American Depositary Receipts (Aug. 2012) at 1 ("SEC ADR Bulletin").

SECOND AMENDED CLASS ACTION COMPLAINT

50.     WCAGY and other ADRs are sold in the United States pursuant to regulations adopted by the SEC, including SEC Rule 12g3-2(b), 17 C.F.R. § 240.12g3-2(b).

51.     The purchase of an ADR is equivalent to the purchase of the underlying foreign securities (here, WDI shares issued by Wirecard) which are held by the depositary banks for the benefit of the purchasers of the ADR (here, WCAGY). As explained by the SEC:

> An ADR is a negotiable certificate that evidences an ownership interest in American Depositary Shares ("ADSs") which, in turn, represent an interest in the shares of a non-U.S. company that have been deposited with a U.S. bank. It is similar to a stock certificate representing shares of stock. The terms ADR and ADS are often used interchangeably by market participants. ADRs trade in U.S. dollars and clear through U.S. settlement systems, allowing ADR holders to avoid having to transact in a foreign currency.

SEC ADR Bulletin at 1.

52.     Thus, ADRs, including WCAGY, are securities that represent specific shares of common stock of foreign issuers that have been deposited with a U.S. bank. This method of sale of foreign shares in the United States has historically been referred to in the industry as a "hat check" model, because an ADR is akin to the receipt provided to a customer who left his hat for safekeeping at the door of a nightclub or restaurant. The hat, in turn, is akin to the foreign shares, which is the article that the customer (investor) has purchased and deposited for safekeeping.

010821-11/1334135 V1

53.     SEC regulations, including SEC Rule 12g3-2(b), require depository institutions to acquire and hold shares of foreign securities in an amount equal to the number of those shares sold as ADRs in the United States, based on the ratio of foreign-to-domestic shares stated in the ADR.[34] The underlying shares of common stock must be deposited with the depositary institution by the time the ADR transaction is cleared, thereby removing them from the market until the ADR is cancelled or sold. Thus, the number of foreign shares that can be sold as ADRs in the United States is limited by the number of shares that have been issued and authorized for sale by the foreign issuer. An ADR program has no ability to expand ownership interests in the foreign issuer beyond the limits established by that issuer (*see infra* § IV.B.2.).

54.     ADRs may be either "sponsored" or "unsponsored." Sponsored ADRs are established pursuant to a contract signed by the foreign issuer. Unsponsored ADRs are established by one or more depositary banks by filing a Form F-6 with the SEC. Unsponsored ADRs may only be established where, *inter alia*: (i) no sponsored ADR program exists; (ii) the foreign issuer is listed on a regulated foreign exchange; (iii) the foreign issuer provides regular financial reports and other investor information in

---

[34] For example, during the Class Period WCAGY ADRs were issued at a ratio of .5 foreign shares (WDI) for each ADS. Thus, for every 1 million shares of WCAGY sold, the depositary banks were required to hold 500,000 shares of WDI for the benefit of the purchasers.

SECOND AMENDED CLASS ACTION COMPLAINT

English, and on a website that is generally available to U.S. investors; and (iv) the holder of the ADR is entitled to receive the corresponding deposited shares issued by the foreign company on demand at any time.

55.   Unsponsored ADRs are not sold without the express or implied consent of the foreign issuer. As described in more detail below, each of the depositary institutions involved in the sale of unsponsored ADRs has a regular practice of contacting foreign issuers before an unsponsored program is established, and will generally not establish or sell unsponsored ADRs where the foreign issuer refuses to consent.

**2.   Establishment of the WCAGY ADR Program**

56.   WCAGY is an unsponsored ADR.

57.   WCAGY shares are denominated in U.S. dollars, cleared through U.S. settlement systems, and listed alongside U.S. stocks.

58.   Three depositary institutions have filed Forms F-6 with the SEC to register and issue WCAGY ADRs in the United States: Citibank, N.A. ("Citibank") (filed Sept. 18, 2013); The Bank of New York Mellon ("BNY") (filed Oct. 2, 2019); and JPMorgan Chase Bank, N.A. ("JPMorgan ") (filed Nov. 22, 2019).[35] Exs. 1-4.

59.   The number of WCAGY shares that are available for sale in the United States is limited by the number of WDI shares that have been issued and authorized

_____

[35] Citibank, BNY, and JPMorgan are collectively referred to herein as the "Depositary Banks."

SECOND AMENDED CLASS ACTION COMPLAINT

for sale by Wirecard, as explained above. Depositary banks are prohibited from selling WCAGY shares that are not supported by underlying shares of WDI stock deposited and held by the depositary. Thus, as with ADRs generally, the Depositary Banks here have no ability to create or issue additional securities or shares of Wirecard beyond the number of WDI shares that have been specifically issued and authorized for sale by the Company.

60.    The Forms F-6 filed by each of the Depositary Banks identify the location of its depository as a physical address in New York City, New York, within the territory of the United States.

61.    Each Form F-6 includes a form of agreement between the Depositary Bank and the holders of WCAGY shares (a "Form of ADR"). Each such agreement filed by the Depositary Banks states that it is to be interpreted under the laws of New York, within the United States.

62.    Each Form of ADR contains terms:

    a)  with the bank for the benefit of the purchaser;

    b)  obligating the bank to hold the deposited WDI shares for the benefit of the purchaser;

    c)  requiring the bank to deliver the WDI shares to the WCAGY purchaser immediately upon tender of their ADR to the bank;

SECOND AMENDED CLASS ACTION COMPLAINT

d) affirming that Wirecard publishes financial and other information required by SEC Rule 12g3-2(b) in English on a website generally available to the public;

e) undertaking to maintain transfer books at the bank's New York City office that list the owners of the ADRs to record transfers of title in those books upon the purchase or sale of an ADR, and to make those books available for inspection during regular business hours;

f) obligating the bank to distribute dividends and other distributions of cash or rights associated with the WDI shares to the WCAGY purchaser on whose behalf those shares are being held; and

g) providing for the reimbursement of certain expenses and fees that may be charged by the bank for its custodial and other services provided under the agreement.

63. Purchasers of WCAGY have the right under the Form of ADR filed by the Depositary Banks to tender their ADRs to the Depositary Bank and receive the underlying WDI shares in return. The Forms of ADR attached to the Forms F-6 filed by each of the Depositary Banks require that, to obtain their underlying WDI shares, purchasers must tender their receipt evidencing the purchase of ADRs (i.e., their ADR), at the Depositary Bank's office in New York.

64. Each Form of ADR attached to the Forms F-6 filed by the Depositary Banks contains the following clause, or a substantially identical clause:

-25-

SECOND AMENDED CLASS ACTION COMPLAINT

Until the surrender of this Receipt in accordance with the terms hereof, the Depositary or its agent will keep a register for the registration and registration of transfers of Receipts and where the Holders of Receipts may, during regular business hours, inspect the transfer books or the list of Holders of Receipts as maintained by the Depositary. The transfer of this Receipt is registrable on the transfer books of the Depositary by the Holder hereof in person or by duly authorized attorney, upon surrender of this Receipt properly endorsed for transfer or accompanied by proper instruments of transfer and payment of funds sufficient to pay the fees and expenses of the Depositary and any applicable taxes and other governmental charges and upon compliance with such regulations, if any, as the Depositary may establish for such purpose.

65.     Consistent with the economic reality of the transaction, the Form of ADR filed with the SEC by each of the Depositary Banks reflects that purchasers are being provided with a receipt reflecting their purchase and ownership of shares of common stock – i.e., WDI – that have been authorized and issued by Wirecard. *See* Ex. 1 (Form F-6, at Exhibit (a)) (Citibank Form of ADR "Evidencing **American Depositary Shares Representing Shares of Common Stock of Wirecard AG**"); Ex. 3 (Form F-6 Exhibit 1) (BNY Form of ADR "Statement of Terms and Conditions with Respect To **American Depositary Shares Representing Common Stock of Wirecard AG**"); Exs. 2 (Form F-6, at Exhibit (a)); Ex. 4 (Form F-6, at Exhibit (a)) (JPMorgan Forms of ADR "Evidencing **American Depositary Shares Representing Ordinary Shares of Wirecard AG**").

SECOND AMENDED CLASS ACTION COMPLAINT
010821-11/1334135 V1

**3.     Wirecard's Consent to Sale of WCAGY**

66.     It is a regular practice and custom in the industry for a depositary institution to notify the foreign issuer of securities of its intent to register those securities for sale as unsponsored ADRs in the United States, and to obtain its affirmative or implied consent to the sale of those securities before an unsponsored ADR is sold. If a foreign issuer refuses to consent or otherwise objects to the establishment of an unsponsored ADR program, a depositary institution ordinarily will not proceed to register or sell those shares as unsponsored ADRs.

67.     For example, in a regulatory comment letter sent to the SEC on April 21, 2008 addressing the question of whether proposed regulations should require formal consent from foreign issuers before an unsponsored ADR program is established, Deutsche Bank, one of the primary ADR depository banks in the U.S., asserted that such a requirement was unnecessary because: "in practice depositary banks obtain the issuer's consent before establishing an unsponsored ADR program." The bank further explained:

> In our experience, foreign issuers are often willing to allow a depositary bank to establish an unsponsored ADR program but are reluctant to memorialize this in writing. We believe that, given the adequacy of the current environment of self-regulation, the protection provided issuers by the ability to affirmatively object to the establishment of an unsponsored ADR program and the benefit provided to U.S. investors by ***unsponsored ADR programs, consent should be implied by a lack of affirmative objection by the issuer***.

68.     Other commentators who regularly advise entities involved in ADR transactions have made similar observations. In an October 2008 article discussing the SEC's adoption of regulations permitting the sale of unsponsored ADRs, the law firm of Paul, Weiss noted, for example, that a "depositary typically requests a letter of non-objection from the issuer before establishing an unsponsored program."[36] Similar observations were made in articles by other law firms regularly involved in advising ADR issuers and investors following the Ninth Circuit's decision in this action.[37]

69.     Based on the foregoing information and belief, one or more of the Depositary Banks, consistent with their business practices and the custom in the industry, contacted Wirecard before the WCAGY ADS program was established and before any WCAGY shares were registered or sold in the United States. On the same information and belief, during those contacts the Depositary Banks: (i) provided

---

[36] Paul, Weiss, Rifind, Wharton & Garrison LLP, *SEC Amends Form F-6, which has Implications for Foreign Private Issuers that do not have ADR Programs* (October 2008), https://www.paulweiss.com/media/1053659/3nov08-f-6.pdf.

[37] *See* Linklaters, *Ninth Circuit Holds that Rule 10b-5 Could Apply to Unsponsored ADRs Traded Over the Counter* (Aug. 3, 2018) https://www.lexology.com/library/detail.aspx?g=6f9186bf-77e5-4bf0-a772-7ede4a9628dd ("Although an unsponsored facility may be established without the consent of the issuer, the depositary will typically request a letter of non-objection from the issuer before establishing the program in order to maintain a good relationship with the issuer."); Sullivan & Cromwell, *Ninth Circuit Holds that Non-U.S. Issuers Can Be Liable in U.S. for Unsponsored American Depositary Receipt Facility* (July 30, 2018) at 2, https://www.sullcrom.com/files/upload/SC-Publication-Ninth-Circuit-Upholds-Lawsuit-Over-Unsponsored-American-Depositary-Receipts.pdf ("depositary banks frequently seek letters of non-objection from the non-U.S. issuer before establishing an unsponsored ADR facility").

SECOND AMENDED CLASS ACTION COMPLAINT

Wirecard with an opportunity to object to and prevent the establishment of such program; (ii) obtained a letter of non-objection or other evidence of consent from Wirecard; and/or (iii) took other actions intended to obtain Wirecard's consent to the sale of unsponsored ADRs in the United States or from which such consent could reasonably be implied.

70.     Wirecard either provided its affirmative consent to the sale of its WDI shares as ADRs in the United States or its consent may be implied under the circumstances.

71.     Wirecard did not make any affirmative objection to, or take any other action reasonably calculated to prevent, the sale of its common stock as unsponsored ADRs in the United States, despite having been provided with an opportunity to do so.

72.     WCAGY would not have been offered for sale in the United States absent Wirecard's affirmative or implied consent to the sale of unsponsored ADRs in the United States.

73.     The following facts lend additional support for finding that Wirecard either affirmatively consented to or participated in the sale of its WDI stock or that such consent and participation may reasonably be implied from its actions.

    a)  Wirecard published its quarterly and annual results in English, as required to support the sale of unsponsored ADRs in the United States. Had Wirecard not published that information in English, or ceased such publication, the sale of its WDI stock as ADRs would have been

-29-

SECOND AMENDED CLASS ACTION COMPLAINT

prohibited and Wirecard would have been required to register its common stock pursuant to § 12(g) of the Exchange Act, 15 U.S.C. § 78L(g).

b) It is unlikely that the Depositary Banks or brokers assisting with transactions in WCAGY or WRCDF, individually or collectively, could have obtained a sufficient number of WDI shares to support sales of those securities without the participation, assistance or consent of Wirecard.

c) The Depositary Banks' substantial holdings in Wirecard common stock also make it unlikely that they would have established an unsponsored ADR program for the sale of WCAGY shares without the consent, or over the objection, of Wirecard.

## C.     The OTC Market

74.     WCAGY and WRCDF shares trade on the Pink market, which is part of the OTC Markets. The OTC Markets and the Pink market are both located in the United States, and are operated by OTC Markets Group, which is based in New York City and are regulated by FINRA and the U.S. Securities and Exchange Commission.

75.     Trades on the OTC Markets are accomplished through the OTC Link Alternative Trading System ("ATS") registered with the SEC and regulated by both the SEC and FINRA. OTC Link ATS allows broker-dealers to quote any OTC equity security eligible for quoting under SEC Rule 15c2-11, 17 C.F.R. § 240.15c2-11. There are thousands of securities quoted on the OTC Link ATS. OTC Link ATS delivers

SECOND AMENDED CLASS ACTION COMPLAINT

trade messages electronically, allowing subscribers to execute, negotiate, or decline trade messages.

76.     The SEC maintains a website containing lists of alternative trading systems, which states: "An ATS is a trading system that meets the definition of 'exchange' under federal securities laws but is not required to register as a national securities exchange . . . ."[38] By rule, the SEC has exempted ATSs from the definition of "exchange" only for the purpose of relieving ATSs from the requirement to register as a national exchange subject to § 6 of the Exchange Act, 15 U.S.C. § 78f.

77.     In its 2018 annual report to investors, OTC Markets Group described OTC Link as follows:

> OTC Link ATS offers our broker-dealer subscribers a fully-attributable, network-based model for quoting and facilitating transactions in OTC equity securities and serves a diverse community of FINRA member broker-dealers that operate as market makers, agency brokers and ATSs, including Electronic Communication Networks ("ECNs"). OTC Link ATS provides a suite of quotation and trade-messaging services offering broker-dealers control of trades and choice of counterparties so they can efficiently provide best execution, attract order flow, and comply with FINRA and SEC regulations. Unlike traditional exchanges and matching engines, OTC Link ATS is not an intermediary. Rather, OTC Link ATS delivers trade messages electronically, allowing subscribers to execute or negotiate trades.
>
> OTC Link ECN functions as a matching engine and router for certain OTC securities. OTC Link ECN complements OTC Link ATS by providing FINRA registered broker-dealer

---

[38] Alternative Trading System ("ATS") List, U.S. Securities and Exchange Commission, https://www.sec.gov/foia/docs/atslist.htm (last visited Feb. 13, 2020).

SECOND AMENDED CLASS ACTION COMPLAINT

subscribers with anonymous order matching functionality. OTC Link ECN acts as an agency intermediary in relation to all transactions executed on the ECN's platform. When orders do not match internally on OTC Link ECN's matching engine, they are routed to an interdealer quotation system where they may appear as quotes using the market participant identifier "OTCX".

[…]

OTC Markets Group Inc. ("OTC Markets Group" or the "Company") (OTCQX: OTCM) operates the OTCQX® Best Market; the OTCQB® Venture Market; and the Pink® Open Market for 10,000 U.S. and global securities. Through OTC Link® ATS and OTC Link ECN, each a Securities and Exchange Commission ("SEC") registered Alternative Trading System ("ATS") operated by the Company's wholly-owned subsidiary OTC Link LLC, a Financial Industry Regulatory Authority, Inc. ("FINRA") and SEC registered broker-dealer, the Company enables investors to easily trade through the broker of their choice and empowers companies to improve the quality and availability of information for their investors.

The Company has three business lines: OTC Link, Market Data Licensing and Corporate Services.

- <u>OTC Link</u> – OTC Link LLC operates two ATSs. OTC Link ATS and OTC Link ECN, which provide trading services to FINRA member broker-dealer subscribers.

- <u>Market Data Licensing</u> – OTC Markets Group provides real-time data, delayed and historical market data, company financial data, security master data, corporate reference data and compliance data for securities traded on the OTCQX, OTCQB and Pink markets. The Market Data Licensing business line provides investors, traders, institutions and regulators with a suite of enterprise and user market data licenses, offered via direct or extranet connectivity, through third party market data redistributors or Order Management Systems ("OMS").

-32-

- <u>Corporate Services</u> – OTC Markets Group operates the OTCQX Best Market and the OTCQB Venture Market and offers companies a suite of services that are designed to create a better informational experience for investors by facilitating public disclosure and communication with investors, promoting greater transparency and allowing companies to demonstrate regulatory compliance and mitigate market risk. These services include the OTC Disclosure & News Service, Real-Time Level 2 Quote Display and Blue Sky Monitoring Service.

78.     The OTC Link ATS permits subscribing broker-dealers to view and publish quotes and negotiate trades in Pink-listed securities, including WCAGY and WRCDF. OTC Link ATS is described on OTC Markets Group's website as an "electronic messaging system" where "[t]raders have direct access to send, execute, negotiate or decline trade messages with increased efficiency and speed."[39] OTC Link ATS is operated by OTC Link LLC, located in New York City.[40]

79.     Broker-dealers can access OTC Link though OTC Dealer, which OTC Markets Group describes as a "high-performance, real-time, front-end application [that] provides a consolidated quotation, trading and information system to attract and access market liquidity."[41]

---

[39] OTC Link ATS Overview, OTC Markets, https://www.otcmarkets.com/otc-link/overview (last visited Feb. 13, 2020).

[40] OTC Markets Group Inc. 2018 Annual Report, https://backend.otcmarkets.com/otcapi/company/financial-report/213065/content (last visited Feb. 13, 2020).

[41] OTC Link ATS Overview, *supra* note 14.

SECOND AMENDED CLASS ACTION COMPLAINT

80.     As of December 31, 2018, 91 broker-dealers subscribed to our OTC Link ATS.[42]

81.     All of the broker-dealers listed in the OTC Market Group's online directory of broker dealers are located in the United States.[43]

82.     According to the company profile posted by Bloomberg, "OTC Link serves clients in the United States."[44]

83.     Trades on the OTC Markets are arranged through the broker-dealers who have subscribed to OTC Link ATS. The broker-dealers may execute the trade internally or externally through market or limit offers posted on OTC Link ATS. Completed trades are reported, cleared and settled by the broker-dealers involved in the transaction. Trades on the OTC Markets are deemed complete upon the delivery of funds by the buyer and delivery of securities by the seller.

84.     FINRA members are prohibited from publishing quotations in any security unless the member is prepared to purchase or sell at the price quote and under the conditions stated at the time the offer is posted. FINRA, Rule 5220 (eff. Jul. 9,

_____

[42] *Id.*

[43] Broker-Dealer Directory, OTC Markets, https://www.otcmarkets.com/otc-link/broker-dealer-directory (last visited Feb. 13, 2020).

[44] OTC Link LLC Company Profile, Bloomberg, https://www.bloomberg.com/profile/company/0719514D:US (last visited Feb. 13, 2020).

2012) ("Rule 5220").[45] The OTC Markets Group further describes Rule 5220 on its website as follows: "Plain speak: Broker-dealers must honor their posted quotes."[46]

85.     Transactions in WCAGY and WRCDF were conducted via servers and facilities located wholly within the United States.

86.     According to OTC Markets Group's FY16, FY17 and FY18 annual reports, its operations during the Class Period were conducted from offices located in New York City and Washington D.C. According to OTC Markets Group's website, brokers access OTC Dealer and OTC Fix through one of five extranet providers in the United States: BT Radianz, TNS, Century Link, NYSE Technologies Connectivity Inc. (SFTI), or Options-IT.

87.     ADRs are issued and shares of Wirecard common stock (WDI) required to support the sale of WCAGY shares are maintained by depositaries located in New York, where transfers of interests in those securities are recorded.

88.     As a result of the foregoing, purchasers and sellers of and WRCDF incur irrevocable liability in the United States to complete transactions executed through the OTC Link ATS.

---

[45] 5220. Offers at Stated Prices Rules & Guidance, Finra, https://www.finra.org/rules-guidance/rulebooks/finra-rules/5220 (last visited Feb. 13, 2020).

[46] Regulation Governing Trading in OTCQX, OTCQB and Pink Markets, OTC Markets, https://www.otcmarkets.com/learn/market-101/regulation (last visited Feb. 13, 2020).

SECOND AMENDED CLASS ACTION COMPLAINT

## V.   BACKGROUND INFORMATION

### A.   Wirecard's Business

89.     Wirecard is a "payment processor" that helps websites collect credit card payments from customers. Wirecard acts as a so-called "Acquirer," an entity that collects money from card issuers and distributes it to merchants.

90.     Wirecard operates its business through a worldwide network of subsidiaries and affiliated companies whose activities and financial data were misleadingly represented by the Company's top executives during the Class Period, as described below. During the Class Period, Wirecard treated its subsidiaries and business units as mere instrumentalities of itself, ordering them to improperly recognize assets in order to meet profit and valuation expectations that Wirecard had established even knowing the targets could not be attained without falsifying financial results. Wirecard used the phrase "Wirecard Group" throughout its public reports and filings to refer to Wirecard and its consolidated subsidiaries.

91.     In Europe, Wirecard owns a bank licensed by Visa and MasterCard to act as an acquirer. But because it lacks similar licenses to act as an acquirer in other countries, Wirecard has said it uses third party acquirers ("TPAs") to help transact around half the payments it processes. Wirecard claims that it coordinated such third-party business primarily through Dubai, Dublin and Munich, where three of the group's largest and most profitable subsidiaries are based.

-36-

92.     The Company regularly communicates with investors through the periodic publication of English-language quarterly and annual reports, and in press releases, conference calls, and investor and analyst presentations. During the Class Period, Wirecard maintained an English-language corporate website at http://www.wirecard.com, on which it established an Investor Relations section where its quarterly and annual reports, press releases, conference call transcripts, corporate profiles, descriptions of its business, and other information about the Company is made available to investors. Wirecard's annual and quarterly reports included detailed financial information presenting data in both Euros and U.S. currency.

93.     On an ongoing basis and for each fiscal year, Wirecard published on its Internet website English-language versions of its annual and quarterly reports, earnings and other press releases, investor presentations, governance and business policies, and other information reflecting the Company's results of operations or financial condition, changes in business, acquisitions or dispositions of assets, changes in  management or control, and other information required to maintain compliance with SEC Rule 12g3-2(b), 17 C.F.R. § 240.12g3-2(b) (*see* ¶¶ 7, 43, 46, 55).

94.     According to the Company's 2018 Annual Report, the Company employs at least 100 employees in its United States-based subsidiary, Wirecard North America, Inc. The Company's 2018 Annual Report also states that in June 2016, Wirecard acquired Citi Prepaid Card Services, a business that "has already issued more than

-37-

2,500 card programmes for large international companies, primarily on the North American market."

95.     Wirecard maintained a substantial presence in the United States through its business activities, operations, and corporate representatives in the United States. During the Class Period, Wirecard's Wirecard North America, Inc. was a corporation organized under U.S. law with its headquarters in Pennsylvania. Wirecard North America, Inc. is a subsidiary of Wirecard, with all of its equity effectively held by Wirecard.

**B.     Wirecard's Growth and History**

96.     Wirecard was founded in 1999 in a suburb of Munich, Germany.

97.     In 2002, Defendant Braun (a former KPMG consultant) took over as chief executive officer and merged Wirecard with Electronic Business Systems.

98.     In 2005, Wirecard was listed on the Frankfurt stock market through a reverse merger with a defunct call centre group, a tactic often employed by companies to avoid the scrutiny of an initial public offering. By this time, Wirecard had 323 employees and the core of its business was managing payments for online gambling and pornography websites.

99.     Although initially known for processing payments for online gambling and pornography websites, Wirecard purchased a bank in 2006, and evolved into a full-service payments operation.

010821-11/1334135 V1

100.   Wirecard has grown by buying smaller payment processing businesses and groups of customers, including a 2017 deal to take on 20,000 merchant clients of Citibank, spread over 11 Asia-Pacific countries.

101.   The Company has also expanded its geographic reach by working with various Third Party Acquirer ("TPA") firms with whom it partners when Wirecard lacks the experience or license to process payments itself.

## VI.   THE FRAUDULENT SCHEME TO OVERSTATE WIRECARD'S REPORTED FINANCIAL RESULTS DURING THE CLASS PERIOD

102.   Throughout the Class Period, Wirecard and the Individual Defendants engaged in a variety of transactions that illicitly fabricated huge sums of nonexistent revenues and otherwise artificially inflated Wirecard's reported financial results, including: a) the recognition of false revenues from TPA transactions; b) the recognition of false revenue from related party transactions and "round-tripping" transactions; and c) reporting huge (and fraudulent) cash balances.

## A.   Wirecard's Recognition of False Revenues from Phony TPA Transactions With Foreign Wirecard Subsidiaries

103.   Half of Wirecard's reported revenues and profits during the Class Period were generated through "partnerships" between Wirecard subsidiaries and three TPAs: 1) Al Alam Solutions (based in a largely unmanned office suite in Dubai); 2) PayEasy Solutions (based in the Philippines); and 3) Senjo (Singapore). According to Wirecard, in jurisdictions in which Wirecard is not licensed to act as an acquirer, it refers clients to these licensed TPAs, in exchange for a share of the processing fees generated by

-39-

those clients. In 2016, Wirecard's partnership with these TPAs purportedly generated revenues of €541 million and resulted in EBITDA of €290 million – representing more than half of Wirecard's reported annual revenues and approximately 95% of its EBITDA.

104.   These partnerships were between TPAs and foreign subsidiaries of Wirecard that were not audited by E&Y, but whose financial results flowed into Wirecard's consolidated reported financial results.

105.   In some instances, it appears that Wirecard reported the revenue of its third-party acquiring partners as Wirecard's own, and used escrow accounts funded by its subsidiaries to bolster the reported cash in Wirecard's account. In other instances, it appears that the revenues and profits that Wirecard recognized from these TPA partnerships were false, and appear to have been generated through bogus and nonexistent "transactions" between foreign subsidiaries of Wirecard with TPAs.

106.   One disturbing example regarding Wirecard's largest "TPA partner" Al Alam Solutions was uncovered by *The Financial Times*.[47] Al Alam was purportedly a TPA partnering with Wirecard to process approximately €350 million in credit card transactions per month for 34 of Wirecard's largest customers. Wirecard claimed to refer clients to Al Alam in exchange for a share of the processing fees generated by

---

[47] Dan McCrum, *Wirecard's Suspect Accounting Practices Revealed*, The Financial Times (Oct.15, 2019), https://www.ft.com/content/19c6be2a-ee67-11e9-bfa4-b25f11f42901.

SECOND AMENDED CLASS ACTION COMPLAINT

those clients. **Wirecard's partnership with Al Alam generated approximately half of Wirecard's annual profits in 2016**. Curiously, the profits from Wirecard's Al Alam partnership were routed through subsidiaries in Dubai and Ireland that do not file public financial statements.

107.   However, as uncovered by a FINANCIAL TIMES investigation, **the vast majority of these transactions appear to be fabricated**. FT reported that it visited Al Alam at its Dubai headquarters, only to find a "threadbare" company with just 6 or 7 employees. FT uncovered a raft of evidence demonstrating that the claimed €350 million per month in processing transactions (as well as the related revenues and profits Wirecard recognized in its financial reports) were fabricated. The evidence cited by FT included:

- When asked by *The Financial Times* in the course of its investigation, Visa and MasterCard both said they did not license Al Alam;

- When contacted by the FT, 15 of the 34 "clients" identified in Wirecard's internal financial records said that they "had never heard of Al Alam";

- Although Wirecard's internal financial records claim that Al Alam was processing €46 million on a monthly basis during 2017 for a Wirecard client called Cymix Pyramid, Irish corporate records show that Cymix was liquidated in 2012;

- Wirecard's financial records recorded approximately €24 million of credit card transactions processed by Al Alam on behalf of U.S.-based CCBill, but that company's Chief Operating Officer told FT that his company had no connection to Al Alam "of any kind.";

-41-

- Wirecard's financial records reflect additional significant revenues and profits from its partnership in purported Al Alam processing transactions for companies that were no longer in business, including Bank de Binary, Molotok and Piku.

108.   The phony revenues generated in the Al Alam partnership transactions were recognized by two thinly-staffed Wirecard subsidiaries, CardSystems Middle East (based in Dubai) and Wirecard UK & Ireland (based in Dublin).

109.   Although the revenues and profits from the purported partnership with TPA Al Alam appear to be entirely (or nearly entirely) false, internal Wirecard financial records demonstrate that *Wirecard recognized €265 million in revenues leading to €173 million in EBITDA from these phony transactions – more than 25% of Wirecard's reported revenues and more than half of its reported EBITDA for 2016*.

**B.     Wirecard's Fraudulent Recognition of "Round-Triping" Sales**

110.    Singapore is the headquarters for Wirecard in Asia. During the Class Period, a senior Wirecard executive in Singapore used forged and backdated contracts in a string of transactions that illicitly fabricated the sales and profits of Wirecard subsidiaries in Asia and the Pacific.

111.   This fraudulent activity was confirmed by a report from a whistleblower within the Company. Wirecard's compliance department retained Rajah & Tann ("R&T"), a Singapore law firm, to conduct an inquiry. The lawyers found evidence of forged documents, accounting irregularities and potential money laundering in

-42-

multiple jurisdictions, ultimately leading to an internal presentation entitled "Project Tiger Summary" that outlined potential violations of Singapore law, including "falsification of accounts" and "money laundering" related to €37 million, which was relayed to the company's four most senior executives, including Defendant Braun, on May 8, 2018.

112.   For instance, the presentation describes contracts with a value of €13m, dated in 2017 and 2018, between four Wirecard subsidiaries and Flexi Flex, a hydraulics and piping company with offices in Singapore and Malaysia. However, all of these revenues were bogus and appear to be based on forged contracts, as confirmed by a director of Flexi Flex that told *The Financial Times* he had not heard of Wirecard, and that his company did not sell software, have Indonesian clients, or even use a payment company.

113.   The "Project Tiger Summary" also described "round-trip transactions" in which money was routed from Wirecard businesses in Hong Kong and Singapore to those it owned in India via external companies and illicitly recognized as "sales" transactions. For example, EUR 2 million was recognized as revenues in a "round-trip" transaction on March 10, 2018 where Wirecard paid an outside company named Inventures, which then transferred the funds to Wirecard subsidiaries Hermes and GI Tech. Far from a legitimate sale to a third party, this transaction merely moved money from one Wirecard entity to another.

SECOND AMENDED CLASS ACTION COMPLAINT

114.   Recognition of these revenues violated Generally Accepted Accounting Principles, including IFRS 15.[48]

**C.     Improper Recognition of Cash and Cash Equivalents**

115.   Due to the huge amounts of phony revenues described above, Wirecard reported corresponding and dramatically increasing cash balances in its annual financial statements during the Class Period:

| Year | Cash (thousands of Euros) |
|------|---------------------------|
| 2015 | 1,062,968 |
| 2016 | 1,332,631 |
| 2017 | 1,901,334 |
| 2018 | 2,719,800 |

116.   By December 31, 2018, Wirecard's reported cash balances of more than €2.7 billion were *almost half* of the Company's reported total assets.

117.   On June 22, 2020, Wirecard admitted that approximately €1.9 billion of the cash the Company had reported as an asset in its annual financial statements probably does "not exist."

---

[48] *Revenue from Contracts With Customers*, International Financial Reporting Standard No. 15, International Financial Reporting Standards Board.

SECOND AMENDED CLASS ACTION COMPLAINT

## VII.   MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

### A.   Wirecard's False and Misleading Reported 2015 Results

118.   The Class Period commences on August 17, 2015, when the Company issued its second quarter 2015 financial report (Q2 2015 Report), which was entitled, "***Being Agile – Creating Value***," which announced outstanding reported interim 2015 financial results as of June 30, 2015, including revenues of €340 million (an increase of 21% from the 2014 interim results); EBITDA of €98 million (an increase of 24%); and total assets of over €2 billion (an increase of 17%). However, these reported financial results were materially false and misleading for the reasons described in Section VI, *supra*.

119.   The Q2 2015 Report also promised a continuation of its "successful strategy of organic growth combined with acquisitions," and reported on the Company's cash, cash equivalents, and net assets in pertinent part as follows:

> Cash equivalents comprise current, extremely liquid financial investments that can be converted at any time at short notice into certain amounts of cash and are only subject to negligible fluctuations in value.
>
> […]
>
> Assets reported in the balance sheet of Wirecard AG increased by kEUR 103,225 in the first half year 2015, rising from kEUR 1,995,159 to kEUR 2,125,384. In the period under review, both non-current and current assets grew, with the latter increasing from kEUR 1,183,013 to kEUR 1,283,102.

-45-

SECOND AMENDED CLASS ACTION COMPLAINT

120.   This disclosure was materially false and misleading because they were based upon false financial information and improper accounting methodology, as described in Section VI, *supra*.

121.   Wirecard's Q2 2015 Report was signed by Defendants Braun, Ley and Marsalek.

122.   The Q2 2015 Report also contained a statement attesting to the preparation of the report in accordance with IFRS and IAS:

> The financial statements as of 30 June 2015 were prepared in accordance with IAS 34 (Interim Financial Reporting) with consideration to the International Financial Reporting Standards (IFRS) and the International Accounting Standards (IAS) as adopted by the EU.

123.   This disclosure was materially false and misleading when made for the reasons described in Section VI, *supra*.

124.   On April 7, 2016, Wirecard issued a press release entitled "*Annual Results: Wirecard AG Reports a Successful 2015 Fiscal Year*," which announced outstanding reported financial results for the year ended December 31, 2015, including revenues of €771.3 million and operating earnings before interest, tax, depreciation and amortization (EBITDA) of €227.3 million. The April 7, 2016 Press Release also disclosed that these excellent reported financial results were the result of "strong organic growth" from both old and new customers:

> The Wirecard Group's strong organic growth in the 2015 fiscal year was based on vigorous growth of the e-commerce core business. This is due to market growth and the resulting

-46-

SECOND AMENDED CLASS ACTION COMPLAINT

010821-11/1334135 V1

rise in transaction volumes from our currently 22,000 existing customers, as well as the sales successes achieved with new customers and partners.

The April 7, 2016 Press Release also forecast significantly higher revenues and earnings in 2016 based upon continued "organic growth" in its target markets:

> The Wirecard Group will continue to pursue primarily organic growth in its target markets. Acquisition opportunities will continue to be reviewed according to conservative M&A criteria. The strategy envisages providing customers of Wirecard AG with highest quality technology and service that is made readily available through the company's presence on all continents.

> Wirecard AG's Management Board expects operating earnings before interest, tax, depreciation and amortisation (EBITDA) of between EUR 290 million and EUR 310 million in 2016. This growth forecast is based on the market growth of online transactions inEurope, dynamic development of our global business, particularly in Asia, and our activities in the area of mobile services, as well as on our ability to open up new business areas

125.   The April 7, 2016 Press Release also directed investors to the Company's annual report (the "2015 Annual Report"), even providing a link to the web address containing this report (www.ir.wirecard.com/financialreports).

126.   The April 7, 2016 Press Release was materially false and misleading when disseminated because, *inter alia*: a) the financial information contained therein (including disclosure of Wirecard's revenues, EBITDA and net income) were materially misstated as described in Section VI, *supra*; b) the Company's reported

-47-

SECOND AMENDED CLASS ACTION COMPLAINT

financial results were not the result of "organic growth," but rather the result of falsified financial reporting.

127.   Also on April 7, 2016, Wirecard held a conference call hosted by Defendants Braun and Ley to discuss the 2015 reported financial results with analysts and investors. This conference call was available to investors in the U.S. and throughout the world. In the conference call, Defendants Braun and Ley discussed and elaborated upon the same false and misleading financial results set forth in the April 7, 2016 Press Release. Additionally, Defendant Braun disclosed the transaction volume from various geographical areas:

> Outside Europe, we had a transaction volume of EUR11.2 billion, from which EUR2.2 billion were in Singapore, EUR2.1 billion in Indonesia, EUR3.6 billion were the rest of Asia Pacific without Singapore and Indonesia. In the Americas, we did EUR1.6 billion, and in Middle East Africa EUR1.7 billion.

This disclosure was materially false and misleading because the transaction volumes were materially overstated, as described herein.

128.   Wirecard's 2015 Annual Report was made available on the Company's website by April 7, 2016. The 2015 Annual Report contained the same materially false and misleading financial information as the April 7, 2016 Press release and was thereby false and misleading for the same reasons.

129.   The 2015 Annual Report also contained a sworn statement by Defendants Braun, Ley and Marsalek attesting to the accuracy of Wirecard's financial reporting:

-48-

010821-11/1334135 V1

**Responsibility statement and disclosures pursuant to Section 37Y No. 1 of the German Securities Trading Act (WpHG) in combination with Sections 297 (2) Clause 4 and 315 (1) Clause 6 of the German Commercial Code (HGB)**

To the best of our knowledge, and in accordance with the applicable reporting principles, the consolidated financial statements give a true and fair view of the assets, liabilities, financial position and results of operations of the Group, and the group management report includes a fair review of the development and performance of the business and the position of the Group, together with a description of the principal opportunities and risks associated with the expected development of the Group.

This disclosure was materially false and misleading when made because Wirecard's financial statements were materially false and misleading and did not give a true and fair view of the value of the revenues, earnings, assets, liabilities, shareholders' equity and financial position and results of operations of Wirecard.

130. Wirecard's 2015 Annual Report also stated the Company had systems in place to "guarantee" the correct accounting of business processes and transactions and to "ensure[] compliance" with accounting regulations and statutory standards. The 2015 Annual Report stated, in relevant part:

**2.4 Internal control and risk management system relating to the Group financial accounting process**

The Wirecard Group has an internal control and risk management system relating to the (Group) accounting process, in which suitable structures and processes are defined and then implemented within the organisation. <u>This is designed to guarantee the timely, uniform and correct accounting of all business processes and transactions</u>. It

-49-

SECOND AMENDED CLASS ACTION COMPLAINT

ensures compliance with statutory standards, accounting regulations and the internal Group accounting directive, which is binding for all companies included in the consolidated financial statements. (emphasis added).

131. This statement was materially false and misleading because the Company's system of accounting and financial reporting internal controls were woefully deficient, as described in more detail in Section VI, *supra*.

132. The 2015 Annual Report also included E&Y's materially false and misleading disclosures that: 1) it had audited Wirecard's reported financial results pursuant to relevant professional auditing standards; and 2) based upon this audit, Wirecard's reported financial results were "a true and fair view of the net assets, financial position and results of operations of" Wirecard (emphasis added):

> **We have audited** the consolidated financial statements prepared by Wirecard AG . . . . We conducted our audit of the consolidated financial statements in accordance with Sec. 317 HGB and **German generally accepted standards** for the audit of financial statements . . . . **We believe that our audit provides a reasonable basis for our opinion**.
>
> Our audit has not led to any reservations.
>
> In our opinion, based on the findings of our audit, the consolidated financial statements comply with IFRSs as adopted by the EU as well as the additional requirements of German commercial law pursuant to Sec. 315a (1) HGB and give a true and fair view of the net assets, financial position and results of operations of the Group in accordance with these requirements. The group management report is consistent with the consolidated financial statements and as a whole provides a suitable view of the Group's position and suitably presents the opportunities and risks of future development.

SECOND AMENDED CLASS ACTION COMPLAINT

Munich, 6 April 2016

Ernst & Young GmbH

Wirtschaftsprüfungsgesellschaft

133. E&Y's disclosures described immediately above were materially false and misleading when made because, as described more fully in Section IX, *infra*: (1) E&Y knew, or was reckless in not knowing that Wirecard's financial statements were materially false and misleading and wildly overstated the Company's actual financial results; (2) E&Y had not conducted any audit of Wirecard's reported financial information consistent with generally accepted auditing standards; and (3) due to E&Y's massive audit flaws, any audit performed by E&Y was the equivalent of "no audit at all" and could not offer a reasonable basis to provide assurance of the accuracy of Wirecard's reported financial results.

**B.    Wirecard's False and Misleading Reported 2016 Results**

134. On April 6, 2017, the Company issued a press release Wirecard issued a press release entitled "*Wirecard AG: Successful 2016 Fiscal Year*," which announced outstanding reported financial results for the year ended December 31, 2016, including revenues of €1,028.4 million (an increase of 33% from 2015); EBITDA of €307.4 million (an increase of 35.2%); and net income of €266.7 million (an increase of 87%). However, these reported financial results were materially false and misleading for the reasons described in Section VI, *supra*.

-51-

010821-11/1334135 V1

135.   The April 6, 2017 Press Release further disclosed that the transaction volume processed through the Wirecard platform grew by 36.5 percent to €61.7 billion, including transaction volume of €August 17, 2015 outside Europe (31.8% of total transaction volume).

136.   The April 6, 2017 Press Release also predicted a "strong performance" of even better financial results in 2017:

> The Management Board of Wirecard AG expects a strong performance in the 2017 fiscal year and confirms its forecast for earnings before interest, tax, depreciation and amortisation (EBITDA) of between EUR 382 million and EUR 400 million.

137.   This disclosure was materially false and misleading because they were based upon false financial information and improper accounting methodology, as described in Section VI, *supra*.

138.   The April 6, 2017 Press Release also disclosed that Wirecard's "2016 Annual Report is available on the company's website at:

ir.wirecard.com/financialreports.

139.   Wirecard's 2016 Annual Report was signed by Defendants Braun, Ley and Marsalek. The 2016 Annual Report disclosed annual revenues of €1,028.4 million, EBITDA of €307.4 million, net income of €266.7 million, total assets of €3,482.1 million and shareholder's equity of €1,475.0 million. These reported financial results were all materially false and misleading for the reasons described in Section VI, *supra*.

SECOND AMENDED CLASS ACTION COMPLAINT

140.   The 2016 Annual Report also contained a sworn statement by Defendants Braun, Ley and Marsalek attesting to the accuracy of Wirecard's financial reporting:

> **Responsibility statement and disclosures pursuant to Section 37Y No. 1 of the German Securities Trading Act (WpHG) in combination with Sections 297 (2) Clause 4 and 315 (1) Clause 6 of the German Commercial Code (HGB)**
>
> To the best of our knowledge, and in accordance with the applicable reporting principles, the consolidated financial statements give a true and fair view of the assets, liabilities, financial position and results of operations of the Group, and the group management report includes a fair review of the development and performance of the business and the position of the Group, together with a description of the principal opportunities and risks associated with the expected development of the Group.

141.   This disclosure was materially false and misleading when made because Wirecard's financial statements were materially false and misleading and did not give a true and fair view of the value of the revenues, earnings, assets, liabilities, shareholders' equity and financial position and results of operations of Wirecard.

142.   Wirecard's 2016 Annual Report stated the Company had systems in place to "guarantee" the correct accounting of business processes and transactions and to "ensure[] compliance" with accounting regulations and statutory standards. The 2016 Annual Report stated, in relevant part:

> **2.4 Internal control and risk management system relating to the Group financial accounting process**
>
> The Wirecard Group has an internal control and risk management system relating to the (Group) accounting

SECOND AMENDED CLASS ACTION COMPLAINT

process, in which appropriate structures and processes are defined and then implemented within the organisation. ***This is designed to guarantee the timely, uniform and correct accounting of business processes and transactions***. It ***ensures compliance*** with statutory standards, accounting regulations and the internal Group accounting directive, which is binding for all companies included in the consolidated financial statements. Any amendments to laws, accounting standards and other pronouncements are analysed for their relevance to, and impact on, the consolidated financial statements, and the internal directives and systems within the Group are adjusted to take account of the resulting changes.

The foundations of the internal control system, in addition to defined control mechanisms such as technical and manual reconciliation and coordination processes, lie in the separation of functions and ensuring compliance with directives and work instructions. The Group accounting process at Wirecard AG is managed by the Accounting and Controlling departments.

143. This statement was materially false and misleading because the Company's system of accounting and financial reporting internal controls were woefully deficient, as described in more detail in Section VI, *supra*.

144. The 2016 Annual Report also included E&Y's materially false and misleading disclosures that: 1) it had audited Wirecard's reported financial results pursuant to relevant professional auditing standards; 2) had reviewed Wirecard's systems of internal control; and 3) based upon this audit, Wirecard's reported financial results were "a true and fair view of the net assets, financial position and results of operations of" Wirecard (emphasis added):

-54-

SECOND AMENDED CLASS ACTION COMPLAINT

*We have audited* the consolidated financial statements prepared by Wirecard AG, Aschheim, comprising the consolidated balance sheet, the consolidated income statement, the consolidated statement of comprehensive income, the consolidated statement of changes in equity, the consolidated cash flow statement, and the notes to the consolidated financial statements, together with the group management report for the fiscal year from 1 January 2016 to 31 December 2016.

\*   \*   \*

*We conducted our audit of the consolidated financial statements in accordance with Sec. 317 HGB and German generally accepted standards* for the audit of financial statements promulgated by the Institut der Wirtschaftsprüfer [Institute of Public Auditors in Germany] (IDW). Those standards require that we plan and perform the audit such that misstatements materially affecting the presentation of the net assets, financial position and results of operations in the consolidated financial statements in accordance with the applicable financial reporting framework and in the group management report are detected with reasonable assurance. Knowledge of the business activities and the economic and legal environment of the Group and expectations as to possible misstatements are taken into account in the determination of audit procedures. *The effectiveness of the accounting-related internal control system and the evidence supporting the disclosures in the consolidated financial statements and the group management report are examined primarily on a test basis within the framework of the audit.* The audit includes assessing the annual financial statements of those entities included in consolidation, the determination of entities to be included in consolidation, the accounting and consolidation principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements and the group management report. We believe that our audit provides a reasonable basis for our opinion.

Our audit has not led to any reservations.

-55-

SECOND AMENDED CLASS ACTION COMPLAINT

> In our opinion, based on the findings of our audit, **the consolidated financial statements comply with IFRSs as adopted by the EU as well as the additional requirements of German commercial law pursuant to Sec. 315a (1) HGB and give a true and fair view of the net assets, financial position and results of operations of the Group in accordance with these requirements.** The group management report is consistent with the consolidated financial statements, satsfy the legal requirements and as a whole provides a suitable view of the Group's position and suitably presents the opportunities and risks of future development.
>
> Munich, 5 April 2017
>
> Ernst & Young GmbH Wirtschaftsprüfungsgesellschaft

145.   These statements were false and misleading because as described more fully in Section IX, *infra*: 1) E&Y was reckless in not knowing that Wirecard's financial statements contained numerous false and misleading statements, 2) E&Y had not taken Wirecard's poor internal controls into account in designing audit procedures; and 3) E&Y failed to conduct an appropriate audit of Wirecard in accordance with applicable auditing principles.

## C.   Wirecard's False and Misleading Reported 2017 Results

146.   On April 12 2018, the Company issued a press release entitled "*Wirecard AG: Targets for 2017 fiscal year achieved*," which announced outstanding reported financial results for the year ended December 31, 2017, including the following:

> Group revenues increased by 44.9 percent to EUR 1.5 billion (PY: EUR 1.0 billion). The transaction volume processed through the Wirecard platform grew by 47.5 percent to EUR 91.0 billion (PY: EUR 61.7 billion). A transaction volume of EUR 39.3 billion was generated outside Europe (PY: EUR August 17, 2015).

SECOND AMENDED CLASS ACTION COMPLAINT

Operating earnings before interest, tax, depreciation and amortisation (EBITDA) increased in 2017 compared to the previous year by 34.2 percent to EUR 412.6 million (PY: EUR 307.4 million). In the 2017 fiscal year, the EBITDA margin increased to 27.7 percent (PY: 29.9 percent). The cash flow from operating activities (adjusted) amounted to EUR 375.7 million (PY: EUR 283.0 million).

In the 2017 fiscal year, earnings after tax increased by 46.8 percent to EUR 259.7 million, compared to the earnings in 2016 adjusted for the special effect from the sale of Visa Europe of EUR 176.9 million. Thus earnings per share stood at EUR 2.10 (PY: EUR 1.43).

However, these reported financial results were materially false and misleading for the reasons described in Section VI, *supra*.

147.   The April 12, 2018 Press Release also predicted even better financial results in 2017:

Due to the strong organic business development, Wirecard Management Board has increased the EBITDA guidance for the fiscal year 2018 to EUR 520 million to EUR 545 million (previous guidance: EUR 510 million to EUR 535 million).

148.   This disclosure was materially false and misleading because they were based upon false financial information and improper accounting methodology, as described in Section VI, *supra*.

149.   The April 12, 2018 Press Release also disclosed that Wirecard's "2017 Annual Report is available on the company's website at:

ir.wirecard.com/financialreports.

SECOND AMENDED CLASS ACTION COMPLAINT

150.   Wirecard's 2017 Annual Report was signed by Defendants Braun, Knoop, Steidl, Marsalek, and Matthias. The 2017 Annual Report disclosed annual revenues of €1,490.0 million, EBITDA of €412.6 million, net income of €259.7 million, total assets of €4,527.5 million and shareholder's equity of €1,635.2 million. These reported financial results were all materially false and misleading for the reasons described in Section VI, *supra*.

151.   The 2017 Annual Report also contained a sworn statement by Defendants Braun, Knoop, Steidl and Marsalek attesting to the accuracy of Wirecard's financial reporting:

> **Responsibility statement and disclosures pursuant to Section 37Y No. 1 of the German Securities Trading Act (WpHG) in combination with Sections 297 (2) Clause 4 and 315 (1) Clause 6 of the German Commercial Code (HGB)**
>
> To the best of our knowledge, and in accordance with the applicable reporting principles, the consolidated financial statements give a true and fair view of the assets, liabilities, financial position and results of operations of the Group, and the group management report includes a fair review of the development and performance of the business and the position of the Group, together with a description of the principal opportunities and risks associated with the expected development of the Group.

152.   This disclosure was materially false and misleading when made because Wirecard's financial statements were materially false and misleading (as described in Section VI, *supra*, and did not give a true and fair view of the value of the revenues,

-58-

SECOND AMENDED CLASS ACTION COMPLAINT

earnings, assets, liabilities, shareholders' equity and financial position and results of operations of Wirecard.

153.   Wirecard's 2017 Annual Report stated the Company had systems in place to "guarantee" the correct accounting of business processes and transactions and to "ensure[] compliance" with accounting regulations and statutory standards. The 2017 Annual Report stated, in relevant part (emphasis added):

> **2.4 Internal control and risk management system relating to the Group financial accounting process**
>
> The Wirecard Group has an internal control and risk management system also in relation to the (Group) accounting process, in which appropriate structures and processes are defined and then implemented within the organisation. This is designed to ***guarantee the timely, uniform and correct accounting*** of business processes and transactions. It ***ensures compliance with statutory standards, accounting regulations*** and the internal Group accounting directive, which is binding for all companies included in the consolidated financial statements.

154.   This statement was materially false and misleading because the Company's system of accounting and financial reporting internal controls were woefully deficient, as described in more detail in Section VI, *supra*.

155.   The 2017 Annual Report also included E&Y's materially false and misleading disclosures that: 1) it had audited Wirecard's reported financial results pursuant to relevant professional auditing standards; 2) had reviewed Wirecard's systems of internal control; and 3) based upon this audit, Wirecard's reported financial

results were "a true and fair view of the net assets, financial position and results of operations of" Wirecard (emphasis added):

> *We have audited* the consolidated financial statements of Wirecard AG, Aschheim, and its subsidiaries (the Group), which comprise the consolidated statement of financial position as of 31 December 2017, the consolidated statement of comprehensive income, consolidated statement of cash flows and consolidated statement of changes in equity for the fiscal year from 1 January 2017 to 31 December 2017, and notes to the consolidated financial statements, including a summary of significant accounting policies.

> \*   \*   \*

> In our opinion, on the basis of the knowledge obtained in the audit,

> –the accompanying consolidated financial statements comply, in all material respects, with the IFRS as adopted by the EU, and the additional requirements of German commercial law pursuant to Section 315e (1) of the German Commercial Code (HGB) and, in compliance with these requirements, give a true and fair view of the assets, liabilities, and financial position of the Group as of 31 December 2017, and of its financial performance for the fiscal year from 1 January 2017 to 31 December 2017.

> **Basis for the opinions**

> *We conducted our audit* of the consolidated financial statements and of the group management report in accordance with Section 317 HGB and the EU Audit Regulation (No 537/2014, referred to subsequently as "EU Audit Regulation") and *in compliance with German Generally Accepted Standards for Financial Statement Audits* promulgated by the Institut der Wirtschaftsprüfer [Insti-tute of Public Auditors in Germany] (IDW).

SECOND AMENDED CLASS ACTION COMPLAINT

156.   These statements were false and misleading because as described more fully in Section IX, *infra*: (1) E&Y was reckless in not knowing that Wirecard's financial statements contained numerous false and misleading statements, (2) E&Y had not taken Wirecard's poor internal controls into account in designing audit procedures; and (3) E&Y failed to conduct an appropriate audit of Wirecard in accordance with applicable auditing principles, including IFRS or PCAOB Standards.

**D.    Wirecard's False and Misleading Reported 2018 Results**

157.   On April 25, 2019, Wirecard issued a press release entitled "*Wirecard AG: Next Stage of Growth*," which announced outstanding reported financial results for the year ended December 31, 2018, including the following:

> Wirecard has entered the next stage of its growth path. In 2018, Group revenues increased by 35.4 percent to EUR 2.02 billion (PY: EUR 1.49 billion). The transaction volume processed through the Wirecard platform grew by 37.3 percent to EUR 124.9 billion (PY: EUR 91.0 billion).

> Operating earnings before interest, tax, depreciation and amortisation (EBITDA) increased in 2018 compared to the previous year by 36.6 percent to EUR 560.5 million (PY: EUR 410.3 million). In the 2018 fiscal year, the EBITDA margin increased to 27.8 percent (PY: 27.6 percent). The cash flow from operating activities (adjusted) amounted to EUR 500.1 million (PY: EUR 375.7 million). The free cash flow from operating activities (adjusted) increased by 50.0 percent to EUR 423.9 million (PY: EUR 282.6 million).

> Earnings after tax increased by 35.7 percent to EUR 347.4 million (PY: EUR 256.1 million), which corresponds to earnings per share of EUR 2.81 (PY: EUR 2.07).

SECOND AMENDED CLASS ACTION COMPLAINT

However, these reported financial results were materially false and misleading for the reasons described in Section VI, *supra*.

158.   The April 25, 2019 Press Release also predicted even better financial results in 2019:

> Wirecard's Management Board has confirmed the EBITDA forecast for the 2019 fiscal year of between EUR 740 million and EUR 800 million.

159.   This disclosure was materially false and misleading because they were based upon false financial information and improper accounting methodology, as described in Section VI, *supra*.

160.   The April 25, 2019 Press Release also disclosed that Wirecard's "2018 Annual Report is available on the company's website at: ir.wirecard.com/financialreports.

161.   Wirecard's 2018 Annual Report was signed by Defendants Braun, Knoop, Steidl, Marsalek, and Matthias. The 2018 Annual Report disclosed annual revenues of €2,016.2 million, EBITDA of €560.5 million, net income of €347.4 million, total assets of €5,854.9 million and shareholder's equity of €1,922.7 million. These reported financial results were all materially false and misleading for the reasons described in Section VI, *supra*.

162.   The 2018 Annual Report also contained a sworn statement by Defendants Braun, Knoop, Steidl and Marsalek attesting to the accuracy of Wirecard's financial reporting:

-62-

**Responsibility statement**

To the best of our knowledge, and in accordance with the applicable reporting principles, the consolidated financial statements as of 31 December 2018 give a true and fair view of the assets, liabilities, financial position and results of operations of the Group, and the group management report, which has been combined with the management report for Wirecard AG, includes a fair view of the development and performance of the business and the position of the Group, together with the description of the principal opportunities and risks associated with the expected development of the Group.

163. The Annual Report 2018, in a section signed by Defendant Matthias, included the following regarding E&Y auditing the Company, in pertinent part:

Financial statements of the company and the consolidated financial statements

Ernst & Young Gmbh Wirtschaftsprüfungsgesellschaft audited the financial statements of the company as of 31 December 2018, the consolidated financial statements as of 31 December 2018 and the management report for the company and the Group, and issued unqualified audit opinions thereon. *The financial statements and the management report of the company were prepared in accordance with the German Commercial Code (HGB). The consolidated financial statements and the Group management report of the company were prepared in accordance with the International Financial Reporting Standards (IFRS) as well as the additional requirements of German law pursuant to Section 315e (1) of the HGB.*

In addition, Ernst & Young GmbH Wirtschaftsprüfungsgesellschaft, Stuttgart, Munich branch, was commissioned to complete an audit with limited assurance of the Group non-financial declaration in accordance with ISAE 3000 and produced a corresponding report. The Group non-financial declaration has been published on the company's website at ir.wire.com.

-63-

SECOND AMENDED CLASS ACTION COMPLAINT

At the meeting on 24 April 2019, *the Supervisory Board intensively discussed and examined the consolidated financial statements and the Group management report, the Group non-financial declaration prepared in accordance with Section 315b of the HGB, the financial statements and management report for the company, the auditor's report and the Management Board's planned proposal for the appropriation of profit.* The required documents were submitted to the members of the Supervisory Board in good time before the meeting so that they had sufficient opportunity to examine them. The auditor participated at this meeting of the Supervisory Board, reported on key audit results and was available to the members of the Supervisory Board to provide supplementary information. The auditor addressed in particular key audit matters which included allegations by a whistle-blower in Singapore. The auditor also explained his findings on the company's control and risk management system relating to the financial accounting process. The Supervisory Board will participate in the further strengthening of these systems in the course of the continuing growth of the company (cf. 2.5 of the Risk Report). *The auditor stated his independence and provided information about services that had been rendered in addition to the auditing services in the 2018 fiscal year.*

The Supervisory Board approved the results of the audit carried out by the auditor and concluded that no objections needed to be raised based on the final results of its examination. The Supervisory Board in particular concurs with the conclusion of the auditor that - taking into account the corrections made by Wirecard – there are no objections against the accounting treatment of the facts that were the subject of various allegations made by a purported whistle-blower in Singapore (cf. the statements under 2.5 of the Risk Report regarding current investigations of the authorities in Singapore and possible criminal liability of individual employees.) In this context, the Supervisory Board took into consideration in particular the quality of the alleged behavior and the materiality threshold for the group audit. With a resolution dated 24 April 2019, the Supervisory Board approved both the consolidated financial statements of the

-64-

company prepared according to IFRS for the 2018 fiscal year and the financial statements of the company prepared according to the HGB for the 2018 fiscal year. The financial statements have consequently been adopted in the sense of Section 172 of the AktG.

At the meeting on 24 April 2019, the Supervisory Board approved this Report of the Supervisory Board, as well as the Corporate Governance Report that is combined with the Corporate Governance Statement.

[…]

At the Annual General Meeting 2018, Ernst & Young GmbH Wirtschaftsprüfungsgesellschaft, Stuttgart, Munich branch, was appointed as the auditor for the financial statements of the company and the consolidated financial statements. The responsible auditor for the 2018 fiscal year in Mr. Martin Dahmen. Ernst & Young GmbH Wirtschaftsprüfungsgesellschaft has been the sole auditor of the company and the Group since 2011 and was previously joint auditor together with RP Richter GmbH Wirtschaftsprüfungsgesellschaft since 2009. In December 2018 the company published the invitation to tender for the group audit 2019. After the completion of the tender procedure the new auditor will be elected by the Annual General Meeting 2019.

*It was agreed with the auditor of the financial statements that he/she would report to the Supervisory Board without delay all findings and events material to the duties of the Supervisory Board as determined in the course of its audit.*

*In addition, the auditors are required to inform the Supervisory Board and/or to make a note in the audit report if they encounter facts in the course of the audit that are irreconcilable with the statement of compliance issued by the management Board and Supervisory Board in accordance with Section 161 AktG.*

(Emphasis added.)

-65-

SECOND AMENDED CLASS ACTION COMPLAINT

164.   The foregoing statements were materially false and misleading when made because Wirecard's financial statements were materially false and misleading (as described in Section VI, *supra*, and did not give a true and fair view of the value of the revenues, earnings, assets, liabilities, shareholders' equity and financial position and results of operations of Wirecard.

165.   Wirecard's 2018 Annual Report stated the Company had systems in place designed to "guarantee" the correct accounting of business processes and transactions and to "ensure[] compliance" with accounting regulations and statutory standards. The 2018 Annual Report stated, in relevant part (emphasis added):

### 2.4 Internal control and risk management system

Wirecard has an internal control and risk management system also in relation to the (Group) accounting process, in which appropriate structures and processes are defined and then implemented within the organisation. This is *designed to guarantee the timely, uniform and correct accounting of business processes and transactions*. It *ensures compliance with statutory standards, accounting regulations and the internal Group accounting directive*, which is binding for all companies included in the consolidated financial statements. Any amendments to laws, ac-counting standards and other pronouncements are ana-lysed for their relevance to, and impact on, the consolidated financial statements, and the internal directives and systems within the Group are adjusted to take account of the resulting changes.

166.   This statement was materially false and misleading because the Company's system of accounting and financial reporting internal controls were woefully deficient, as described in more detail in Section VI, *supra*.

SECOND AMENDED CLASS ACTION COMPLAINT

167.   The 2018 Annual Report also included E&Y's materially false and misleading disclosures that: 1) it had audited Wirecard's reported financial results pursuant to relevant professional auditing standards; 2) had reviewed Wirecard's systems of internal control; and 3) based upon this audit, Wirecard's reported financial results were "a true and fair view of the net assets, financial position and results of operations of" Wirecard (emphasis added):

> **We have audited** the consolidated financial statements of Wirecard AG, Aschheim, and its subsidiaries (the Group), which comprise the consolidated statement of financial position as of 31 December 2018, the consolidated income statement, the consolidated statement of comprehensive income, consolidated statement of changes in equity and consolidated statement of cash flows for the fiscal year from 1 January 2018 to 31 December 2018, and notes to the consolidated financial statements, including a summary of significant accounting policies.
>
> *   *   *
>
> In our opinion, on the basis of the knowledge obtained in the audit, *the accompanying consolidated financial statements comply, in all material respects, with the IFRS* as adopted by the EU, and the additional requirements of German commercial law pursuant to Sec. 315e (1) of the HGB ["Handelsgesetzbuch": German CommercialCode] and, in compliance with these requirements, give a true and fair view of the assets, liabilities, and financial position of the Group as at 31 December 2018,and of its financial performance for the reporting year from 1 January 2018 to 31 December 2018.
>
> **Basis for the opinions**
>
> **We conducted our audit** of the consolidated financial statements and of the group management report in accordance with Sec. 317 HGB and the EU Audit Regulation (No 537/2014, referred to subsequently as "EU Audit

-67-

010821-11/1334135 V1

Regulation") and **in compliance with German Generally Accepted Standards for Financial Statement Audits** promulgated by the Institut der Wirtschaftsprüfer [Institute of Public Auditors in Germany] (IDW).

168.    These statements were false and misleading because as described more fully in Section IX, *infra*: (i) E&Y was reckless in not knowing that Wirecard's financial statements contained numerous false and misleading statements, (ii) E&Y had not taken Wirecard's poor internal controls into account in designing audit procedures; and (iii) E&Y failed to conduct an appropriate audit of Wirecard in accordance with applicable auditing principles.

## VIII.  THE TRUTH REGARDING WIRECARD'S MASSIVE FRAUD EMERGES THROUGH A SERIES OF PARTIAL DISCLOSURES

169.    On January 30, 2019, *The Financial Times* reported that a Wirecard executive had used forged and backdated contracts in a string of suspicious transactions that, it said, raised questions about the integrity of the company's accounting practices. According to the article, an internal presentation "outlined potential violations of Singapore law, including 'falsification of accounts' and 'money laundering.'" Further, "[t]he whistleblower who briefed the FT on the document was motivated to do so, the person said, out of a concern that no action appeared to have been taken over potentially criminal acts inside a company presenting itself as a blue-chip financial institution."

170.    On this disturbing news, shares of WCAGY fell $8.54 per share from the prior day's closing price of $95.20 (or nearly 9%) to close at $86.66 per share on

SECOND AMENDED CLASS ACTION COMPLAINT

January 30, 2019. Shares of WRCDF fell $28.10 per share from the prior day's closing price of $190.00 per share (nearly 15%) to close at $161.90 per share on January 30, 2019.

171.   In order to prop up its share price, Wirecard immediately issued a statement on January 30, 2019 calling *The Financial Times* article "false, inaccurate, misleading and defamatory" and further claiming that the article "lacks any substance and is completely meaningless."

172.   On February 1, 2019, *The Financial Times* reported that "[a]n external law firm commissioned by Wirecard to investigate the payment company's Singapore office found evidence indicating 'serious offences of forgery and/or of falsification of accounts', according to a preliminary report on the inquiry seen by the Financial Times." According to the article, the lawyers' report stated the following:

> On the face of the evidence uncovered so far, these acts appear to bear out at the very least serious offences of forgery and/or of falsification of accounts/documents under section 477A of Singapore's Penal Code. As these acts were intentional, there are reasons to suspect that they may have been carried out to conceal other misdeeds, such as cheating, criminal breach of trust, corruption and/or money laundering.

173.   On this news, shares of WCAGY fell $16.60 per share from the prior day's closing price of $83.24 (nearly 20%) to close at $66.64 per share on February 1, 2019. Shares of WRCDF fell $30.17 per share from the prior day's closing price of $164.05 (18.4%) to close at $133.88 per share on February 1, 2019.

SECOND AMENDED CLASS ACTION COMPLAINT

174.   On April 24, 2019, *The Financial Times* published another article entitled, "Wirecard relied on Three Opaque Partners for Almost All its Profit," reporting that "[h]alf of the worldwide revenue and almost all of the reported profits of Wirecard" have come from only three opaque partner companies in recent years. According to the article, Al Alam Solutions, a Dubai-based payments processor with skeletal operations, was the largest of the three "partner" entities, and a former Al Alam employee said the business had six or seven staff in total and "the boss" was Oliver Bellenhaus, a Wirecard executive. The other partners were PayEasy Solutions, a Philippine payments group that shares an office with a Manila bus company, and Singapore-based Senjo. The three companies allegedly contributed earnings before interest, tax, depreciation and amortisation of €290m on revenues of €541m.[49]

175.   The next day, on April 25, 2019, *The Financial Times* published an article entitled, "Wirecard seeks to put scandal behind it with results," reporting that Wirecard had announced that auditor E&Y signed off its 2018 accounts and that the supervisory board had agreed measures to improve its processes. According to the article, publication of full-year results had been delayed for three weeks after Wirecard disclosed that some employees may face criminal liability in the group's Singapore

---

[49] Dan McCrum, *Wirecard relied on three opaque partners for almost all its profit*, The Financial Times (Apr. 24, 2019), https://www.ft.com/content/a7b43142-6675-11e9-9adc-98bf1d35a056.

SECOND AMENDED CLASS ACTION COMPLAINT

unit, where it is embroiled in a police investigation into suspected forgery and fraudulent accounting.[50]

176.   On this news, shares of WCAGY fell $4.72 per share from the prior day's closing price of $75.90 (6.2%) to close trading at $71.18 per share on April 25, 2019. Shares of WRCDF fell $6.00 per share from the previous-day's closing price of $146.25 (4.1%) to close trading at $140.25 per share on April 25, 2019.

177.   On October 14, 2019, *The Financial Times* published an article entitled, "Wirecard's suspect accounting practices revealed," which cast further doubt on Wirecard's accounting practices.

178.   In response, shares of WCAGY fell $1.09 per share from the prior day's closing price of $78.29 (1.39%) to close trading at $77.20 per share on October 14, 2019. Shares of WRCDF fell $5.92 per share from the previous-day's closing price of $157.71 (5.92%) to close trading at $151.79 per share on October 14, 2019. The next day, shares continued to plummet, as shares of WCAGY fell another $9.83 per share (12.73%) to close trading at $67.37 per share on October 15, 2019. Shares of WRCDF fell $17.25 per share (11.36%) to close trading at $134.54 per share on October 15, 2019.

---

[50] Olaf Storbeck and Dan McCrum, *Wirecard seeks to put scandal behind it with results*, The Financial Times (Apr. 25, 2019), https://www.ft.com/content/9f6b4f70-671f-11e9-9adc-98bf1d35a056.

SECOND AMENDED CLASS ACTION COMPLAINT

179.   On November 6, 2019, *The Financial Times* published an article entitled, "KPMG widens review of Wirecard accounting," which reported on Wirecard's announcement that "a special audit by KPMG will be wider-ranging than previously announced, examining accusations from short-sellers about the German payment company's lending activities in Brazil and Turkey."[51]

180.   According to the article, in addition to reported suspicions that hundreds of millions of euros in sales and profits at Wirecard businesses in Dubai and Dublin were fraudulent, KPMG would also look at Wirecard's use of a type of lending known as a "Merchant Cash Advance" — a type of loan designed to bridge the gap between when merchants process credit card payments and when they receive the money. Specifically, KPMG would look into the claims made by short seller MCA Mathematik that, while Wirecard claimed it had put €400m into making short-term loans to its customers, with many of them being located in Turkey and Brazil, filings made by Wirecard's Brazil subsidiary at the Brazil's central bank do not describe significant MCA lending. In Turkey, such advance cash loans to merchants were not legal, so it remains unclear where money for the loans had gone. Wirecard claimed

---

[51] Olaf Storbeck and Dan McCrum. *KPMG widens review of Wirecard accounting*, The Financial Times (Nov. 6, 2019), https://www.ft.com/content/e132cb98-0073-11ea-b7bc-f3fa4e77dd47.

SECOND AMENDED CLASS ACTION COMPLAINT

that KPMG had already started work on the special audit, which is expected to be concluded by March 2020.[52]

181.   On January 10, 2020, the Company announced that Wulf Matthias, Chairman of the Supervisory Board of Wirecard AG, "has resigned in today's Board Meeting as Chairman of the Supervisory board for personal reasons."[53] The same day, *Bloomberg* published an article entitled, "Wirecard Chairman Resigns in Midst of Accounting Controversy," reporting that Matthias "resigned after months of controversy over the digital payments company's accounting practices," and had "faced a battle to calm investors rattled by reports of accounting irregularities. According to Neil Campling, an analyst at Mirabaud Securities, "[t]he role of the supervisory board, which Matthias chaired, "is key," especially in Wirecard's case. KPMG, which has been commissioned to perform an independent special audit on the back of the allegations, is accountable only to the supervisory board, he said. Supervisory boards in Germany play an important role as they are formed of shareholders and employee representatives, who oversee the management and approve major business decisions.[54]

---

[52] *Id.*

[53] Press Release, Wirecard, Change at the top of the Supervisory Board of Wirecard AG: Wulf Matthias resigns from the chair of the committee (Jan. 10, 2020), https://www.wirecard.com/en-us/company/press-releases/change-at-the-top-of-the-supervisory-board-of-wirecard-ag.

[54] Nico Grant *et al.*, *Wirecard Chairman Resigns in Midst of Accounting Controversy*, Bloomberg Technology (Jan. 10, 2020, 2:46 PM),

SECOND AMENDED CLASS ACTION COMPLAINT

182.   *Bloomberg* also noted Wirecard's revenue soared in 2018 after it bought more than 15 companies in a few years, allegations of accounting fraud at Wirecard in Singapore and other Asian countries, the R&T investigation, and *The Financial Times*' report in October 2019 that "payments processed by a Dubai-based partner company in 2016 and 2017 may not have taken place." Neil Campling also stated, "The more we dig on Wirecard, the more disturbing it looks," according to the article.

183.   On April 28, 2020, KPMG reported that its investigation into Wirecard's practices had been obstructed by both Wirecard and its third party partners, and it was unable to trace or verify any of the underlying transactions for 2016 to 2018, the period it was investigating. According to KPMG, the Company's third-party partners refused to cooperate, rendering KPMG unable to confirm whether the Company's reported sales revenue existed or was correct.[55] Moreover, KPMG also reported that "Bank statements that prove the receipt of payments of about €1bn at escrow agent 1, were not submitted to us," and that its investigators "have not been able to conclusively assess the reliability of the bank confirmations" sent to Wirecard's

---

https://www.bloomberg.com/news/articles/2020-01-10/wirecard-chairman-resigns-in-midst-of-accounting-controversy.

[55] Paul J. Davies, *Wirecard Shares Tumble as Questions Remain After Special Audit*, The Wall Street Journal (Apr. 28, 2020), https://www.wsj.com/articles/wirecard-tumbles-as-questions-remain-after-special-audit-11588071316.

SECOND AMENDED CLASS ACTION COMPLAINT

longstanding auditor, E&Y. In some cases, KPMG had to rely on screenshots instead of original documents.[56]

184.   In the hours following the release of the KPMG report, analysts and journalists quickly noted the report's alarming adverse findings. Most critically, KPMG was unable to verify over $1 billion in transactions with third parties due to Wirecard's apparent refusal or inability to provide relevant data.[57] KPMG's examination of the third party business is still ongoing, and the publication of Wirecard's annual results was postponed once again.[58] KPMG encountered delays and obstacles to the investigation, including "an absence of original documents such as bank records, a 'significant delay' in accessing material and difficulty in securing interviews with key Wirecard employees."[59] One analyst described the report as "anything but a clean bill of health," and added that the years 2016 to 2018 "remain a black hole" that left Wirecard "wide open to further allegations."[60] The same day, on

---

[56] Olaf Storbeck and Dan McCrum, *KPMG unable to verify Wirecard's third-party profits*, The Financial Times (Apr. 28, 2020), https://www.ft.com/content/56a2057c-b975-4965-b0cf-641b83ee0f82.

[57] Sarah Syed and Eyk Henning, *Wirecard Says KPMG Could Not Review All Data for Audit*, Bloomberg (Apr. 28, 2020), https://finance.yahoo.com/news/wirecard-says-kpmg-could-not-061125248.html [ECF No. 74-9].

[58] Olaf Storbeck and Dan McCrum, *KPMG unable to verify Wirecard's third-party profits*, Financial Times (Apr. 28, 2020), https://www.ft.com/content/56a2057c-b975-4965-b0cf-641b83ee0f82 [ECF No. 74-10].

[59] *Id.*

[60] Patricia Uhlig, Hans Seidenstuecker and Aradhana Aravindan, *Wirecard Shares Crash 26% After Critical KPMG Audit*, The New York Times (Apr. 28, 2020),

SECOND AMENDED CLASS ACTION COMPLAINT

April 28, 2020, a prominent investor published an open letter to Wirecard's supervisory board stating that KPMG's inability to verify Wirecard's financial statements raised additional questions over management's compliance with anti-money laundering and know-your-customer laws, and called for the removal of CEO Markus Braun.[61]

185.   As a result of the foregoing, shares of WCAGY fell $17.13 from the prior day's closing price of $71.71 (17.13%) to close trading at $54.58 per share on April 28, 2020 and another $4.91 per share (9.00%) to close trading at $49.67 per share on April 29, 2020. Shares of WRCDF fell $35.75 from the prior day's closing price of $140.79 (25.39%) to close trading at $105.04 per share on April 28, 2020 and another $5.04 per share (4.80%) to close trading at $100.00 per share on April 29, 2020.

186.   On May 4, 2020, Braun publicly rejected calls for him to step aside. In an apparent concession that the Company's internal controls were grossly deficient, the Braun announced nine projects to improve "global internal control systems including how it reports and punishes compliance violations and dealings with business partners." Among the changes announced were a boosting of staff in the Company's

---

https://www.nytimes.com/reuters/2020/04/28/technology/28reuters-wirecard-auditor-report.html [ECF No. 74-11].

[61] Chris Hohn and Max Schroeder, Letter: *Audit of Wirecard by KPMG*, TCI Fund Management Limited (Apr. 28, 2020), https://www.tcifund.com/files/corporateengageement/wirecard/TCI%20-%20Letter%20to%20Wirecard%2028%20April%202020.pdf [ECF No. 74-12].

SECOND AMENDED CLASS ACTION COMPLAINT

compliance department to 160 from 100, and a move away from doing business with third-party business partners, which process payments in countries where Wirecard has no license to operate.[62] On the same day, an analyst called the audit report "mostly a disaster" as it "failed to conclusively rule out any balance sheet manipulation at Wirecard and instead contained some crushing language regarding transparency and cooperation."[63]

187.   On this news, shares of WCAGY fell $1.16 per share from the prior day's closing price of $48.95 (2.36%) to close trading at $47.79 per share on May 4, 2020. Shares of WRCDF fell $2.64 per share from the previous-day's closing price of $101.25 (2.61%) to close trading at $98.61 per share on May 4, 2020.

188.   On May 11, 2020, *Reuters* reported that a Munich court is planning to drop proceedings against British short seller Fraser Perring for suspected manipulation of Wirecard's share price. The investigation into Perring was launched in 2016 after Wirecard's stock plummeted after Perring's Zatarra Research accused the company of misleading accounting and fraud.[64] The case essentially ended Wirecard's long-

---

[62] Eyk Henning, Sarah Syed, and Jan-Patrick Barnert, *Wirecard CEO Resists Calls to Quit, Plans Business Overhaul*, Bloomberg (May 4, 2020), https://www.bloomberg.com/news/articles/2020-05-04/wirecard-ceo-resists-calls-to-quit-plans-to-overhaul-business.

[63] Stefan Redlich, *Wirecard Bombs Again Following A Devastating KPMG Special Audit Report*, Seeking Alpha (May 4, 2020), https://seekingalpha.com/article/4342613-wirecard-bombs-again-following-devastating-kpmg-special-audit-report.

[64] Joern Poltz, Doug Busvine, and Tom Sims, *Munich court to drop case against*

SECOND AMENDED CLASS ACTION COMPLAINT

standing defense that critiques of its accounting practices were mere schemes by short sellers.

189.   On this news, shares of WCAGY fell $1.41 per share from the prior day's closing price of $50.91 (2.77%) to close trading at $49.50 per share on May 11, 2020. Shares of WRCDF fell $7.98 per share from the previous-day's closing price of $104.00 (7.67%) to close trading at $96.02 per share on May 11, 2020.

190.   On June 18, 2020, Wirecard announced that its auditor, Ernst & Young GmbH, informed the Company that EUR 1.9 billion ($2.1 billion) (approximately a quarter of the Company's consolidated balance sheet total could not be accounted for, and that as result, the audit of its 2019 annual and consolidated financial statements would be postponed indefinitely.[65]

191.   On this news, shares of WCAGY fell $38.30 per share from the prior day's closing price of $58.50 (65.47%) to close trading at $20.20 per share on June 18, 2020. Shares of WRCDF fell $71.47 per share from the previous-day's closing price of $113.29 (71.47%) to close trading at $41.82 per share on June 18, 2020.

_____

*British short seller over Wirecard shares*, Reuters (May 11, 2020), https://www.reuters.com/article/us-wirecard-shortsale/munich-court-to-drop-case-against-british-short-seller-over-wirecard-shares-idUSKBN22N1Y4.

[65] Press Release, Wirecard, Wirecard AG: Date for publication of annual and consolidated financial statements 2019 delayed due to indications of presentation of spurious balance confirmations (June 18, 2020), https://ir.wirecard.com/websites/wirecard/English/5110/news-detail.html?newsID=1984117&fromID=1000.

SECOND AMENDED CLASS ACTION COMPLAINT

192.   The next day, on June 19, 2020, the Company issued a brief statement that Braun had resigned as CEO "with immediate effect" and that James Freis would take his place as interim CEO.[66] *CNN Business* similarly reported on the resignation, further reporting that if the missing $2 billion is "not found quickly, the digital payments firm may never recover."[67] Jasper Lawler, head of research at London Capital Group, reportedly stated that "Without a very concise explanation in short order, we fear Wirecard is headed to zero."[68]

193.   On this news, shares of WCAGY fell $6.45 per share from the prior day's closing price of $20.20 (31.93%) to close trading at $13.75 per share on June 19, 2020. Shares of WRCDF fell $14.22 per share from the previous-day's closing price of $41.82 (34.00%) to close trading at $27.60 per share on June 19, 2020.

194.   On June 22, 2020, Wirecard admitted that the $2 billion of cash on its balance sheet probably does "not exist," that it had previously mischaracterized its biggest source of profits, and that it was now trying to work out "whether, in which manner and to what extent such business has actually been conducted for the benefit of the company". The Company additionally withdrew its most recent financial results

---

[66] Charles Riley and Eoin McSweeney, *Wirecard CEO quits after $2 billion goes missing and fraud accusations fly*, CNN Business (June 19, 2020), https://www.cnn.com/2020/06/19/tech/wirecard-fraud-tech-accounting/index.html.

[67] Ryan Browne, *Wirecard CEO Markus Braun resigns as accounting scandal batters shares*, CNBC (June 19, 2020), https://www.cnbc.com/2020/06/19/wirecard-ceo-markus-braun-resigns-as-company-share-price-collapses.html.

[68] *Id.*

SECOND AMENDED CLASS ACTION COMPLAINT

and said other years' accounts may be inaccurate.[69] As *The Wall Street Journal* reported the same day, the announcement left the Company, fighting for survival, as the Company began working to retain credit lines with lenders and cut costs or sell business lines to stay afloat, and its fall from grace would represent "one of the biggest corporate scandals in Europe" in years. Felix Hufeld, the president of BaFin, Germany's financial regulator, described Wirecard's situation as "a complete disaster."[70]

195.   Of particular note was the revelation that the missing (and likely fictitious) $2 billion was equivalent to all the net income Wirecard had reported over more than a decade, and that the three main third-party partner companies that supposedly provided a large share of Wirecard's reported revenue and the bulk of its profits for years may never have provided any business to the Company.[71]

196.   The same evening, then-former CEO Braun was arrested in Munich, following prosecutors' suspicion that Braun was inflating Wirecard's balance sheet

---

[69] Olaf Storbeck, Dan McCrum, and Stefania Palma, *Wirecard fights for survival as it admits scale of fraud*, Financial Times (June 22, 2020), https://www.ft.com/content/2581fda5-8c89-46b5-9acf-ba8a88d74d88.

[70] Paul J. Davies, *Wirecard Says Missing $2 Billion Probably Doesn't Exist*, The Wall Street Journal (June 22, 2020), https://www.wsj.com/articles/wirecards-missing-2-billion-probably-doesnt-exist-board-says-11592802732; *see also* Charles Riley, *Wirecard says missing $2 billion never existed. Its stock is down 85% in 3 days*, CNN Business (June 22, 2020), https://www.cnn.com/2020/06/22/tech/wirecard-missing-money/index.html.

[71] *Id.*

SECOND AMENDED CLASS ACTION COMPLAINT

and sales volume by faking income from transactions with so-called third-party acquirers, possibly in cooperation with other perpetrators, for the purpose of making the company appear financially strong and more attractive for investors and customers. Braun was granted bail of 5 million euros ($5.67 million) the following afternoon.[72] Wirecard also announced, without explanation, that it had terminated Jan Marsalek, its chief operating officer that it had previously suspended.[73]

197.   On this news, shares of WCAGY fell $6.35 per share from the prior day's closing price of $13.75 (46.18%) to close trading at $7.40 per share on June 22, 2020. Shares of WRCDF fell $12.45 per share from the previous-day's closing price of $27.6 (45.11%) to close trading at $15.15 per share on June 22, 2020.

198.   On June 24, 2020, multiple news reports announced that Wirecard's former chief operating officer, Defendant Jan Marsalek, was missing and may have travelled to the Philippines. Menardo Guevarra, the Philippine secretary of justice, reportedly announced an investigation into the Wirecard fraud by the Philippine National Bureau of Investigation.[74]

---

[72] Karin Matussek and Sarah Syed, *Former Wirecard CEO Braun arrested over missing cash scandal*, Accounting Today (June 23, 2020), https://www.accountingtoday.com/articles/former-wirecard-ceo-braun-arrested-over-missing-cash-scandal.

[73] Steve Goldstein, *Wirecard says it's terminated COO Marsalek*, MarketWatch (June 22, 2020), https://www.marketwatch.com/story/wirecard-says-its-terminated-coo-marsalek-2020-06-22.

[74] John Reed, Olaf Storbeck, and Stefania Palma, *Philippine authorities search for Wirecard's number two in fraud probe*, Financial Times (June 24, 2020),

SECOND AMENDED CLASS ACTION COMPLAINT

199.   On this news, shares of WCAGY fell $3.21 per share from the prior day's closing price of $10.06 (31.91%) to close trading at $6.85 per share on June 24, 2020. Shares of WRCDF fell $6.14 per share from the previous-day's closing price of $20.00 (30.70%) to close trading at $13.86 per share on June 24, 2020.

200.   On June 25, 2020,  just days after $2 billion was announced missing by its auditor, Wirecard filed for insolvency. The Company said in a statement that it had opened legal proceedings in Munich "due to impending insolvency and over-indebtedness."[75] At the time of filing, Wirecard reportedly owed creditors almost $4 billion, and the Company admitted that, with 1.3 billion euros ($1.5 billion) of loans due within a week, its survival as a going concern was "not assured."[76]

201.   On this news, shares of WCAGY fell $5.11 per share from the prior day's closing price of $6.85 (74.60%) to close trading at $1.74 per share on June 25, 2020. Shares of WRCDF fell $10.26 per share from the previous-day's closing price of $13.86 (74.03%) to close trading at $3.60 per share on June 25, 2020.

---

https://www.ft.com/content/fa01a04f-8f35-4219-9aff-58f4ba58fd34; *see also* Jörn Poltz and Karen Lema, *Philippines to investigate Wirecard's phantom billions*, Reuters (June 24, 2020), https://www.reuters.com/article/us-wirecard-accounts/former-wirecard-ceo-freed-on-bail-in-missing-billions-case-idUSKBN23V0Y2.

[75] Charles Riley, *Wirecard files for insolvency after ex-CEO arrested in $2 billion scandal*, CNN Business (June 25, 2020), https://www.cnn.com/2020/06/25/tech/wirecard-insolvency/index.html.

[76]  Arno Schuetze and John O'Donnell, '*The money's gone': Wirecard collapses owing $4 billion*, Reuters (June 25, 2020), https://news.yahoo.com/wirecard-files-insolvency-083819193.html.

SECOND AMENDED CLASS ACTION COMPLAINT

202.   The Class Period concludes on June 26, 2020, when news reports disclosed that U.K. financial regulators had frozen Wirecard's British operations (Wirecard Card Solutions), leaving consumers unable to use the Company's payment cards, and unable to access cash using Wirecard technology.[77,78] Visa Inc. and MasterCard Inc. were also reportedly considering revoking Wirecard AG's ability to process payments on their networks.[79]

203.   At the same time, E&Y, which audited Wirecard for a decade, was facing increased scrutiny for its failure to conduct routine audit procedures that would have revealed the fraud earlier. Among its scrutinized actions was E&Y's failure for more than three years to request crucial account information from a Singapore bank where Wirecard claimed it had up to €1bn in cash — a routine audit procedure that could have uncovered the vast fraud at Wirecard.[80] The German shareholders' association

[77] Paul J. Davies and Caitlin Ostroff, *U.K. Regulators Suspend Wirecard's British Operations*, The Wall Street Journal (June 26, 2020), https://www.wsj.com/articles/regulators-suspend-wirecards-british-operations-11593176858.

[78] Kevin Peachey, *Wirecard: Cardholders' money locked as FCA freezes UK subsidiary*, BBC News (June 26, 2020), https://www.bbc.com/news/business-53198409.

[79] Sarah Syed, Jennifer Surane, and Steven Arons, *Visa, Mastercard Weigh Cutting Wirecard Ties After Scandal*, BloombergQuint (June 26, 2020), https://www.bloombergquint.com/business/visa-mastercard-weigh-cutting-ties-with-wirecard-after-scandal.

[80] Olaf Storbeck, Tabby Kinder, and Stefania Palma, *EY failed to check Wirecard bank statements for 3 years*, The Financial Times (June 26, 2020), https://www.ft.com/content/a9deb987-df70-4a72-bd41-47ed8942e83b.

SECOND AMENDED CLASS ACTION COMPLAINT

SdK announced that it had filed a criminal complaint against auditors at E&Y, targeting two current employees and one former employee of E&Y.[81]

204.   On this news, shares of WCAGY fell $0.95 per share from the prior day's closing price of $1.74 (54.60%) to close trading at $0.79 per share on June 26, 2020. Shares of WRCDF fell $2.00 per share from the previous-day's closing price of $3.60 (55.56%) to close trading at $1.60 per share on June 26, 2020.

205.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## IX.   E&Y'S DEFICIENT AUDIT AND ROLE IN THE SCHEME

206.   Wirecard was only able to successfully perpetrate its massive accounting scheme because of E&Y's either knowing complicity, or egregious refusal to see the obvious or to investigate the doubtful. As described by *The Financial Times*, E&Y's prestige and reputation was instrumental in convincing investors that Wirecard's reported financial results were legitimate:[82]

> For a decade, EY's reputation as one of the Big Four worldwide accountancy and auditing firms has helped to rebuff criticism of Wirecard's accounts and business

---

[81] Ryan Browne, *Wirecard auditors face legal action after collapse of scandal-hit payments firm*, CNBC (June 26, 2020), https://www.cnbc.com/2020/06/26/wirecard-investor-group-files-criminal-complaint-against-ey-auditors.html.

[82] Dan McCrum, *Wirecard's Suspect Accounting Practices Revealed*, The Financial Times (Oct. 15, 2019), https://www.ft.com/content/19c6be2a-ee67-11e9-bfa4-b25f11f42901.

-84-

SECOND AMENDED CLASS ACTION COMPLAINT

practices. Its signature on the financial statements in April this year helped to convince many investors that Mr Braun's decision to minimise the Singapore accounting scandal — first reported by the FT — was credible.

207.   E&Y's audit procedures and practices were so deficient that their audits of Wirecard's 2015-2018 reported financial results amounted to an egregious refusal to see the obvious or to investigate the doubtful. E&Y's auditing judgments were such that no reasonable accountant would have made the same decisions if confronted with the same facts, causing the "audits" to be entirely worthless and amount to no audit at all.

208.   E&Y, which audited Wirecard for a decade, has faced increased scrutiny for its failure to conduct routine audit procedures that would have revealed the fraud earlier. Among its scrutinized actions was E&Y's failure for more than three years to request crucial account information from a Singapore bank where Wirecard claimed it had up to €1bn in cash — a routine audit procedure that could have uncovered the vast fraud at Wirecard. The German shareholders' association SdK announced that it had filed a criminal complaint against auditors at E&Y, targeting two current employees and one former employee of E&Y.

209.   E&Y audited Wirecard's financial statements for the years ended December 31, 2015 through December 31, 2018.

210.   E&Y's opinion letters stated that it had conducted its audits in accordance with German generally accepted standards for the audit of financial statements

-85-

SECOND AMENDED CLASS ACTION COMPLAINT

promulgated by the Institut der Wirtschaftsprüfer [Institute of Public Auditors in

Germany] (IDW) and International Auditing Standards "IAS"). The IAS refers to

standards established by the International Auditing and Assurance Standards Board,

which functions as an independent standard setting body under the auspices of the

International Federation of Accountants ("IFAC"). IFAC issues International

Standards on Auditing ("ISA"), which are similar to those issued by the American

Institute of Certified Public Accountants and the Public Company Accounting

Oversight Board.

211.   Each year, E&Y issued a "clean" unqualified report attesting to the

accuracy of Wirecard's financial statements.

212.   E&Y's audit opinions for at least the years ended December 31, 2015

through December 31, 2018 falsely stated that the firm's audits of Wirecard had been

conducted in accordance with German GAAS and IAS standards. Its representations

were false because, upon information and belief, E&Y did not plan and perform its

audits to obtain reasonable assurances that Wirecard's financial statements were free

of material misstatements, and did not examine evidence supporting the purported

bank balances and disclosures in the financial statements. E&Y's audits therefore did

not "provide a reasonable basis for [its] opinion" and, by stating to the contrary, the

opinions were entirely false.

213.    E&Y willfully, recklessly and/or grossly failed in its responsibility to confirm the accuracy of Wirecard's financial disclosures in at least the following respects:

a)      ISA 200 requires an auditor to plan and perform an audit with an attitude of professional skepticism, which is necessary for the auditor to identify and properly evaluate matters that increase the risk of material misstatements resulting from fraud or error (for example, management's characteristics and influence over the internal control environment, industry conditions, and operating characteristics and financial stability). Thus, representations by management would ordinarily be expected to be supported by other evidence and would not be assumed to be necessarily correct.

b)      Wirecard's claims of steadily increasing revenues and escalating cash balances should have been met with skepticism on the part of E&Y, but were not. One of the most basic tools employed by virtually every auditor of a company with significant cash balances is to obtain a confirmation of the existence and balances of the Company's bank. ISAS505, *External Confirmations*, recognizes that "the reliability of audit evidence is influenced by its source and by its nature, and is dependent on the individual circumstances under which it is obtained." Further, this auditing standard recognizes that "[a]udit evidence is more reliable when it is obtained from independent sources outside the entity" and "[a]udit evidence obtained directly by the auditor is more

-87-

reliable than audit evidence obtained indirectly or by inference." Accordingly, it was, at a minimum, reckless for E&Y to not obtain bank confirmations directly from the banks that Wirecard claimed held billions of Euros of its assets during the Class Period.

c)      Additionally, E&Y should have recognized a variety of "red flags" raised by the information it was receiving including, but not limited to: (i) dramatically increasing reported sales by Wirecard, primarily through partnerships between a small number of opaque and questionable TPAs with foreign Wirecard subsidiaries that were not audited by E&Y; (ii) corresponding dramatic increases in reported bank balances in odd locations such as the Philippines; (iii) increasing loan balances by the company despite its reported large cash balances; and d) the stockpiling of billions of dollars of Euros in a small bank in the Philippines.

214.   Despite these and other "red flags" that should have compelled E&Y to perform more extensive audit procedures under International Auditing Standards, it refused to perform even the simple and basic step of obtaining a confirmation of these highly questionable bank balances directly from the bank. This failure allowed Wirecard to perpetrate its accounting scheme and overstate its reported bank balances and revenues by at least €1.9 billion during the Class Period.

215.   E&Y failed, *inter alia*, (i) to exercise due professional care in the performance of the audits and the preparation of the reports; (ii) to obtain a level of

-88-

knowledge of Wirecard's business that would enable E&Y to plan and perform its audits in accordance with international auditing standards, including an understanding of the events, transactions, and practices that could have a significant effect on the financial statements; (iii) to properly study and evaluate Wirecard's internal controls; (iv) to obtain sufficient, competent evidential material to provide it with a reasonable basis for forming an opinion in each of its audits of Wirecard; and (v) to satisfy itself that the financial disclosures were adequate.

216.   E&Y knew or should have known that its clean audit reports were material to investors' decisions to purchase shares in Wirecard and to refrain from redeeming their investments. Shares of Wirecard were not publicly traded. Hence, no independently verified third-party financial information about Wirecard or their performance was available to investors or prospective investors in Wirecard other than E&Y's audit report and the audited financial statements.

## X.   APPLICABILITY OF PRESUMPTION OF RELIANCE

217.   Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that at all relevant times, WDI, WCAGY and WRCDF traded in an efficient market. The efficiency of the market for these securities may be established by the following facts, among others:

a)   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b)   the omissions and misrepresentations were material;

-89-

c)      the Company's securities are traded in efficient markets;

d)      the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

e)      WCAGY and WRCDF were actively traded as ADRs on the OTC Markets in the United States at prices that matched the contemporaneous trading price of Wirecard common stock on the FWB and other German markets. Both the FWB and the OTC Markets are highly efficient and automated markets;

f)      During the Class Period, Wirecard was followed by multiple analysts;

g)      Wirecard published its quarterly and annual reports, press releases, presentation materials, and other material information of significance to investors on its website, including contemporaneous English-language versions of materials submitted to regulators in Europe;

h)      the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

-90-

SECOND AMENDED CLASS ACTION COMPLAINT

i)    Unexpected material news about the Company was rapidly

reflected in and incorporated into the Company's stock price during the Class

Period.

218.   Information that affected the price of Wirecard's common stock affected

the price of WCAGY and WRCDF in the same manner and to the same extent. The

price of Wirecard's common (F) shares and ADRs traded on the OTC Markets in the

United States during the Class Period was based upon and moved in tandem with the

price of Wirecard's common stock traded on FWB. The price of WRCDF shares

generally tracks the currency-adjusted price of WDI common stock on the FWB

exchange. The price of WCAGY shares, which reflect an ownership interest in .5

shares of Wirecard's common stock, is generally one-half the currency-adjusted price

of Wirecard's common stock traded on the FWB. As a result, the same facts that

support the finding that the market for Wirecard common stock sold on the FWB in

Germany was efficient also support a finding that the market for Wirecard's common

stock sold on the OTC market in the United States was efficient. The price of both

WCAGY and WRCDF sold in the United States is linked to and moves in tandem with

the price of Wirecard WDI common stock on the Frankfurt exchange.

219.   Based upon the foregoing, Plaintiff and the members of the Class are

entitled to a presumption of reliance upon the integrity of the market.

220.   Alternatively, Plaintiff and the members of the Class are entitled to the

presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of*

SECOND AMENDED CLASS ACTION COMPLAINT

*the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## XI. LOSS CAUSATION & DAMAGES

221. Plaintiff and each member of the proposed Class suffered economic losses as a direct and proximate result of the misleading conduct alleged herein. Each Class member suffered similar injury as a result of: (i) their purchase of Wirecard securities at prices that were higher than they would have been had defendant made truthful and complete disclosures of information about the Company as necessary to prevent the statements, omissions, and course of business alleged herein from being materially false or misleading to investors; and (ii) their retention of those securities through the date of one or more declines in the market price of those shares that was caused by the revelation of facts, transactions, occurrences, or risks concealed from investors by defendant's scheme to defraud, including the actual or anticipated financial consequences of its concealed actions.

222. The fraudulent accounting and the other misrepresentations and omissions alleged herein caused shares of WCAGY and WRCDF to trade at prices higher than they would have during the Class Period had the Company disclosed accurate and truthful information about the financial condition, results, and operations of its business.

010821-11/1334135 V1

223.   The declines in the price of the Wirecard securities and resulting losses are directly attributable to the disclosure of information and materialization of risks that were previously misrepresented or concealed by the Defendants. Had Plaintiffs known of the material adverse information not disclosed by the Defendants or been aware of the truth behind their material misstatements, they would not have purchased the Wirecard securities at artificially inflated prices.

224.   As a result of their purchases of the Wirecard securities, Plaintiff suffered economic loss and damages, as contemplated by the federal securities laws.

A.   **Loss Causation is Demonstrated by the Revelation of Defendants' Fraud Through a Series of Corrective Disclosures**

225.   Loss causation is demonstrated when the truth behind Defendants' various false statements and material omissions was gradually revealed to the market in a series of corrective disclosures. When the truth about Defendants' misconduct was revealed through a series of disclosures including, but limited to, the following, the value of Wirecard securities declined precipitously as the prior artificial inflation no longer propped up the Company's prices:

a)   **Disclosures Regarding Allegations of Forged Contracts**. In response to the January 30, 2019 report by *The Financial Times* that a senior Wirecard official was suspected of using forged and backdated contracts to manipulate the Company's financial results, shares of WCAGY fell $8.54 per

-93-

SECOND AMENDED CLASS ACTION COMPLAINT

share or nearly 9% to close at $86.66 and shares of WRCDF fell $28.10 per share or nearly 15% to close at $161.90 per share. (*See* ¶¶ 169-70);

b) **Disclosure of Internal Investigation of Fraud**. In response to the February 1 2019 report by *The Financial Times* that a law firm retained by Wirecard found forgery and falsification of accounts in the Company's Singapore office, shares of WCAGY fell $16.60 per share (nearly 20%) and shares of WRCDF fell $30.17 (18.4%). (*See* ¶¶ 172-73);

c) **Disclosure of Wirecard's Accounting Practices**. In response to April 24, 2019 and April 25, 2019 news reports outlining Wirecard's questionable accounting practices, shares of WCAGY fell $4.72 per share (about 6.2%) and shares of WRCDF fell $6.00 per share (4.1%). (*See* ¶¶ 174-76);

d) **Further Disclosure of Accounting Practices and Internal Wirecard Documents**. In response to October 14, 2019 news reports casting further doubts upon Wirecard's accounting practices, along with internal Wirecard documents confirming these reports, shares of WCAGY fell $1.09 (about 1.4%) on October 14, 2019 and another $9.83 (12.73%) on October 15, 2019. Shares of WRCDF fell $5.92 (5.92%) on October 14, 2019 and another $17.25 (11.36%) on October 15, 2019. (*See* ¶¶ 177-78);

e) **Disclosure of KPMG Findings**. In response to KPMG's April 28, 2020 disclosures regarding its forensic investigation into Wirecard's accounting

-94-

policies, shares of WCAGY plunged on April 28, 2020 by $17.13 (17.13%) and another $4.91 (9.00%) on April 29, 2020. Shares of WRCDF dropped $35.75 on April 28, 2020 (25.39%) and another $5.04 (4.80%) on April 29, 2020 (*See* ¶¶ 183-85);

f)       **Disclosures of Additional Details Regarding Wirecard's False Accounting**. In response to further reporting on May 4, 2020 regarding Wirecard's false accounting and Defendant Braun's refusals to resign, shares of WCAGY fell $1.16 per share (2.36%) and shares of WRCDF fell $2.64 (2.61%) from a previous-day close of $101.25 to close at $98.61 per share on May 4, 2020. (*See* ¶¶ 186-87);

g)       **Disclosure of Rejection of Wirecard's "Short-seller" Claims**. In response to the May 11, 2020 disclosure that a Munich court had flatly rejected Wirecard's excuse that short-sellers were responsible for the Company's declining share price, shares of WCAGY fell approximately $1.41 per share (2.77%) and shares of WRCDF fell approximately $7.98 (7.67%). (*See* ¶¶ 188-89);

h)       **Disclosure of Missing Cash Balances**. In response to the June 18, 2020 disclosure by Wirecard that E&Y had informed the Company that EUR 1.9 billion of previously reported cash balances could not be accounted for, shares of WCAGY plummeted by $38.30 per share (65.47%) and shares of WRCDF fell $71.47 (71.74%). (*See* ¶¶ 190-91);

i)      **Disclosure of Defendant Braun's Resignation**. In response to Wirecard's June 19, 2020 disclosure of Defendant Braun's resignation as CEO on June 19, 2020, shares of WCAGY fell approximately $6.45 (31.93%) and shares of WRCDF fell $14.22 (34.00%). (*See* ¶¶ 192-93);

j)      **Disclosures Regarding Wirecard's Admission of Accounting Misstatements and Defendant Braun's Arrest**. In response to Wirecard's June 22, 2020 admissions that billions of Euros on its previously-reported balance sheets "probably did not exist" and its withdrawal of previously reported financial results and Defendant Braun's arrest, shares of WCAGY fell $6.35 per share (46.18%) and shares of WRCDF fell $12.45 (45.11%). (*See* ¶¶ 194-96);

k)      **Disclosures Regarding Defendant Marsalek**. In response to June 24, 2020 news reports that Defendant Marsalek was "missing," and may have travelled to the Philippines, shares of WCAGY fell $3.21 (31.91%) and shares of WRCDF fell $6.14 (30.70%). (*See* ¶¶ 198-99);

l)      **Disclosures Regarding Wirecard's Bankruptcy**. In response to Wirecard's June 25, 2020 disclosure that it had filed for insolvency, shares of WCAGY fell $5.11 (74.6%) and shares of WRCDF fell $10.26 (74.03%). (*See* ¶¶ 200-01);

m)      **Disclosures Regarding UK Regulator's Freeze of Wirecard Operations.** In response to disclosures that U.K. financial regulators had frozen

-96-

Wirecard's British operations, shares of WCAGY fell $0.95 (54.60%) and shares of WRCDF fell $2.00 (55.56%) on June 26, 2020. (*See* ¶¶ 202-04)

226.   These declines in the prices of the Wirecard securities immediately following corrective disclosures were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to Plaintiff and other investors. The timing and magnitude of the price declines negates any inference that the losses suffered by Plaintiff were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

**B.     Alternatively, Loss Causation is Demonstrated by the Materialization of Concealed Risks**

227.   Alternatively, loss causation can be demonstrated by the materialization of the risks concealed by Defendants' misconduct. At the time of each of Plaintiff's purchases, the price of the Wirecard ADRs were artificially inflated as a result of: (i) Defendants' undisclosed widespread bribery and kickback scheme which was unlawful, and hence inherently unstable; and (ii) Defendant CNO's materially false financial statements.

228.   Defendants' false statements served to conceal the risks that the Defendants' preparation and dissemination of false financial statements would become publicly available.

SECOND AMENDED CLASS ACTION COMPLAINT

229.   It was foreseeable that the public exposure of Wirecard's accounting and financial reporting scheme would lead to negative financial and legal consequences to Defendants, including: (i) ratings agency downgrades; (ii) deteriorating liquidity and bankruptcy; (iii) regulatory investigations; (iv) criminal prosecutions of Wirecard and/or its employees; (v) withdrawal of previously issued financial reports; and (vi) the inability to complete and timely file required financial statements. The materialization of any one or more of these factors would lead to a significant decline in the price of Wirecard securities.

230.   The value of Plaintiff's investments in Wirecard securities was negatively impacted when the concealed risks materialized in at least, but not limited to, the following respects:

a)   **Ratings agency downgrades**: (¶ 16);

b)   **Adverse publicity and reputational damage**: (¶¶ 169, 172, 174-75, 179, 183-84, 186, 194);

c)   **Whistleblower activity:** (¶¶ 169);

d)   **Deteriorating liquidity**: (¶¶ 194, 200);

e)   **Regulatory investigations**: (¶¶ 175, 198, 202-03);

f)   **Employee Resignations or firings**: (¶¶ 181, 192, 196);

g)   **Criminal prosecutions**: (¶¶ 175; 196);

h)   **Withdrawal of Previously Reported Financial Results** (¶ 194); and

-98-

010821-11/1334135 V1

i)    <u>**Inability to complete and timely file required financial**</u>

<u>**statements**</u>: (¶¶ 175, 190).

## XII.   PLAINTIFF'S CLASS ACTION ALLEGATIONS

231.   Plaintiff brings this action as a class action pursuant to Federal Rule of

Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons and

entities other than Defendants who purchased shares of WCAGY and WRCDF on the

OTC Market between August 17, 2015 through June 26, 2020, both dates inclusive

(the "Class Period"). Excluded from the Class are Defendants herein, the officers and

directors of the Company, at all relevant times, members of their immediate families

and their legal representatives, heirs, successors or assigns and any entity in which

Defendants have or had a controlling interest.

232.   The members of the Class are so numerous that joinder of all members is

impracticable. Throughout the Class Period, the Company's securities were actively

traded OTC. While the exact number of Class members is unknown to Plaintiff at this

time and can be ascertained only through appropriate discovery, Plaintiff believes that

there are hundreds or thousands of members in the proposed Class. Record owners and

other members of the Class may be identified from records maintained by the

Company or its transfer agent and may be notified of the pendency of this action by

mail, using the form of notice similar to that customarily used in securities class

actions.

SECOND AMENDED CLASS ACTION COMPLAINT

233.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

234.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

235.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

      a)     whether Defendants' acts as alleged violated the federal securities laws;

      b)     whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

      c)     whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

      d)     whether the Individual Defendants caused the Company to issue false and misleading quarterly and annual reports and public statements during the Class Period;

-100-

e) whether Defendants acted knowingly or recklessly in issuing false and misleading quarterly and annual reports and public statements during the Class Period;

f) whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

g) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

236.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XIII. CLAIMS FOR RELIEF

### COUNT I

#### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
#### Against Defendant Wirecard and the Individual Defendants

237.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

-101-

SECOND AMENDED CLASS ACTION COMPLAINT

238.   This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

239.   During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

240.   The Company and the Individual Defendants violated § 10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

241.   The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or

-102-

SECOND AMENDED CLASS ACTION COMPLAINT

dissemination of such statements or documents as primary violations of the securities laws. These Defendants, by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

242.   Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

243.   As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

SECOND AMENDED CLASS ACTION COMPLAINT

244.   Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

245.   As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

246.   By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act
### Against The Individual Defendants

247.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

248.   During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their

SECOND AMENDED CLASS ACTION COMPLAINT

senior positions, they knew the adverse non-public information regarding the

Company's business practices.

249.   As officers and/or directors of a publicly owned company, the Individual

Defendants had a duty to disseminate accurate and truthful information with respect to

the Company's financial condition and results of operations, and to correct promptly

any public statements issued by the Company which had become materially false or

misleading.

250.   Because of their positions of control and authority as senior officers, the

Individual Defendants were able to, and did, control the contents of the various

reports, press releases and public reports and/or filings which the Company

disseminated in the marketplace during the Class Period. Throughout the Class Period,

the Individual Defendants exercised their power and authority to cause the Company

to engage in the wrongful acts complained of herein. The Individual Defendants

therefore, were "controlling persons" of the Company within the meaning of Section

20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct

alleged which artificially inflated the market price of the Company's securities.

251.   Each of the Individual Defendants, therefore, acted as a controlling

person of the Company. By reason of their senior management positions and/or being

directors of the Company, each of the Individual Defendants had the power to direct

the actions of, and exercised the same to cause, the Company to engage in the

unlawful acts and conduct complained of herein. Each of the Individual Defendants

exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

252.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## COUNT III

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Against Ernst & Young GmbH

253.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

254.   During the Class Period, E&Y carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did: (1) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (2) cause Plaintiffs and other members of the Class to purchase Wirecard securities at artificially inflated and distorted prices. In furtherance of this unlawful scheme, plan and course of conduct, E&Y issued knowingly false audit reports during the Class Period. E&Y's accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts.

255.   E&Y, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to misrepresent the true financial condition or Wirecard and conceal adverse material information about the business, operations and future prospects of Wirecard as specified herein.

256.   E&Y employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Wirecard's value, performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Wirecard and its business operations and financial condition in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Wirecard securities during the Class Period.

257.   E&Y had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that failed to ascertain and to disclose such facts, even though such facts were available to them. E&Y's material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Wirecard's financial condition from the investing public and supporting the artificially inflated price of its securities.

-107-

010821-11/1334135 V1

As demonstrated by E&Y's false and misleading statements during the Class Period, E&Y, if it did not have actual knowledge of the misrepresentations and omissions alleged, was highly reckless in failing to obtain such knowledge by failing to take steps necessary to discover whether those statements were false or misleading.

258.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price for Wirecard's securities was artificially inflated during the Class Period.

259.   In ignorance of the fact that market prices of Wirecard's publicly-traded securities were artificially inflated or distorted, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which Wirecard's securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by defendants during the Class Period, Plaintiffs and the other members of the Class acquired Wirecard securities during the Class Period at artificially high prices and were damaged thereby.

260.   At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding Wirecard's financial results and condition, Plaintiffs and other members of the Class would not have purchased or otherwise acquired Wirecard securities, or, if

SECOND AMENDED CLASS ACTION COMPLAINT

they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices or distorted prices at which they did.

261.   By virtue of the foregoing, E&Y has violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

262.   As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of Wirecard's securities during the Class Period.

## XIV.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## XV.   DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

-109-

SECOND AMENDED CLASS ACTION COMPLAINT

010821-11/1334135 V1

DATED: August 14, 2020

HAGENS BERMAN SOBOL SHAPIRO LLP

By: ___/s/ *Reed R. Kathrein*_____
Reed R. Kathrein (139304)
Danielle Smith (291237)
Lucas E. Gilmore (250893)
715 Hearst Avenue, Suite 202
Berkeley, CA  94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
reed@hbsslaw.com
danielles@hbsslaw.com
lucasg@hbsslaw.com

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com

*Counsel for Lead Plaintiff Lawrence Gallagher*

SECOND AMENDED CLASS ACTION COMPLAINT
010821-11/1334135 V1